**THE INSTITUTE FOR JUSTICE**
Joseph Gay*
jgay@ij.org
Robert Frommer*
rfrommer@ij.org
901 N. Glebe Rd. Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd. Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

* Admitted *pro hac vice*

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Ste. 300
Santa Monica, California 90401
Tel. (424) 258-5190

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **DONALD LEO MELLEIN,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA; and Federal Bureau of Investigation Special Agents LYNNE ZELLHART, NATHAN CHERNEY, KAARE MATHISON, ALLEN GROVE, CHRISTINA CLYBURN, and BLAIRE FULCHER, in their individual capacities,**<br><br>Defendants. | Case No. 2:23-cv-07970-RGK-MAR<br><br><br>**FIRST AMENDED COMPLAINT** |

**INTRODUCTION**

1.      When the government takes someone's personal property, it should be responsible for keeping it safe. Yet all too often, government officials take people's property—to forfeit, to use as evidence, or simply because they can—and when the government's asserted need for the property ends, the government fails to return the property, in whole or in part.

2.      That's what happened to Plaintiff Donald Mellein. The government broke into Don's safe-deposit box at U.S. Private Vaults (USPV) in Beverly Hills, California, which he used to store part of his retirement savings, including cash, a gold bar, and 110 gold coins. Without any evidence that Don had done anything wrong, the government tried to administratively forfeit the gold bar and cash. The government eventually abandoned its unjustified forfeiture attempt and tried to return the property. But by that time, the gold coins in Don's box had disappeared.

3.      Don's problems began on March 22, 2021, when the FBI raided USPV's business premises based on suspicion that the business itself had committed various crimes. The FBI's warrant application stated that by seizing USPV's property, the FBI would end up with custody of the individual safe-deposit boxes, too. And to address the obvious constitutional concerns that presented, the FBI promised the magistrate judge in its warrant application that the FBI would "preserve the property for safekeeping" and return the property to the rightful owners.

4.      But the FBI also had a separate plan—concealed from the magistrate judge who approved the warrant—to administratively forfeit all boxes containing property worth at least $5,000 (the FBI's minimum threshold for profitability), and to conduct investigatory searches of the boxes for evidence to support the forfeitures. These investigatory searches demanded significant time and effort—for instance, running all cash by drug-sniffing dogs and documenting agents' notes and observations to use in later forfeiture proceedings. The resulting time crunch left

agents scrambling to search each box as quickly as possible so they could move on to the next one.

5.      This wasn't just an egregious violation of the boxholders' Fourth Amendment rights. It also left little time for complying with the government's promises to safeguard the boxes and return the contents to the owners. The purported point of opening the boxes was to create "inventories" of the contents that would protect them against loss or theft. But in the dash to process each box as quickly as possible, the agents often didn't even take the time to carefully check for and protect all the valuable property in the box, once they confirmed that the contents were worth more than $5,000 and therefore subject to forfeiture. And the resulting "inventories" they created were all but useless, describing property worth anywhere from a few dollars to a million dollars with vague terms like "miscellaneous coins." In the rush to finish, it was inevitable that valuable property would go missing, never to be returned to the rightful owners.

6.      After the FBI abandoned its efforts to forfeit Don's property, it returned his cash and gold bar. But it didn't return his 110 gold coins. After he filed an earlier lawsuit, represented by different counsel, the government "found" 47 of his coins. But it never returned the remaining 63 gold coins, which were worth $123,419. And it told him that his earlier lawsuit couldn't challenge the missing coins until he filed an administrative claim with the government first.

7.      Don therefore dismissed his earlier lawsuit without prejudice and filed an administrative claim with the FBI, explaining when and how he had purchased his gold coins, that he was storing them in his USPV box up until the USPV raid, and that the FBI had not returned 63 of the coins. Adding insult to injury, however, the FBI denied any responsibility, disingenuously stating that there was "no evidence of negligence or wrongful acts on the part of any FBI employee."

8.      That's wrong. Don's gold coins were completely secure until FBI agents broke open the safe-deposit box looking for property that could be forfeited.

FIRST AMENDED COMPLAINT

Their disappearance can only be explained by the acts or omissions of the FBI agents who broke into the box and rummaged through it. The FBI never should have broken into the safe-deposit boxes in the first place but, once it did, it became responsible for returning everything it had custody of, unless it had a lawful reason to keep it.

9.     Don is entitled to have his gold coins returned, or to be reimbursed for their loss, regardless of whether he can prove that some FBI employee did something wrong or was negligent. Whatever the reason for the coins disappearing, the government is responsible for either returning the coins to Don or compensating him for what it took.

10.     This lawsuit therefore seeks to hold the government to its word. The government promised that it would safeguard and return the property it took from the USPV safe-deposit boxes. It should be accountable for taking Don's property and not giving it back.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346(b)(1), 1367, 2201, and 2202.

12.     Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1402(b) and 1391(e)(1).

## PARTIES

13.     Plaintiff Donald Leo Mellein is a retired civil servant residing in Los Angeles County, California. At USPV's Beverly Hills facility, Don and his wife rented a safe deposit box in which they placed cash, a gold bar, and 110 gold coins, as well as various personal documents.

14.     Defendant United States of America (the "United States" or the "government") is the national federal government established by the U.S. Constitution. It is liable for the acts of its officials under the Federal Tort Claims

Act, 28 U.S.C. §§ 1346, 2671–80. References to conduct by the United States include acts taken by its agents and employees.

15.     Defendant Lynne Zellhart is a special agent with the Federal Bureau of Investigation who is responsible for the acts, violations, and injuries alleged in this action. She spearheaded the government's secret plan to break into the USPV safe-deposit boxes in violation of the Fourth Amendment. Among other conduct, she made representations to the magistrate judge and to boxholders about safeguarding the property so it could be returned to the rightful owners; led the development of the secret plan to seize and forfeit boxes containing property worth more than $5,000 and to conduct investigatory searches for evidence to support the forfeitures; created specialized procedures to conduct the investigatory searches of the boxes at the expense of safeguarding their contents; and directly supervised the process of breaking into the USPV boxes, conducting investigatory searches of the contents, seizing the contents for forfeiture, and eventually returning (or failing to return) the contents to the boxholders.

16.     Defendants Nathan Cherney, Kaare Mathison, Allen Grove, Christina Clyburn, and Blaire Fulcher (the "Search Defendants") are agents of the Federal Bureau of Investigation who are also responsible for the acts, violations, and injuries alleged in this action. Among other conduct, the FBI's documentation of its search indicates that Defendants Cherney and Mathison conducted the search of Plaintiff's USPV safe-deposit box and logged the "evidence" they collected from the box; Defendant Grove assisted with the search and witnessed the collection and logging of valuable items; Defendant Clyburn helped to collect and log the evidence they collected from the box; and Defendant Fulcher assisted with the search and helped to process and document the collection of the evidence. In these roles, the Search Defendants were entrusted with safeguarding the contents, including the gold coins stored in the box, so that they could be safely returned to Plaintiff.

17.     The Search Defendants, together with Defendant Zellhart, are referred to collectively as the "Individual Defendants." They are sued in their individual capacities under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), and California statutory and common law. The acts, violations, and injuries for which they are responsible in this action also form the basis for liability of the United States of America under the Federal Tort Claims Act.

## FACTUAL ALLEGATIONS

### Don Deposited His Personal Property With USPV

18.     USPV is a corporation that operated a safe-deposit-box facility at 9182 West Olympic Blvd., Beverly Hills, California.

19.     USPV's Beverly Hills facility housed about 1,400 safe-deposit boxes in its vault.

20.     USPV safe-deposit-box service provided renters with several advantages over traditional banks. It had better hours of operation than most banks, and customers could access the outer vault themselves using biometric data (like an iris scan) rather than having to wait for a USPV employee to assist them.

21.     USPV also provided enhanced security and privacy. For example, all the keys for USPV's safe deposit boxes are left in customers' hands, so USPV and its employees cannot access its customers' safe-deposit boxes without their knowledge.

22.     On or about September 2017, Don rented safe-deposit box number 224 at USPV.

23.     This created a relationship between Don as bailor and USPV as the bailee. As bailee, USPV had duties under California law to safeguard Don's property and was liable for the failure to return his property when required to do so.

24.     Additionally, as part of the contract between USPV and Don, USPV agreed to provide complete and total security for the contents of Don's safe-deposit

box and to be liable for loss of, theft of, or unauthorized access to the contents of the box.

25.     For many years, Don stored his property in a safe-deposit box at Wells Fargo. Due to concerns about banking instability, Don chose to rent a safe-deposit box at USPV and move his property there because he believed it would be safer. He also liked that USPV had a convenient location.

26.     Don trusted and expected USPV to safeguard his property. He had every impression that USPV was a trustworthy, legitimate business.

27.     Don used his box to store part of his retirement savings, including cash, a gold bar, and 110 gold coins. He also stored copies of personal documents.

28.     Don and his wife had purchased the gold coins largely from the proceeds of selling their home in Malibu in 2002. On or about January 5, 2005, they purchased 30 Canadian Maple Leaf gold one-ounce coins. Around late March 2006, they purchased 60 American Eagle gold one-ounce coins. And on or about May 5, 2008, they purchased 20 American Eagle gold one-ounce coins.

29.     Consistent with USPV's recommendation, Don also placed his contact information, as well as information identifying his beneficiaries, on top of the interior sleeve of his box. The remaining contents of his box were contained within that interior sleeve.

30.     Don was current on the lease payment for his USPV safe-deposit box as of March 22, 2021.

31.     Don visited his box at USPV three or four times a year. He last visited his box and viewed the contents in about January 2021. At that time, in addition to other property, the box contained his gold coins, stacked neatly in plastic tubes, and placed at the back of his box.

32.     As of March 22, 2021, Don's USPV safe-deposit box contained cash, a gold bar, 110 gold coins, and personal documents, such as receipts for the gold purchases.

FIRST AMENDED COMPLAINT

**The Government And Defendant Zellhart Obtain A Warrant To Seize USPV's Nest Of Safe-Deposit Boxes By Promising To Safeguard The Contents**

33.     On March 9, 2021, the United States indicted USPV, the company, for money laundering and drug trafficking.

34.     On March 17, 2021, the government applied to a magistrate judge for a warrant to search USPV's business premises and to seize certain business property owned by USPV. Defendant Zellhart had been in charge of drafting the affidavit for the warrant application and ultimately swore under oath that it was true.

35.     In the application, Defendant Zellhart made representations under oath to the magistrate judge about how the government would conduct the search.

36.     One item the warrant application requested permission to seize was the "nests of safety deposit boxes," that is, the relatively worthless structure that houses all the individual safe-deposit boxes.

37.     The application explained that the government sought to seize "the nests of boxes themselves, not their contents." But by seizing the nests, the government would "end up with custody of what is inside those boxes."

38.     To alleviate the obvious concerns arising from the government taking the property of so many innocent third parties, the warrant application promised to safeguard the contents of the safe-deposit boxes so that they could be returned to their rightful owners.

39.     The warrant application assured the magistrate judge that agents would follow their written inventory policies to "protect their agencies from claims of theft or damage to the contents of the boxes."

40.     The warrant application also represented that agents would seek to "identify the owner and preserve the property for safekeeping."

41.     Relying on these statements that the government would safeguard the contents of the boxes and reunite them with the rightful owners, the magistrate

FIRST AMENDED COMPLAINT

judge issued the warrant to search USPV's business premises and to seize the nest of safe-deposit boxes.

42.    The warrant, however, specifically did not authorize a "criminal search or seizure of the contents of the safety deposit boxes."

43.    Instead, the warrant instructed agents to conduct an "inventory" of the boxes "to protect their agencies and the contents of the boxes."

44.    The warrant also directed agents to inspect the boxes in order to identify ownership, so that the property could be safely returned to the rightful owners.

**The Government and Defendant Zellhart Separately Plan To Forfeit Everything Over $5,000 And To Search The Boxes For Evidence Of Crimes**

45.    But in contrast to the statements in its warrant application, the government had also formulated a separate plan for the USPV boxes that it did not disclose to the magistrate judge.

46.    Defendant Zellhart testified about this plan during depositions in an earlier lawsuit. According to her testimony as the government's 30(b)(6) representative, the government decided to move forward with indicting USPV and raiding its business in the summer or fall of 2020.

47.    Defendant Zellhart also testified that from the beginning, she and the government planned to seize the nest of safe deposit boxes in the USPV raid. Defendant Zellhart also confirmed that the government did not want the nest for its evidentiary value, but instead to bring USPV's business to a "screeching halt."

48.    Defendant Zellhart also testified that by about this time, she and the government were already planning to use civil forfeiture against some or all the property at USPV.

49.    As part of this planning, the FBI agent in charge of the Los Angeles Field Office criminal division spoke with the head of the asset forfeiture unit for the office in summer 2020. He asked whether the unit could handle the anticipated

forfeiture of hundreds of USPV boxholders' property. The forfeiture head confirmed that the office could process that volume.

50.     As planning for the raid progressed, and before applying for the warrant, the forfeiture head of the FBI's Los Angeles Field Office "made a determination that there was probable cause to proceed [with civil forfeiture] on assets seized in the investigation from U.S. Private Vaults," including "the contents of the boxes." That is, even before applying for the warrant, the government "had already determined that there was probable cause to move forward" with forfeiture actions against the box contents. The only factor determining whether the government tried to forfeit the box contents was whether it "met the minimum monetary threshold" of $5,000, because below that, "the cost [to forfeit] would be more than the value of the asset."

51.     To carry out this large-scale forfeiture, Defendant Zellhart created specialized one-time search procedures for the USPV boxes. These procedures were admittedly designed to identify evidence to support the forfeitures. As Agent Zellhart confirmed in her 30(b)(6) deposition, she "wanted agents to gather information concerning, for instance, whether the money smelled like drugs, or if it was banded -- packaged in an unusual manner." The specialized search procedures included, for example, running currency by drug sniffing dogs, documenting agents' "cash observations," and providing copies of all paperwork to the asset forfeiture unit.

**In The Rush To Search For Evidence To Support The Forfeitures, Defendants Fail To Safeguard The Contents Of The Boxes Like They Promised**

52.     On March 22, 2021, the government executed its search and seizure warrant at USPV's business premises, seized the "nest" of safe-deposit boxes, and, in so doing, "end[ed] up with custody of what [was] inside those boxes."

10

53.     Having obtained custody of the contents of the boxes, the government assumed the role and accompanying duties of bailee of the contents previously held by USPV.

54.     Having obtained custody of the contents of the boxes, the government assumed responsibility for safeguarding the property and returning the contents to the rightful owners, as the government represented it would do in its warrant application.

55.     When the government obtained custody of the USPV safe-deposit boxes and the contents of the boxes, the contents were safe and secure because they were in locked boxes that could only be accessed by those boxes' owners using their keys.

56.     Instead of honoring its promises to safeguard the safe-deposit boxes and return the contents to the rightful owners, the government instead spent the week of March 22, 2021, breaking into the safe-deposit boxes to look for property to forfeit and searching for evidence to support the forfeitures (such as running cash by drug-sniffing dogs, describing the condition of cash, and looking inside sealed envelopes).

57.     The resulting search was hectic. Searching nearly 1,400 boxes for evidence to support the forfeitures took days longer than anticipated. This led to time constraints that required Defendants to cut corners in their efforts to safeguard boxholders' property. (They did not, of course, cut corners in their efforts to search for evidence to support the forfeitures.)

58.     For example, one way to safeguard the contents of the boxes was to videotape the process of opening the boxes. But as Defendant Zellhart confirmed in her deposition, "reality got in the way," and Defendants did not videotape about half of the boxes they opened.

59.     Another way to safeguard the contents of the boxes would have been to create meaningful inventories describing the valuable property taken from the

FIRST AMENDED COMPLAINT

boxes. But in the chaos following the raid and the rush to search for evidence to support their forfeiture plans, Defendants failed to create meaningful inventories. As one agent involved in the searches testified in an earlier deposition, the agents were trying to be "speedy" with each box so they could "move on to the next one." And as the searches dragged on, adjoining businesses became frustrated by the government's lingering presence, further pressuring Defendants to "move as quickly as [they] could," and putting a "premium" on "processing boxes quickly."

60.     This rushed, slapdash process created inventories that were essentially useless for their ostensible purpose of safeguarding the contents of the boxes. Instead, the inventories described the contents in vague, general terms, like "miscellaneous coins" or "assorted jewelry" or "miscellaneous general items." These descriptions could cover anything from novelty items worth a couple bucks to rare and valuable coins and jewelry worth millions.

61.     Another way of safeguarding the contents of the boxes against theft, damage, or loss would have been to leave the safe-deposit boxes locked. But that would not have accomplished the government's purpose of finding boxes with property that could be forfeited. To achieve that purpose, the government broke into the boxes and deliberately exposed those contents to theft, damage, and loss.

62.     At the same time, the government also exceeded the warrant's prohibition on any "criminal search or seizure of the contents of the safety deposit boxes." The government used specialized procedures designed to uncover evidence of crimes, stated in court filings that it was "examin[ing] the specific facts of each box and each claim" to "distinguish between honest and criminal customers," and seized everything worth over $5,000 for purposes of forfeiture.

63.     The foreseeable and probable result of breaking open the boxes was that valuable property would be stolen, damaged, misplaced, or lost. The locked boxes were safe, so opening them inevitably created a risk of loss. And trying to process so many boxes in such a short period of time would inevitably lead to some

property going missing, even in the best of circumstances. And these were not the best of circumstances, with agents searching for evidence to support the forfeitures at the expense of being careful to safeguard the property.

64.     Valuable property stored in the USPV safe-deposit boxes was in fact stolen, damaged, misplaced, or lost after the government broke into them.

65.     For example, one safe-deposit box held the retirement savings of an 80-year-old, semi-retired doctor, who later filed suit under the name Dr. Linda R. The agents searching her box created a written inventory that listed "misc. coins" and a video inventory that only vaguely depicted envelopes containing coins, without quantifying the number, type, or value of coins they contained. Dr. R. filed a lawsuit and a motion for the return of her property under Federal Rule of Criminal Procedure 41(g) after discovering the government had lost dozens of gold coins that were worth more than $75,000. The government successfully moved to dismiss that lawsuit for lack of jurisdiction on the ground that Rule 41(g) does not provide a remedy for lost property.

66.     In another case, a married couple used their box to store $2,000 in cash and silver coins they had purchased as a retirement nest egg. After initially trying to forfeit the silver, the government eventually agreed to return the property it had seized from the couple's box. The government returned the silver, but it never returned the $2,000 in cash. To this day, the government has neither returned the cash nor reimbursed the couple for the missing property. (They are represented by the same counsel as Don and are filing a lawsuit at the same time as this one challenging the government's loss of their cash.)

### Defendants Take Don's Property

67.     As with the other USPV safe-deposit boxes, the government also took custody of Don's box on or about March 22, 2021.

68.     Sometime during the week of March 22, 2021, the Search Defendants broke into Don's box.

69.     According to the government's representations to the magistrate judge and restrictions contained in the warrant, the Search Defendants broke into Don's box to safeguard the property in the government's custody until it could be safely returned to Don.

70.     Consistent with those representations, the Search Defendants had a duty to safeguard the contents of Don's box so that the property could be returned to Don.

71.     But instead of safeguarding Don's property, the Search Defendants broke into Don's box to look for property to forfeit, and to search for evidence to support the forfeiture.

72.     When the Search Defendants estimated that the contents of Don's box were worth more than $5,000, they seized those contents for the purpose of subjecting them to administrative forfeiture.

73.     The Search Defendants also prepared the inventory forms for Don's box.

74.     On information and belief, those forms do not refer to the 110 gold coins stored in Don's box.

75.     Don first learned about the FBI's USPV raid in about early April 2021.

76.     The FBI had posted a notice at USPV, directing boxholders to go to a "uspvclaims" webpage on the FBI website "to initiate a claim for your US Private Vaults box." The link directed users to a "U.S. Private Vaults Claim Form," which instructed users to provide certain information "[t]o make a claim for property stored at U.S. Private Vaults in Beverly Hills, California."

77.     Don, through his prior attorney, submitted his claim to the FBI on April 12, 2021. He then received through counsel an email from the FBI explaining that "all property seized is in a secure FBI facility. FBI agents and staff are working diligently, in a methodical and systematic way, to process all claims and address each safe deposit box that is in our custody." The email further stated that "it is

14

important to us that we ensure property is returned to the lawful owner," and that the FBI would either "make arrangements to return your property" or "request additional information."

**After Attempting To Forfeit His Property, The**

**Government Returns Don's Gold Bar And Cash, But Not His Gold Coins**

78.    As the government had planned to do before the raid, it "initiated civil administrative forfeiture against all of the boxes that met the minimum monetary threshold." The property in Don's box was worth more than $5,000, so the government initiated administrative forfeiture proceedings against his box, despite no evidence that the property was properly subject to forfeiture.

79.    On or about May 24, 2021, Don received a "Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings." The notice was dated May 21, 2021, and stated that the government was initiating administrative forfeiture proceedings with respect to the cash and gold bar the government had taken from Don's safe-deposit box. The notice did not refer to the gold coins that Don stored in his box.

80.    On May 20, 2021, the government also issued an omnibus notice of seizure directed to USPV. The omnibus notice stated that the government was initiating administrative forfeiture proceedings with respect to the contents of several hundred USPV safe-deposit boxes, including the cash and gold bar that Don stored in his box. The omnibus notice did not reflect the gold coins that Don stored in his box.

81.    In early June 2021, Don's former counsel spoke with Defendant Zellhart, who agreed to abandon the government's effort to forfeit the contents of Don's box and to return his property to him. When Don's counsel asked about the gold coins that were not identified in the forfeiture notices, Defendant Zellhart replied that perhaps the gold coins had become separated from the rest of Don's property.

82.    On or about June 14, 2021, the government returned Don's cash and gold bar.

83.    The government did not return Don's 110 gold coins, which were not reflected in the property receipt he received.

84.    Don's counsel immediately informed the government about the 110 missing coins and reached out several times over the ensuing weeks to try to find the missing coins. Those attempts were unsuccessful.

85.    On August 13, 2021, Don, through his former counsel, filed a lawsuit against the government seeking to have his 110 gold coins returned or to otherwise be compensated for the missing coins.

86.    On December 2, 2021, the government notified Don that it had "found" 47 of his gold coins and would return them. The government stated, however, that it had not been able to find the remaining 63 coins.

87.    The government returned the 47 coins it found: 27 of the Canadian Maple coins and 20 of the American Eagle coins.

88.    But it did not return the other 63 gold coins, and still has not returned them. The missing coins include 3 Canadian Maple gold coins and 60 American Eagle gold coins.

89.    The government sought to dismiss Don's lawsuit on the ground that he could not assert a claim about the missing 63 gold coins until he first filed an administrative claim with the FBI. Don then voluntarily dismissed his lawsuit without prejudice.

90.    On March 9, 2023, through his former counsel, Don submitted an administrative claim to the FBI under the FTCA, seeking compensation for the 63 gold coins that the government never returned.

91.    On March 27, 2023, the FBI denied Don's claim, asserting that there was "no evidence of negligence or wrongful acts on the part of any FBI employee."

92.     But Don's gold coins were safe and secure in his safe-deposit box on March 22, 2021. It was only when the FBI took custody of his box and then broke into it that his gold coins (initially all 110, then later 63 of them) went missing. Whatever happened to them, the only explanation is that they were lost due to either negligence or a wrongful act by an FBI employee.

93.     Additionally, regardless of whether any specific FBI employee did something wrong or was negligent, once the government took custody of Don's property, it was responsible for either returning all the gold coins to him or compensating him for what it took.

**INJURY TO PLAINTIFF**

94.     If the government had never taken custody of Don's safe-deposit box at USPV, Don would still have access to his box and to the 63 gold coins stored in his box that were never returned and the $123,419 that those coins were worth would still be available to help fund his retirement.

95.     The government's failure to abide by the representations in its warrant application, the restrictions the judge imposed in the warrant, and its representations to boxholders in its claims materials resulted in the loss of 63 of the gold coins that Don stored in his USPV box.

96.     The government's failure to fulfill its duty to safeguard the contents of Don's box, to exercise reasonable care to ensure the contents were not lost, stolen, or misplaced, and ultimately to return the contents to the rightful owners, resulted in Don's loss of 63 of the gold coins he had stored in his USPV box.

97.     The government's abdication of its responsibilities to safeguard the contents of Don's box to instead pursue profitable forfeitures resulted in the loss of 63 of the gold coins that Don had stored in his USPV box.

98.     Because the 63 gold coins he had stored in his box were never returned to him, Don can no longer use them as a source of retirement savings.

99.   To redress these injuries, Don therefore asserts the following various theories of liability, all of which seek the same relief: $123,419 in damages for the 63 gold coins that Defendants took custody of but never returned.

**CLAIMS FOR RELIEF**

**COUNT I: Conversion and Trespass to Chattels**

**Against Defendant United States of America**

**Under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b)(1), 2671–80)**

100.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

101.   Under the Federal Tort Claims Act (FTCA), Defendant United States of America is liable for injury or loss of property caused by the negligent or wrongful acts or omissions of its employees acting within the scope of their office or employment.

102.   Defendant United States of America is liable for the tortious acts and injuries caused by the Individual Defendants and other agents working on its behalf because they committed those tortious acts and caused those injuries while acting on behalf of the FBI.

103.   Don timely and properly exhausted the FTCA's administrative claims process.

104.   Don owned and had the right to possess the gold coins he stored in his USPV safe-deposit box.

105.   The Individual Defendants, while acting on behalf of the FBI, exercised dominion over the contents of Don's USPV safe-deposit box when they took custody of the box and searched it on or about the week of March 22, 2021, and in so doing, the Individual Defendants engaged in a wrongful act, interfered with Don's property without lawful justification, or otherwise disposed of Don's property rights in the 63 gold coins.

106. Defendant Zellhart engaged in a wrongful act that interfered with Don's property rights when she instructed the Search Defendants to break into Don's box, seize the contents for forfeiture, and search for evidence to support the forfeiture.

107. Defendant Zellhart willfully interfered with Don's property without lawful justification when, in violation of the Fourth Amendment, she participated in securing and implementing a warrant that misled the magistrate judge about the government's plans to seize the contents of the boxes for forfeiture and to search for evidence to support the forfeitures.

108. Defendant Zellhart willfully interfered with Don's property without lawful justification when, in violation of the Fourth Amendment, she supervised and instructed the Search Defendants to conduct an unlawful search of Don's box under the guise of the inventory doctrine and to conduct the purported "inventory" in a way that exceeded the express limitations in the warrant and was instead a pretext for an investigatory search of the box.

109. The Search Defendants engaged in a wrongful act that interfered with Don's property rights when they broke into his box, seized the contents for forfeiture, and searched for evidence to support the forfeiture.

110. The Search Defendants willfully interfered with Don's property without lawful justification when they conducted an unlawful search of Don's box in violation of the Fourth Amendment.

111. The Search Defendants engaged in a wrongful act that interfered with Don's property rights to the extent they stole Don's gold coins or allowed them to be stolen by others. In the absence of any explanation for the 63 missing gold coins, their disappearance can only be explained by the wrongful acts of the Search Defendants.

112.   Even assuming they acquired initial possession of the gold coins lawfully, Defendants also wrongfully interfered with Don's property rights when Defendants refused to return all the gold coins upon request.

113.   As a result of Defendants' unwarranted interference with Don's property and possessory rights, Don has incurred damages in the amount of $123,419.

114.   The United States is therefore liable under the FTCA for the torts of conversion and trespass to chattels.

### COUNT II: Breach of Bailment
### Against Defendant United States of America
### Under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b)(1), 2671–80)

115.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

116.   Under the FTCA, Defendant United States of America is liable for injury or loss of property caused by the negligent or wrongful acts or omissions of its employees acting within the scope of their office or employment.

117.   Defendant United States of America is liable for the tortious acts and injuries caused by the Search Defendants and other agents working on its behalf because they committed those tortious acts and caused those injuries while acting on behalf of the FBI.

118.   Don timely and properly exhausted the FTCA's administrative claims process.

119.   USPV held the contents of the safe-deposit boxes as bailee, and Defendants took on the obligations of a bailee when they transferred custody of the contents of Don's box from USPV to themselves.

120.   The contents of the USPV safe-deposit boxes were delivered into the custody of Defendants for the purpose of safeguarding the contents until they could be returned to the rightful owners.

121.   Defendants made statements, both to the magistrate judge and directly to boxholders, that they were taking delivery of the contents of the USPV boxes for the purpose of caring for the property until the rightful owners could request redelivery.

122.   The contents of the USPV safe-deposit boxes were also delivered into Defendants' custody to benefit Defendants by helping them to shut down USPV's business and search for property that could be forfeited.

123.   As bailees, Defendants received delivery of the contents of Don's box, including the gold coins.

124.   Don has demanded the return of his property, including his gold coins.

125.   Defendants failed to return all the property, specifically 63 of the gold coins, when Don demanded redelivery.

126.   Defendants have not offered any justification for their failure to re-deliver Don's property, nor is there any possible explanation other than the wrongful or negligent acts of Defendants.

127.   Defendant United States of America is therefore liable for breaching its bailment obligations in the amount of $123,419.

## COUNT III: Negligence

### Against Defendant United States of America

### Under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b)(1), 2671–80)

128.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

129.   Under the FTCA, Defendant United States of America is liable for injury or loss of property caused by the negligent or wrongful acts or omissions of its employees acting within the scope of their office or employment.

130.   Defendant United States of America is liable for the tortious acts and injuries caused by the Search Defendants and other agents working on its behalf

because they committed those tortious acts and caused those injuries while acting on behalf of the FBI.

131.   Don timely and properly exhausted the FTCA's administrative claims process.

132.   Defendants had a duty, pursuant to the representations in the warrant application, the limitations in the warrant, their representations to boxholders, and from their own conduct in taking custody of the boxes, to safeguard the contents of the boxes in their custody, to ensure that those contents were not lost, stolen, or destroyed, and ultimately to return the contents of the USPV boxes to their rightful owners.

133.   Defendants breached this duty when they lost or stole 63 of Don's gold coins.

134.   The government and Defendant Zellhart breached this duty when they failed to take reasonable care to prevent Don's gold coins from being lost or stolen. They instructed the agents searching the boxes to search for evidence to support the forfeitures instead of safeguarding the contents of the boxes, created instructions for searching the boxes that were calculated to uncover evidence to support the forfeitures at the expense of safeguarding the contents, and directly created the frenzied environment that required agents to search the boxes as quickly as possible.

135.   The Search Defendants also breached this duty when they failed to take reasonable care to prevent Don's gold coins from being lost or stolen. They failed to take the time to secure the contents against theft or loss, instead processing the box as quickly as they could so they could move on to the next one. The Search Defendants also failed to create a meaningful inventory of the valuable property inside Don's box. Finally, under the circumstances, the disappearance of 63 of the gold coins can only be explained by the Search Defendants' failure to take reasonable care to guard the contents of Don's box.

136.   Don's gold coins were secure in his box before Defendants broke into it. In the absence of any explanation or evidence from the government about how the gold coins disappeared, the only explanation under the circumstances is that Defendants were negligent or worse.

137.   As a proximate result of Defendants' breach of that duty, Don has been damaged in the amount of $123,419.

138.   The United States is therefore liable under the FTCA for the tort of negligence.

**COUNT IV: Conversion and Trespass to Chattels**

**Against Individual Defendants**

**Under California Law**

139.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

140.   Don owned and had the right to possess the gold coins he stored in his USPV safe-deposit box.

141.   The Individual Defendants exercised dominion over the contents of Don's USPV safe-deposit box when they took custody of the box and searched it on or about the week of March 22, 2021, and in so doing, the Individual Defendants engaged in a wrongful act, interfered with Don's property without lawful justification, or otherwise disposed of Don's property rights in the cash.

142.   Defendant Zellhart engaged in a wrongful act that interfered with Don's property rights when she instructed the Search Defendants to break into Don's box, seize the contents for forfeiture, and search for evidence to support the forfeiture.

143.   Defendant Zellhart willfully interfered with Don's property without lawful justification when, in violation of the Fourth Amendment, she participated in securing and implementing a warrant that misled the magistrate judge about the

23

**FIRST AMENDED COMPLAINT**

government's plans to seize the contents of the boxes for forfeiture and to search for evidence to support the forfeitures.

144.   Defendant Zellhart willfully interfered with Don's property without lawful justification when, in violation of the Fourth Amendment, she supervised and instructed the Search Defendants to conduct an unlawful search of Don's box under the guise of the inventory doctrine and to conduct the purported "inventory" in a way that exceeded the express limitations in the warrant and was instead a pretext for an investigatory search of the box.

145.   The Search Defendants engaged in a wrongful act that interfered with Don's property rights when they broke into Don's box, seized the contents for forfeiture, and searched for evidence to support the forfeiture.

146.   The Search Defendants willfully interfered with Don's property without lawful justification when they conducted an unlawful search of Don's box in violation of the Fourth Amendment.

147.   The Search Defendants engaged in a wrongful act that interfered with Don's property rights to the extent they stole Don's gold coins or allowed them to be stolen by others. In the absence of any explanation for the 63 missing gold coins, their disappearance can only be explained by the wrongful acts of the Search Defendants.

148.   Even assuming they acquired initial possession of the gold coins lawfully, the Individual Defendants also wrongfully interfered with Don's property rights when they refused to return all the gold coins upon request.

149.   As a result of the Individual Defendants' unwarranted interference with Don's property and possessory rights, Don has incurred damages in the amount of $123,419.

150.   The tortious conduct by the Individual Defendants also violated the Constitution, including the Fourth Amendment.

151.   As a result of the tortious and unconstitutional conduct of the Individual Defendants, Don has incurred damages in the amount of $123,419.

152.   Individual Defendants' tortious conduct also violated the Constitution and therefore falls under the Westfall Act exception for claims "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). To the extent the claim remains barred by 28 U.S.C. § 2679(b)(1) under current precedent, Don preserves the issue.

**COUNT V: Breach of Bailment**

**Against Individual Defendants**

**Under California Law**

153.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

154.   USPV held the contents of the safe-deposit boxes as bailee, and the Individual Defendants took on the obligations of a bailee when they transferred custody of the contents of Don's box from USPV to themselves.

155.   The contents of Don's USPV safe-deposit box were delivered into the custody of the Individual Defendants for the purpose of safeguarding the contents until they could be returned to the rightful owners.

156.   Defendants made statements, both to the magistrate judge and directly to boxholders, indicating that the Individual Defendants were taking delivery of the contents of the USPV boxes for the purpose of caring for the property until the rightful owners could request redelivery.

157.   The contents of the USPV safe-deposit boxes were also delivered into the Individual Defendants' custody to benefit the Individual Defendants by helping them to accomplish their objectives of shutting down USPV's business and searching for property that could be forfeited.

158.   As bailees, the Individual Defendants received delivery of the contents of Don's box, including the gold coins.

159.   Don has demanded the return of his property, including his gold coins.

160.   The Individual Defendants failed to return all the property, specifically 63 of the gold coins, when Don demanded redelivery.

161.   The Individual Defendants have not offered any justification for their failure to re-deliver Don's property, nor is there any possible explanation other than the wrongful or negligent acts of the Individual Defendants

162.   The conduct by the Individual Defendants, which was both tortious and breached the bailment contract, also violated the Constitution, including the Fourth Amendment.

163.   As a result of the tortious conduct, breach of contract, and unconstitutional conduct of the Individual Defendants, Don has incurred damages in the amount of $123,419.

164.   Individual Defendants' tortious conduct also violated the Constitution and therefore falls under the Westfall Act exception for claims "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). To the extent the claim remains barred by 28 U.S.C. § 2679(b)(1) under current precedent, Don preserves the issue.

## COUNT VI: Negligence
## Against Individual Defendants
## Under California Law

165.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

166.   The Individual Defendants had a duty pursuant to the representations in the warrant application, the limitations in the warrant, the representations to boxholders, and from their own conduct in taking custody of the boxes, to safeguard the contents, to ensure the contents were not lost, stolen, or destroyed, and ultimately to return the contents of the USPV boxes to their rightful owners.

167.   The Individual Defendants breached this duty when they lost or stole 63 of Don's gold coins.

168.   Defendant Zellhart breached this duty when she failed to take reasonable care to prevent Don's gold coins from being lost or stolen. She instructed the agents searching the boxes to search for evidence to support the forfeitures instead of safeguarding the contents of the boxes, created instructions for searching the boxes that were calculated to uncover evidence to support the forfeitures at the expense of safeguarding the contents, and directly created the frenzied environment that required agents to search the boxes as quickly as possible.

169.   The Search Defendants also breached this duty when they failed to take reasonable care to prevent Don's gold coins from being lost or stolen. They failed to take the time to secure the contents against theft or loss, instead processing the box as quickly as they could so they could move on to the next one. The Search Defendants also failed to create a meaningful inventory of the valuable property inside Don's box. Finally, under the circumstances, the disappearance of 63 of the gold coins can only be explained by the Search Defendants' failure to take reasonable care to guard the contents of Don's box.

170.   Don's gold coins were secure in his box before the Search Defendants broke into it. The mere fact of its disappearance necessarily implies negligence by the Individual Defendants.

171.   As a proximate result of the Individual Defendants' breach of that duty, Don has been damaged in the amount of $123,419.

172.   The tortious conduct by the Individual Defendants also violated the Constitution, including the Fourth Amendment.

173.   As a result of the tortious and unconstitutional conduct of the Individual Defendants, Don has incurred damages in the amount of $123,419.

174.   Individual Defendants' tortious conduct also violated the Constitution and therefore falls under the Westfall Act exception for claims "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). To the extent the claim remains barred by 28 U.S.C. § 2679(b)(1) under current precedent, Don preserves the issue.

**COUNT VII: Unreasonable Search In Violation Of The Fourth Amendment Against Individual Defendants**

**Under *Bivens*, Westfall Act, Bane Act, and directly under the Fourth Amendment**

175.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

176.   The Fourth Amendment protects against unreasonable searches of personal property, including safe-deposit boxes. Warrantless searches are presumptively unreasonable unless a historically recognized exception applies.

177.   The USPV warrant only authorized the search and seizure of USPV's property. It did "not authorize a criminal search or seizure of the contents of the safety deposit boxes." When the Search Defendants, as ordered by Defendant Zellhart, searched Don's safe-deposit box for forfeitable property and for evidence to support the forfeitures, the search was presumptively unreasonable unless an exception to the warrant requirement applies.

178.   The Individual Defendants sought to justify their search of Don's box (and the other USPV boxes) under the inventory exception to the warrant requirement, but that exception only applies in well-defined situations (like taking custody of an automobile), not seizing locked boxes belonging to hundreds of individuals. The inventory exception is further limited to searches pursuant to standardized policies, while the Individual Defendants searched Don's box pursuant to special supplemental procedures created by Defendant Zellhart solely for the USPV searches.

179.  The inventory exception also does not apply here because the Individual Defendants did not actually conduct an inventory search of Don's box and, on information and belief, did not create a meaningful inventory of the contents. Instead, the Individual Defendants were searching Don's box for forfeitable property and for evidence to support the forfeiture.

180.  To the extent the USPV warrant permitted the Individual Defendants to break into Don's boxes to conduct an inventory, the search was still unreasonable. The warrant expressly stated that it did "not authorize a criminal search or seizure of the contents of the safety deposit boxes," yet the inventory search here was a mere pretext to search Don's box for forfeitable property and evidence to support the forfeitures.

181.  To the extent the USPV warrant permitted the Individual Defendants to break into Don's boxes to conduct an inventory, the search was still unreasonable, because the warrant only authorized the inventory searches because Defendant Zellhart misrepresented the true scope of the searches Defendants intended to conduct and failed to disclose the plan to search the boxes for forfeitable property and for evidence to support the forfeitures.

182.  It is clearly established, and every reasonable FBI agent has fair warning, that agents may not search safe-deposit boxes without a warrant or an exception to the warrant requirement.

183.  It is clearly established, and every reasonable FBI agent has fair warning, that the inventory exception does not permit searches that are a pretext for investigatory searches.

184.  It is clearly established, and every reasonable FBI agent has fair warning, that the inventory exception applies to specific situations like taking custody of an automobile or booking people into jail, not to breaking into hundreds of safe-deposit boxes.

FIRST AMENDED COMPLAINT

185.  It is clearly established, and every reasonable FBI agent has fair warning, that the inventory exception applies to searches under standardized procedures, not specialized, one-time procedures created for that specific search.

186.  It is clearly established, and every reasonable FBI agent has fair warning, that searches pursuant to a warrant may not exceed the express limitations of the warrant.

187.  It is clearly established, and every reasonable FBI agent has fair warning, that warrants may not be obtained by misstating the scope of the intended search and omitting material facts about the intended search.

188.  Despite these clearly delineated rights, the Individual Defendants deliberately acted in a manner calculated to deprive Don of his rights.

189.  Don is therefore entitled to damages in the amount of $123,419 for the unreasonable search of his USPV safe-deposit box.

190.  Don is entitled to these damages of $123,419 directly under the Fourth Amendment, which contains clear, prohibitory, enforceable language that binds the government and each of its officers, including the Individual Defendants.

191.  Don is alternatively entitled to damages of $123,419 pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which provides a cause of action against agents who violate the Fourth Amendment. Additionally, Don has no alternative remedies for his injuries caused by Defendants, and Don's claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for his injuries.

192.  Don is alternatively entitled to damages of $123,419 pursuant to the Westfall Act, which provides that its bar on actions against federal employees "does not extend or apply to a civil action against an employee of the Government … which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

193.  Don is alternatively entitled to damages of $123,419 pursuant to California's Bane Act, which provides a right of action against any person who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution … of the United States … ." Cal. Civ. Code § 52.1(b), (c).

**COUNT VIII: Unreasonable Seizure In Violation Of The Fourth Amendment Against Individual Defendants**

**Under *Bivens*, Westfall Act, Bane Act, and directly under the Fourth Amendment**

194.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

195.   The Fourth Amendment protects against unreasonable seizures of personal effects, including cash. Even if the seizure is lawful at its inception, it can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests. And if the original justification for the seizure dissipates, the government must cease the seizure or secure a new justification.

196.   When the Search Defendants searched and seized the contents of Don's safe-deposit box in accordance with Defendant Zellhart's instructions, they either unreasonably allowed 63 of the gold coins to be stolen or otherwise executed the seizure in an unreasonable manner resulting in the loss of the property.

197.   The Individual Defendants have not returned Don's gold coins, and the seizure is ongoing. And because the original justification for the seizure has dissipated, the Individual Defendants must secure a new justification for the ongoing seizure. Having stolen, lost, or destroyed the 63 gold coins is not a valid justification for refusing to return them to Don.

198.   It is clearly established, and every reasonable FBI agent has fair warning, that when seizing personal property like gold coins, agents may not take the property for their own use or allow others to take the property for their own use.

199.   It is clearly established, and every reasonable FBI agent has fair warning, that when seizing personal property like gold coins, agents must conduct the seizure in a manner that does not unreasonably infringe possessory interests, including by acting reasonably to ensure the property is not stolen, lost, or destroyed.

200.   It is clearly established, and every reasonable FBI agent has fair warning, that the continuing seizure of personal property like gold coins requires an ongoing justification, and that having stolen, lost, or destroyed the property is not a valid justification.

201.   Despite these clearly delineated rights, the Individual Defendants deliberately acted in a manner calculated to deprive Don of his rights.

202.   Don is therefore entitled to damages in the amount of $123,419 for the unreasonable manner of the seizure and unjustified continuing seizure of his personal property.

203.   Don is entitled to these damages of $123,419 directly under the Fourth Amendment, which contains clear, prohibitory, enforceable language that binds the government and each of its officers, including the Individual Defendants.

204.   Don is alternatively entitled to damages of $123,419 pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which provides a cause of action against agents who violate the Fourth Amendment. Additionally, Don has no alternative remedies for his injuries caused by Defendants, and Don's claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for his injuries.

FIRST AMENDED COMPLAINT

205.   Don is alternatively entitled to damages of $123,419 pursuant to the Westfall Act, which provides that its bar on actions against federal employees "does not extend or apply to a civil action against an employee of the Government … which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

206.   Don is alternatively entitled to damages of $123,419 pursuant to California's Bane Act, which provides a right of action against any person who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution … of the United States … ." Cal. Civ. Code § 52.1(b), (c).

**COUNT IX: As-Applied Deprivation of Property Without Due Process Of Law Under the Fifth Amendment Due Process Clause**

207.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in ¶¶ 1 through 99 above.

208.   The Fifth Amendment Due Process Clause states, "No person shall be … deprived of life, liberty, or property, without due process of law."

209.   Don had property, his 63 gold coins, stored in his USPV safe-deposit box.

210.   Don has been deprived of that property.

211.   There is no right unless there is also a legal remedy when that right is invaded. If the government stole or lost the property of innocent people and no remedy exists, that violates due process of law.

212.   To the extent the previous counts brought against Defendants in this Complaint are subject to legal defenses (under the FTCA or the Westfall Act's bar on actions against federal employees) that resultingly deprive Don of any remedy, then Don has been deprived of that property without any process of law, let alone "due process of law."

33

213.   Thus, to the extent those statutes would apply here to permit Don to be deprived of his property without due process of law, those statutes are unconstitutional as applied because they violate Don's right to due process of law, and therefore cannot be invoked to deny Don a remedy.

**REQUEST FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

A.   Award damages in favor of Plaintiff Donald Leo Mellein and against Defendants United States, Lynne Zellhart, Nathan Cherney, Kaare Mathison, Allen Grove, Christina Clyburn, and Blaire Fulcher in the amount of $123,419.

B.   Declare that Plaintiff Donald Leo Mellein is entitled to a remedy for the government's loss of his 63 gold coins.

C.   To the extent the Court determines that if there is no remedy available for Plaintiff's injuries under the Constitution, *Bivens*, the Federal Tort Claims Act, the Bane Act, or the Westfall Act, then declare that the Federal Tort Claims Act and the Westfall Act are unconstitutional as applied here, and that Defendants Lynne Zellhart, Nathan Cherney, Kaare Mathison, Allen Grove, Christina Clyburn, and Blaire Fulcher are liable in damages under California law for their unconstitutional and tortious conduct in violation of Plaintiff's constitutional rights (conversion, breach of bailment, and negligence).

D.   To the extent the Court determines that the FTCA, Westfall Act, or any other law deprives Plaintiff of a remedy for the deprivation of his property, declare that those statutes would violate Plaintiff's rights under the Fifth Amendment Due Process Clause, as applied to the facts of this case, by permitting Plaintiff to be deprived of his property without due process of law.

E.   Award Plaintiff attorneys' fees, costs, and expenses under 28 U.S.C. § 2412 and any other applicable provisions of law or equity; and

F.   Award any further legal and equitable relief the Court may deem just and proper.

FIRST AMENDED COMPLAINT

Dated: December 19, 2023

Respectfully Submitted,

/s/ Joseph Gay

**INSTITUTE FOR JUSTICE**
Joseph Gay*
jgay@ij.org
Robert Frommer*
rfrommer@ij.org
901 N. Glebe Rd. Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
16781 Chagrin Blvd. Suite 256
rjohnson@ij.org
Shaker Heights, OH 44120
Tel. (703) 682-9320

* Admitted *pro hac vice*

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Ste. 300
Santa Monica, California 90401
Tel. (424) 258-5190

*Attorneys for Plaintiff*

FIRST AMENDED COMPLAINT