E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JASMIN YANG (Cal. Bar No. 255254)
YUJIN CHUN (Cal. Bar No. 306298)
Assistant United States Attorney
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-8827 (Yang)-0929 (Chun)
     Facsimile: (213) 894-7819
     E-mail: jasmin.yang@usdoj.gov
            yujin.chun@usdoj.gov

Attorneys for Lynne K. Zellhart

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD LEO MELLEIN,<br><br>       Plaintiff,<br><br>       v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>       Defendants. | No. 2:23-cv-07970-RGK-MAR<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF LYNNE K. ZELLHART'S N MOTION TO DISMISS**<br><br>Hearing Date:   March 4, 2024<br>Hearing Time:   9:00 a.m.<br>Ctrm:         850<br><br>Honorable R. Gary Klausner |

Defendant Lynne K. Zellhart hereby requests that the Court take judicial notice and consider the following documents in connection with her concurrently filed Motion to Dismiss. Special Agent Zellhart makes this request pursuant to Federal Rule of Evidence 201. A true and correct copy of the documents referenced in the Motion are attached hereto:

1. **Exhibit 1**: Order re Court Trial entered on September 29, 2022 at Dkt. 140 in *Snitko v. United States of America, et al.*, United States District Court Central District of California Case No. 2:21-cv-04405-RGK-MAR (*"Snitko"*);

2. **Exhibit 2**: Application for a Warrant by Telephone or Other Reliable Electronic Means filed on March 17, 2021 *In the Matter of the Search of 9182 W. Olympic Blvd., Beverly Hills, California*, United States District Court for the Central District of California Case No.: 2:21-MJ-01302, filed in *Snitko* at Dkt. 122-3;

3. **Exhibit 3**: Order re: Defendants' Motions to Dismiss entered on December 7, 2021 at Dkt. 76 in *Louis Loe v. United States of America, et al.*, United States District Court for the Central District of California Case No. 2:21-cv-03348-RGK-MAR.

Dated: January 16, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section


     /s/ *Jasmin Yang*
JASMIN YANG
Assistant United States Attorney

Attorneys for Lynne K. Zellhart

1

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | ***Paul Snitko, et al v. United States of America, et al*** | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Krystal Hernandez | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

**Proceedings:**  **(IN CHAMBERS) Order re Court Trial [DE 112]**

## I.    INTRODUCTION

On June 9, 2021, Paul Snitko, Jennifer Snitko, Joseph Ruiz, Tyler Gothier, Jeni-Verdon Pearsons, Michael Storc, and Travis May (collectively, "Plaintiffs") filed a First Amended Class Action Complaint against the United States of America, acting United States Attorney Tracy L. Wilkison, and Assistant Director of the FBI Kristi Koons Johnson (collectively, "Defendants" or "the Government"). (ECF No. 33.) Plaintiffs allege Fourth Amendment violations arising from the Federal Bureau of Investigation's ("FBI") search and seizure of Plaintiffs' property located in safe deposit boxes on the premises of non-party US Private Vaults ("USPV"). On October 12, 2021, the Court certified a class of Plaintiffs: USPV box renters who had their property seized, had identified themselves to the FBI, and had their property returned. (*See* Order re: Pls' Mot. Class Certification at 5, 10, ECF No. 78.)

The parties have submitted briefs to the Court for a bench trial. (ECF Nos. 112, 122, 130.) For the following reasons, the Court grants judgment in favor of Defendants.

## II.    FINDINGS OF FACT[1]

### A.    USPV's Business and Customers

USPV operated a business in Beverly Hills, California, that rented safety deposit boxes to customers anonymously. (*See* Rodgers Decl., Ex. B at 57, ECF No. 122-3.) To maintain customer

---

[1] This opinion serves as the findings of fact and conclusions of law required by Federal Rule of Civil Procedure ("Rule") 52. Fed. R. Civ. P. 52. Any finding of fact that actually constitutes a conclusion of law is adopted as such, and vice-versa.

EXHIBIT 1 SNITKO RULING
PAGE 002

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | **Paul Snitko, et al v. United States of America, et al** | | | |

anonymity, USPV did not require customers to provide personal information, social security numbers, driver's licenses, or any other form of identification in order to rent a box. (*Id.* at 61.) Customers kept all keys to the boxes—USPV could only access a rented box by drilling it open. (*Id.*) USPV's facility was also outfitted with significant security measures, including iris-scan vault access, 24/7 electronic monitoring, 24/7 armed response, and a time lock on the vault itself. (*Id.*)

Due to USPV's anonymity, its boxes were used regularly by unsavory characters to store criminal proceeds, a fact both known to and desired by USPV's principals. (*See id.* at 57, 76–81; Frommer Decl., Ex. K at 874–75, ECF No. 112-19.) In fact, USPV seemingly targeted criminal clientele on its website, noting that "the less we know [about our customers] the better," and that their service helped customers avoid "government agencies (such as the IRS) or attorneys armed with court orders." (Rodgers Decl., Ex. B at 62.) Government investigations of individual USPV boxholders resulted in the execution of numerous federal search warrants on the premises, along with the forfeiture of box contents that were the criminal proceeds of, *inter alia*, ransoms, gambling and prostitution rings, drug operations, and identity theft schemes. (*See id.* at 68–74.)

However, USPV did not solely rent to criminal customers. Many USPV customers used its services for legitimate reasons. Those customers included the named plaintiffs and class members in this case. For example:

- Paul and Jennifer Snitko used their USPV box to store legal documents, watches with sentimental value, hard-drive backups, coins, and gold jewelry. They used USPV "because [their] bank had a waiting list for a safe deposit box, [they] live in a wildfire prone area . . . and [they] require a place to store [their] wedding bands when engaging in sports activities . . . ." (P. Snitko Decl. ¶¶ 4–6, ECF No. 112-1; J. Snitko Decl. ¶¶ 4–6, ECF No. 112-2.)
- Tyler Gothier stored "silver and other personal property" in his box and used USPV due to its convenient location. (Gothier Decl. ¶¶ 4–5, ECF No. 112-3.)
- Joseph Ruiz stored $57,000 in cash in his box and used USPV because he was concerned that "the COVID pandemic would make it impossible for [him] to withdraw [his] funds from a bank account." (Ruiz Decl. ¶¶ 4–6, ECF No. 112-4.)
- Michael Storc and Jeni-Verdon Pearsons stored "approximately $2,000 in cash, as well as approximately $20,000 worth of silver," along with "personal documents" in their

---

In addition, Defendants made numerous objections to Plaintiffs' evidence. (*See* ECF No. 133.) To the extent that the Court has relied on any objected-to evidence, those objections are overruled. To the extent that the Court has not do so, those objections are denied as moot.

**CIVIL MINUTES - GENERAL**

EXHIBIT 1 SNITKO RULING
PAGE 003

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | | |

box. They used USPV because they needed a safe place to keep the silver. (Storc Decl. ¶¶ 4–5, ECF No. 112-5; Verdon-Pearsons Decl. ¶¶ 4–5, ECF No. 112-6.)

- Travis May stored $63,000 in cash, $100,000 in gold, and various documents in sealed envelopes in his box, and used USPV as an "alternative location to access valuables in case of emergencies." (May Decl. ¶¶ 4–5, ECF No. 112-7.)

### B.    The Government's Investigation of USPV

From 2015 to 2019, the Government individually investigated "criminals [that were] regularly using [USPV] to store criminal proceeds." (Frommer Decl., Ex. K at 874.) Several different agencies, including the FBI, the Drug Enforcement Administration ("DEA"), and the United States Postal Inspection Service ("USPIS"), had "different investigations open on individual customers." (*Id.*) However, after "almost five years of" investigating individual boxholders, the various agencies concluded that they "weren't doing anything effective," because "the problem was the business itself." (*Id.* at 875.) The agencies determined that, because the "real problem" was the "money laundering facilitator, which is [USPV], the business," they should open an investigation into the business and its principals. (*Id.* at 876.) That investigation began in April 2019. (*Id.*)

The investigation of the business uncovered that USPV's principals were aware of, and indeed actively solicited, the use of their deposit boxes by criminals. (Rodgers Decl., Ex. B at 76–134.) In fact, USPV principals were themselves engaged in criminal conduct. (*See id.*) By June or July 2020, the agencies had "quite a lot of pretty good evidence" against USPV, and thus began discussions about obtaining indictments and warrants against the company. (Frommer Decl., Ex. M at 1227, ECF No. 135-1.) The agencies discussed that they wanted to seize "the thing that made [USPV] go" and take "their business out," which involved seizing "eye scanners, the money counter," and "the nest[s] of safe deposit boxes." (*Id.* at 1231.)

Because the agencies intended to seize the box nests, they began discussing the potential to civilly forfeit both the nests and the individual box contents in "late summer . . . of 2020, or maybe in the fall there." (*Id.* at 1233.) In connection with these plans, Jessie Murray ("Murray"), an FBI forfeiture agent, was asked by her supervisor if the Los Angeles field office had the capacity to "handl[e] and process[]" a "large-scale seizure" of USPV property and the contents of USPV's deposit boxes. (Frommer Decl., Ex. O at 1527, ECF No. 135-4.) Murray stated that the office could indeed handle a large-scale seizure, but she could not offer an opinion on whether there was probable cause to forfeit the assets until she reviewed the finalized warrant affidavit. (*Id.* at 1533–34.) Upon review of the affidavit[2]

---

[2] The contents of the affidavit are discussed in full below.

EXHIBIT 1 SNITKO RULING
PAGE 004

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|----------|------------------------|--|------|--------------------|
| Title | ***Paul Snitko, et al v. United States of America, et al*** | | | |

in February 2021 (prior to its submission to the magistrate), Murray determined that there was indeed probable cause to seize the contents of the safe deposit boxes. (*Id.* at 1537.)

### C.     <u>The Indictment Against USPV and the FBI's Warrant Application</u>

On March 9, 2021, a grand jury returned an indictment against USPV. (*See* Rodgers Decl., Ex. F, ECF No. 122-7.) The indictment charged USPV with conspiracy to money launder, distribute controlled substances, and structure financial transactions. (*Id.* at 276–77, 280, 282.) The indictment also included two forfeiture allegations, both of which reflected a finding of "probable cause to believe" that the computers, money counters, surveillance equipment, biometric scanners, and the nests of safety deposit boxes were "subject to forfeiture." (*Id.* at 285, 288.)

A little more than a week later, on March 17, 2021, the Government submitted applications to Magistrate Judge Steve Kim ("Judge Kim") for search and seizure warrants, both of which included a common affidavit by Special Agent Lynne Zellhart ("Zellhart"), the agent in charge of the FBI's investigation. (*See* Rodgers Decl., Exs. B, D, ECF Nos. 122-3, 122-5.) While the affidavit primarily discussed the fruits of the investigation, it also noted that the Government sought to seize the box nests as "evidence and instrumentalities of USPV's criminality." (Rodgers Decl., Ex. B at 137.) While the warrants would authorize the seizure of the boxes, Zellhart declared that she was not seeking to authorize the seizure of the *contents* of those boxes. (*Id.*) However, by seizing the nests, Zellhart noted that "the government will necessarily end up with custody of what is inside those boxes initially," and that "[a]gents will follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner." (*Id.*) Agents would also, "in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner," and then would "attempt to notify the lawful owners of the property . . . how to claim their property." (*Id.* at 137–38.)

Judge Kim subsequently issued the warrants, which identified the items to be seized as, *inter alia*, the "[n]ests of safety deposit boxes and keys." (Rodgers Decl, Ex. A at 32.) The warrant did not "authorize a criminal search or seizure of the contents of the safety deposit boxes," but did allow for agents to "follow their written inventory policies" to both "protect their agencies and the contents of the boxes" and allowed for an "inspect[ion] of the contents of the boxes in an effort to identify their owners in order to notify them so they can claim their property." (*Id.* at 32–33.)

      **CIVIL MINUTES - GENERAL**      

EXHIBIT 1 SNITKO RULING
PAGE 005

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

**D.**     **The FBI's Written Policies**

Because the warrants provided that agents must "follow their written inventory policies" and identify box owners "in accordance with their written [unknown persons] policy," a brief summary of those policies is warranted here. In addition, Agent Zellhart drafted "Supplemental Instructions on Box Inventory" specifically for the USPV search and seizure, and agents were to follow those instructions while inventorying box contents. The Court discusses each in turn.

     *1.*     *Written Inventory Policy*

The FBI's inventory policy is contained within its Domestic Investigations and Operations Guide ("DIOG"), a "dictionary or a thesaurus" for FBI agents. (Frommer Decl., Ex. M at 1215.) The DIOG instructs agents that, after "lawfully taking custody of property," they must "conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents." (Rodgers Decl., Ex. E at 273, ECF No. 122-6.) Agents must then record the results of the inventory on certain specified forms, and the summary "must include, but is not limited to, a description of the property and the items secured for safekeeping." (*Id.* at 274.) In addition to providing a summary of the property, agents "should also memorialize facts pertinent to other activities undertaken during the inventory process, such as . . . a non-inventory-related search conducted and any evidence collected (*i.e.*, FD-1087, "Collected Evidence Log" [Sentinel]) that are relevant to the investigation." (*Id.*) Finally, the DIOG instructs that agents may not conduct inventories "solely for investigative purposes," and that "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible." (*Id.*)

     *2.*     *Policy Regarding Custody of an Unknown Person's Property*

The FBI also has a policy on the proper procedure to follow should agents come into possession of an unknown person's property. That policy states that agents should "inspect the property as necessary to identify the owner and preserve the property for safekeeping," and such an inspection should "extend no further than necessary to determine ownership." (Rodgers Decl., Ex. B at 138.) The "unknown persons" policy is separate from the FBI's inventory policy, and an inspection done to identify the property owner "doesn't stop [the FBI] from needing to inventory the [property] . . . to protect the property itself, to protect [the FBI] from accusations of loss or theft, [and] to protect [the FBI] from hazardous materials." (Frommer Decl., Ex. K at 933.)

---

EXHIBIT 1 SNITKO RULING
PAGE 006

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

3. _Supplemental Instructions on Box Inventory_

In preparation for the raid on USPV, Zellhart drafted a set of supplemental inventory instructions (the "Supplemental Instructions"), which used the DIOG as a "reference" or a "resource" and "were created to help the team focus in on what we were doing and how we were doing it." (Frommer Decl., Ex. M at 1214–15.) The Supplemental Instructions ordered agents to "search and inventory all boxes according to FBI policies and procedures," to process "all inventoried contents . . . as described in this memo," and to complete all required inventory paperwork. (Frommer Decl., Ex. D at 282, ECF No. 112-12.) The Supplemental Instructions included the following mandates:

- The inventory of each box was to be video recorded.
- In removing the boxes, teams were to "tak[e] care to preserve possible fingerprint evidence." (*Id.* at 283.)
- The team would then "identify the contents of each box, creating an inventory list," bagging and labeling each item, and completing forms for receipt of property, an evidence log, specific agent notes, and for chain of custody. (*Id.*) Agents were also to identify cash and drugs with red and green labels, respectively.
- Agents were to note if a box included a "USPV notification form identifying a contact person for the box." (*Id.*) They were to "bag and tag" the form and were not allowed to "search the content of boxes for evidence, but may examine the contents to identify the box owner." (*Id.*)
- Each inventory was to include the box door with its lock, any form with emergency contact information, the physical deposit box, and the box's contents.
- Any item recovered was to be submitted to FBI evidence technicians and asset forfeiture agents, who would enter evidence into the FBI's database and generate forfeiture identification numbers, respectively.
- Any amount of cash over $5,000 was to be placed in an evidence bag and given a forfeiture identification number.
- There "will be canine units on scene," and any cash "will be taken . . . to the canine unit." (*Id.* at 284.) Further, agents were to take notes on the "condition of cash," including on how "the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.); if there appears to be a drug residue present; if a gun is also present." (*Id.*)
- Non-cash valuables were to be collected, inventoried, and transported to "Evidence Control . . . where they will be stored until claimed or otherwise disposed as determined appropriate." (*Id.* at 284.) Evidence relating to digital currency was to be inventoried in the same manner.

EXHIBIT 1 SNITKO RULING
PAGE 007

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | ***Paul Snitko, et al v. United States of America, et al*** | | | |

- Drugs had to be "processed according to normal procedures for seizing illegal drugs. Inventory teams should take care to preserve packaging of drug evidence (and external box if possible) for possible fingerprints." (*Id.*)

(*See id.* at 282–84.)

### E. Execution of the Warrants

The Government executed the search and seizure warrants from March 22 to March 26, 2021. (Frommer Decl., Ex. J at 665–66, ECF No. 112-18.) Over that period of time, the FBI inventoried the contents of over 700 safe deposit boxes. (Frommer Decl., Ex. K at 940.) In performing the inventory, agents occasionally found letters taped to the inside sleeve of the deposit box, purportedly identifying the owner of the box and providing the owner's contact information. (Frommer Decl., Ex. J at 695.) Even after finding these letters, agents would break open the interior of the box and inventory the box's contents. (*Id.* at 701.)

Once they had opened the interior of the boxes, agents would examine the box contents, take photographs, and show the contents to a video camera that was recording the inventory. (*See, e.g.*, Frommer Decl., Ex. A at 140, 176, 220, 239, ECF Nos. 136-1–3; *see also* Frommer Decl., Ex. B.2 at 6:00–8:30, ECF No. 136-4; Frommer Decl., Ex. B.4 at 14:00–14:45.) When they encountered cash, agents documented its condition and presented the cash to drug-sniffing dogs, noting if the dogs alerted. (Frommer Decl., Ex. A at 29; *see also* Frommer Decl., Ex. J at 683–84.)

### F. Forfeiture Proceedings and the Instant Litigation

After seizing the nests of boxes and their contents, the Government initiated administrative forfeiture proceedings on May 20, 2021, against any box contents that met a minimum monetary threshold of $5,000. (*See* Rodgers Decl., Ex. J, ECF No. 122-11; Frommer Decl., Ex. O at 1562–63.) Soon thereafter, on May 27, 2021, Plaintiffs filed this action. (*See* Compl., ECF No. 1.) Four plaintiffs quickly filed an Application for a Temporary Restraining Order asking the Court to enjoin the Government from continuing with the forfeiture proceedings. (Pls.' Appl. for TRO, ECF No. 44.) In granting the Application, the Court found that those movants had demonstrated a likelihood of success on their claim that the Government's "anemic" administrative forfeiture notices, which provided no factual basis or statutory authority for the seizure of Plaintiffs' property, violated their constitutional rights. (Order re: TRO Appl. at 3–4, ECF No. 52.) Through the pendency of this litigation, nearly all

---

EXHIBIT 1 SNITKO RULING
PAGE 008

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | | |

Plaintiffs and class members have had their seized property returned.[3] (*See, e.g.*, Rodgers Decl. Ex. M at 361–62, ECF No. 122-17; Rodgers Decl. Ex. Y at 430–33, ECF No. 122-26.)

### III.   CONCLUSIONS OF LAW

Plaintiffs argue that the Government's actions in the USPV investigation "callously disregarded the[ir] Fourth Amendment rights," and they seek an injunction ordering the Government to "sequester and return" the records generated during the inventory of the USPV deposit boxes. (Pls.' Trial Br. at 19.) Plaintiffs' Fourth Amendment argument is two-pronged: (1) that the Government's search and seizure exceeded the limitations set out in the USPV warrant; and (2) that the Government breached its duty of candor by misleading Judge Kim in its warrant application. The Court addresses each argument in turn.

#### A.   **Whether the Government Exceeded the Bounds of the Warrant**

The first question is whether the Government's actions exceeded the bounds of the warrant. The warrant, while authorizing the seizure of the nests of boxes at USPV, did not "authorize a criminal search or seizure of" their contents. (Rodgers Decl., Ex. A at 32.) However, it authorized agents to "follow their written inventory policies," both to "protect their agencies and contents of the boxes" and to "identify [box] owners." (*Id.* at 33.) Plaintiffs argue that the Government ignored the warrant's strictures against criminal search and seizure because any purported inventory was a sham—a mere pretext to rummage through box contents for evidence. (Pls.' Trial Brief at 16.) The Government counters that the inventory complied with written policy and was not pretextual. (Defs.' Opp'n at 12–15, ECF No. 122.) Accordingly, to determine whether the Government's search exceeded the bounds of the warrant, the Court must ascertain whether the Government conducted a constitutionally proper inventory search.

##### 1.   *Legal Standard*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search and seizure by law enforcement officers is "*per se* unreasonable . . . subject only to a few

---

[3] Plaintiffs Michael Storc and Jeni Verdon-Pearsons declare that they have not received $2,000 in cash that was in their box. (*See* Storc Decl. ¶ 17.) Zellhart, on the other hand, declares that the Government never found $2,000 in their box and does not possess those funds. (Zellhart Decl. ¶ 2, ECF No. 122-40.) This dispute notwithstanding, those plaintiffs are not seeking individualized relief in this class action trial. (*See* Pls.' Trial Br. at 2, ECF No. 112 ("Plaintiffs are entitled to have the government 'sequester and return,' or otherwise destroy, records containing personal information about class members and their property that it possesses as a result of its search . . . . The Court should enter judgment ordering the government to do exactly that.").)

EXHIBIT 1 SNITKO RULING
PAGE 009

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | | |

specifically established and well-delineated exceptions." *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012). One such exception is the inventory search, which is intended to "produce an inventory" of property that law enforcement has legally taken possession of to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Because an inventory search fulfills law enforcement's "community caretaking" function, such a search must be undertaken "on the basis of something other than suspicion of evidence of criminal activity." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). Accordingly, the search must be performed pursuant to "standard [written] criteria," and those criteria must not give officers discretion in determining the scope of the search. *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987).

Because an inventory search must be non-investigative in nature, the Ninth Circuit has held that an "inventory search is invalid if it was a pretext for an investigative search." *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993). An inventory is pretextual when the "only reason" law enforcement performs an inventory is to find evidence of criminality. *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017). There is, however, a critical wrinkle to the pretext analysis; "the mere presence of a criminal investigatory motive or a dual-motive—one valid and one impermissible—does not render an . . . [inventory] search invalid; instead, the Court asks whether the challenged search or seizure *would have occurred in the absence of an impermissible reason*." *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) (emphasis added). The "underlying principle" that a Court should look to is whether it appears that "the police raised the inventory search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019). Situations where an officer "no doubt expect[s] to find evidence of criminal activity," but conducts an otherwise reasonable inventory search, are not constitutionally impermissible. *Id; see also Bowhay*, 992 F.2d at 231 ("Penalizing officers who are candid enough to admit they hope to find evidence of a crime can only encourage obfuscation and dishonesty, without protecting reasonable expectations of privacy.")

       2.    *Analysis*

Plaintiffs argue that the Government's inventory was constitutionally improper for two different reasons: (1) the record establishes the true motive of the "inventory" was to uncover evidence of criminality; and (2) the Government's inventory failed to make a fulsome record of the box contents, indicating pretext. (*See* Pls.' Trial Brief at 17–18.) The Court analyzes each below.

EXHIBIT 1 SNITKO RULING
PAGE 010

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | ***Paul Snitko, et al v. United States of America, et al*** | | | |

 

     *a.   Improper Investigatory Motive*

     Whether an inventory was impermissibly pretextual hinges one question: would the challenged search have occurred but for the Government's allegedly improper investigatory purpose? Here, the answer is yes. The warrant authorized the Government to seize the nests of deposit boxes and inventory the contents of those boxes in accordance with standardized policy. (Rodgers Decl., Ex. A at 32–33.) The FBI's inventory policy requires that when an agent "lawfully take[s] custody of property," he or she must "conduct a prompt and thorough search of the contents of the property, *including searching any locked or unlocked containers*." (Rodgers Decl., Ex. E at 273.) Thus, because the Government had lawfully taken custody of the box nests (due to the warrant's authorization to seize them), the inventory policy mandated that agents examine the locked containers within. Agents had no discretion to determine which boxes should be inventoried and which should not—indeed, a policy granting such discretionary authority would run afoul of the Supreme Court's inventory search jurisprudence. *See Bertine*, 479 U.S. at 375–76. It therefore seems clear that the agents would have cracked the deposit boxes and searched their contents whether or not they had an impermissible investigatory motive.[4]

     Plaintiffs make much of the FBI's policy regarding custody of an unknown person's property, which was alluded to in both the affidavit and the warrants. That policy requires agents to "inspect the property as necessary to identify the owner," but which should "extend no further than necessary to determine ownership." (Rodgers Decl., Ex. B at 138.) Plaintiffs argue that on numerous occasions during the USPV raid, agents continued rummaging through boxes even after they were able to determine who the boxholder was. But Plaintiffs ignore critical language in the warrant and affidavit—that, *in addition* to examining box contents to identify owners, agents were to conduct an inventory of the boxes, which required them to examine the contents of locked containers. Thus, the fact that agents continued to examine box contents even after identifying the owners' identity does not indicate that the inventory search was pretextual.

     Plaintiffs also point to numerous instances in the record indicating that the Government expected to find evidence of criminality during its inventory. For example, investigating agents candidly admitted that they "fully expected there to be criminal customers at this business," and thus they anticipated "that there would be criminal proceeds in the safe deposit boxes." (Frommer Decl., Ex. K at 889–890.) In addition, the Supplemental Instructions drafted by Agent Zellhart gave guidance on how to handle items

---

[4] The FBI's standardized policy tells agents that, "where feasible," they should obtain a warrant for property that may be subject to an inventory search. (Rodgers Decl., Ex. E at 274.) Here, the anonymous nature of the boxes prevented the Government from determining who owned a specific box or what was inside, and thus prevented them from describing with particularity "both the place to be searched and the . . . things to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). As such, the policy's warrant section does not change the Court's "but-for" analysis.

EXHIBIT 1 SNITKO RULING
PAGE 011

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | ***Paul Snitko, et al v. United States of America, et al*** | | | |

with indicia of criminality, along with instructing agents on how to properly inventory the seized property. The agents executing the warrant also arranged for drug-sniffing dogs to be present at USPV, a tactic that would be unnecessary unless agents expected to discover drugs or drug-adjacent cash.

Given this evidence, there can be no question that the Government expected, or even hoped, to find criminal evidence during its inventory. Unfortunately for Plaintiffs, the mere presence of such a motive is not by itself enough. An impermissible investigatory motive must be the *only* reason the agents conducted the inventory. *Compare Garay*, 938 F.3d at 1112 ("Given the circumstances leading up to the search, the officers no doubt expected to find evidence of criminal activity inside the vehicle. But that expectation would not invalidate an otherwise reasonable inventory search.") *with Johnson*, 889 F.3d at 1128, 1129 n.1 (finding inventory search invalid where officers admittedly seized items "simply because they believe[d] the items might be of evidentiary value."); *see also United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003) ("Law enforcement called for a drug-sniffing dog to be brought to the scene . . . [and law enforcement officers] testified the search was partly conducted to investigate the possibility Rowland might be trafficking narcotics. Clearly, therefore, police had an investigative motive. Such a motive alone, however, does not sour an inventory search.")

Plaintiffs must establish that the Government would not have seized the nests and opened the boxes *but for* the impermissible investigatory motive, and they have failed to do so here. The Government's purpose in seizing the nests—which it was authorized to do—was to "take [USPV] out of business . . . [i]f we had not taken the boxes, they could have replaced the computers, the money counters, the eyeball scanners, and they would have been back in business on April 1st . . . . So the nest of security boxes was part and parcel of taking this company out of business." (Frommer Decl., Ex. K at 891–92.) Once the nests were seized, the warrant authorized the agents to inventory their contents, an inventory which was intended to "protect the FBI, [] to get an accounting of what's actually there, [] to protect us against an accusation of theft or loss, [] to protect us against hazardous material, and . . . to get a full, you know, a full accounting of what's there when we return it." (*Id.* at 833–34.) That the Government had a legitimate inventory motive is evidenced by the fact that the 4-day process, wherein agents recorded the contents of 700 boxes,[5] resulted in the Government being able to successfully return property claimed by hundreds of box owners, including the class members here. (*See* Frommer Decl., Ex. K at 935 ("[W]e've returned about 500 boxes . . . . We were committed to getting the property back to the correct person.").) It beggars belief that agents would have worked in this manner *solely* to invent a pretext for a criminal search of the box contents.

---

[5] The Court also notes that inventorying one box could take "up to 45-minutes to process . . . properly." (Frommer Decl., Ex. K at 943.)

EXHIBIT 1 SNITKO RULING
PAGE 012

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|----------|------------------------|---|------|--------------------|
| Title | *Paul Snitko, et al v. United States of America, et al* | | | |

In all, Plaintiffs have certainly shown that the Government had a dual motive in inventorying the contents of each deposit box. But that is not enough. They must demonstrate that the improper investigatory motive was the *only* reason that the Government opened the safety deposit boxes, and they have not done so.[6] Thus, they have so far failed to show that the inventory was pretextual.

### b. *Failure to Conduct a Meaningful Inventory*

Plaintiffs' other pretext argument is that the Government's "inventory" did not, in fact, meaningfully record the contents of the deposit boxes. They point to the fact that agents would sometimes fail to specifically count the items that were in a box and instead use a catch-all descriptor on inventory forms such as "miscellaneous general items." (Frommer Decl., Ex. A at 44.) In addition, the photographs agents took occasionally made it either difficult or impossible to determine how much property was in the box. (*See* Frommer Decl., Ex. A at 179, 184 (inventory lists "uncounted gold color coins" and photograph shows pile of coins).)

This argument is also unavailing. First, the FBI inventory policy does not require an enumerated list of all items being inventoried. Rather, it simply mandates "a written summary," which must include "a description of the property and the items secured for safekeeping." (Rodgers Decl., Ex. E at 274.) Where a law enforcement policy does not require a detailed, itemized inventory list, an officer's failure to "record all items recovered on a specific form or in a particular fashion" does not invalidate the inventory search. *United States v. Garner*, 181 F.3d 988, 992 (8th Cir. 1999); *cf. United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (finding inventory search invalid where, despite policy that "require[d] officers to create a detailed, itemized inventory," police officer listed property only as "misc. tools").

Nonetheless, Plaintiffs cite *United States v. Roberts*, 430 F. Supp. 3d 693 (D. Nev. 2019), for the proposition that a "failure to properly and completely document property indicated that inventory search was pretextual." (Pls.' Trial Br. at 18.) At the outset, the Ninth Circuit's recent precedent disagrees with Plaintiffs' statement of law, holding that "minor noncompliance with department policies does not invalidate an otherwise lawful inventory search." *Magdirila*, 962 F.3d at 1157 (finding valid inventory where officers did not document "all property" on the inventory form). This is true even where "officers

---

[6] In their Reply Brief, Plaintiffs argue that the "dual motive" analysis is only applicable to warrantless searches, and thus inapposite here. Plaintiffs are incorrect: the Ninth Circuit has recently applied the dual-motive framework to searches conducted pursuant to a warrant. *See Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019) (finding a plaintiff's suspicionless detention, which occurred during the execution of a search warrant, would not have occurred but for law enforcement's sole improper purpose of deporting immigrant workers).

EXHIBIT 1 SNITKO RULING
PAGE 013

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|----------|----------------------|---|------|---------------------|
| Title | ***Paul Snitko, et al v. United States of America, et al*** | | | |

listed only some property . . . though they booked additional property as evidence." *Garay*, 938 F.3d at 1111. Controlling law aside, *Roberts* is factually distinguishable from the instant matter. In that case, the officer made no attempts to actually document the items he found during the purported inventory, whereas the agents here contemporaneously documented the contents of all 700 safety deposit boxes. *Roberts*, 430 F. Supp. at 699. Further, the officer in *Roberts* "merely ruffled things around" with "apparent carelessness," whereas the agents here took four days to document every box, write down the contents within, take photographs, and show the property to a video camera. *Id.* at 705. Finally, the officer in *Roberts* "did not even attempt to use his body camera . . . to document items . . . . [which] would surely have been more consistent with policy." *Id.* Here, of course, the agents documented the inventory with both photographs and a video camera to supplement the written forms they used.

To the extent the agents here failed to comply with the inventory policy (if at all), their non-compliance is far closer to the permissible non-compliance of officers in *Magdirila* and *Garay* than it is to the officer's actions in *Roberts*. Accordingly, the Court finds that the Government's failure to document every item taken from the boxes in exacting detail does not indicate that the inventory search was pretextual.[7]

### 3. *Conclusion*

For the foregoing reasons, the Court finds that Plaintiffs have failed to prove that the Government's inventory search was a pretext for an impermissible investigatory motive. And as the Court noted above, Plaintiffs' claim that the Government exceeded the bounds of the warrant hinges on whether the Government's actions were a valid inventory. Having found a valid inventory, the Court necessarily finds that the Government did not exceed the bounds of the warrant. Plaintiffs have failed to prove this prong of their Fourth Amendment argument.

---

[7] On Reply, Plaintiffs argued that the investigating agents were not actually following their standardized inventory policies because Zellhart had crafted Supplemental Instructions that superseded the DIOG and were the operative policy for the raid. (*See* Frommer Decl., Ex. M at 1215.) The Court is not convinced. While the Supplemental Instructions provide more detailed guidance than the DIOG does, they do not seem to contradict the DIOG. For example, the Supplemental Instructions order agents to show all cash to drug-sniffing dogs and to note any indicia that the cash may have been involved in drug trafficking. But the DIOG contemplates that, when inventorying property, agents may have to "memorialize facts pertinent to other activities undertaken during the inventory process, such as . . . any evidence collected . . . that are relevant to the investigation." (Rodgers Decl., Ex. E at 274.) The DIOG also contemplates the discovery of contraband or evidence during an inventory, which "should be immediately seized." (*Id.*) In all, it does not appear that agents failed to follow the FBI's written inventory policy merely because they *also* followed case-specific instructions.

EXHIBIT 1 SNITKO RULING
PAGE 014

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

### B.  Whether the Government Breached its Duty of Candor in its Warrant Application

Plaintiffs' other Fourth Amendment argument is that the Government misled Judge Kim in its warrant affidavit, thus breaching its duty of candor. Specifically, Plaintiffs note that the affidavit states only that the Government intended to inventory the box contents, while omitting the fact that investigators were making preparations to forfeit much of that property.

Naturally, law enforcement agents may not submit warrant affidavits that contain "material falsities or omissions." *United States v. Garcia-Cruz*, 978 F.2d 537, 540 (9th Cir. 1992). The test for determining whether a false statement or omission was material is "whether an affidavit containing the omitted material would have provided a basis for a finding of probable cause." *Id.* If probable cause would have remained even if the omitted facts were included in the affidavit, an omission is "immaterial." *Id.* Further, an omission relating to "how the search would be conducted," rather than relating to "whether a warrant should issue" in the first place, is also immaterial. *United States v. Mittelman*, 999 F.2d 440, 444 (9th Cir. 1993) (finding misstatement immaterial where "no one disputes that there was ample cause to conduct the search, and where the only dispute is over how that search was conducted").

Here, Plaintiffs do not argue that the purported omission—that the Government had made certain preparations to forfeit boxholder contents—had any effect on the existence of probable cause to search and seize USPV's property, including the nests of boxes. Rather, they base their argument on two Ninth Circuit cases that address alternative types of improper affidavit omissions.

First, they cite to *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (*overruled in part on other grounds by Hamer v. Neighborhood Hous. Servs. Of Chi.*, 138 S. Ct. 13, 16–17 (2017)) (hereafter, "*CDT*"). In *CDT*, the Government sought a warrant to search the defendant's computers, which contained data on steroid tests conducted on professional baseball players. *Id.* at 1166. However, the Government only had probable cause to retrieve the electronic files of ten players. *Id.* In its affidavit, the Government informed the magistrate that there was a significant risk the data it sought might be destroyed, which required a broad seizure of all data on CDT's servers, including that for which the Government had no probable cause. *Id.* at 1168. What the Government failed to tell the magistrate, however, was that CDT had "agreed to keep the data intact" for a certain amount of time, an omission that "created the false impression that, unless the data were seized at once, it would be lost." *Id.* at 1178 (Kozinski, J., concurring). The Court found that this omission caused the magistrate to issue a warrant he may not otherwise have issued. *Id.*

Here, by contrast, the omission of the Government's forfeiture preparations did not "create[] [a] false impression." *Id.* The affidavit was rife with details of prior investigations into individual USPV

EXHIBIT 1 SNITKO RULING
PAGE 015

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | | Date | September 29, 2022 |
|---|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | | |

boxholders that resulted in forfeiture, and it noted that the agents executing the warrant would inventory the contents of all individual boxes. Any reasonable magistrate would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture.[8]

Plaintiffs next cite to *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978). In that case, law enforcement officials unsuccessfully applied to a federal judge for a search warrant based on suspected cocaine trafficking. *Id.* at 420. Faced with rejection, they immediately went to a state court and sought a warrant for the same property, this time based on suspected marijuana possession. *Id.* In doing so, the agents made no mention of their failed attempt to obtain a warrant in a different court. *Id.* The state court warrant issued, and agents used it to search primarily for evidence of cocaine trafficking. *Id.* at 421. The Ninth Circuit held that the omission of the rejected warrant application from the state court affidavit would not, by itself, be reason to invalidate the warrant. *Id.* at 422. Indeed, even the Government's "continued [undisclosed] purpose to discover evidence" of the cocaine trafficking scheme would not have been improper. *Id.* Rather, the violation came when the agents "did not confine their search in good faith to the objects of the warrant . . . [and] they substantially exceeded any reasonable interpretation of its provisions." *Id.* at 423. That, of course, is not the case here, where the Court has found that the Government did, in fact, confine its search to the warrants' requirements.

In all, Plaintiffs have not demonstrated either that: (1) the omission of the Government's forfeiture plans from the affidavit was material to a finding of probable cause as to USPV; or (2) that the Government's conduct in this matter was equal to or greater than the violative conduct in *CDT* or *Rettig*. Thus, the Court finds that Plaintiffs' second Fourth Amendment argument fails.

---

[8] The *CDT* Court also took umbrage with the Government's blatant disregard of certain restrictions the magistrate had put in the warrant. *Id.* at 1171. Here, as discussed above, the Government did not exceed the scope of the warrant, much less blatantly disregard its strictures.

EXHIBIT 1 SNITKO RULING
PAGE 016

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS JUDGMENT TO DEFENDANTS.** Defendants shall lodge a proposed judgment that accords with this Order by **October 7, 2022.**

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer      kmh

EXHIBIT 1 SNITKO RULING
PAGE 017

# EXHIBIT 2

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| | ) Case No. 2:21-MJ-01302 |
| 9182 W. OLYMPIC BLVD., | ) |
| BEVERLY HILLS, CALIFORNIA | ) |
| | ) |
| | ) |
| | ) |

**FILED**
CLERK, U.S. DISTRICT COURT
**3/17/21**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ev _____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846; 31 U.S.C. §§ 5324 and 5331. | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lynne Zellhart
_____
*Applicant's signature*

Special Agent Lynne Zellhart, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 17, 2021
_____
*Judge's signature*

City and state: Los Angeles, CA
_____
Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

**USAO 000015**

AUSA Andrew Brown, x0102, 11th Floor

## ATTACHMENT A - USPV

The premises to be searched is:

The storefront located at 9182 W. OLYMPIC BLVD., BEVERLY
HILLS, CALIFORNIA, which houses the businesses known as Olympic
Gold & Jewelry and U.S. Private Vaults in a single retail space
with only one entrance.  The premises to be searched is a retail
space in a strip mall located on the south side of Olympic Blvd.
between S. Palm Drive and S. Oakhurst Drive.  It bears the
current street number "9182" over the glass entry door on the
left side of the space, and the former street number "9186"
towards the right.  Above the premises to be searched on the
stucco wall is the sign "US PRIVATE VAULTS" in red and blue
letters.  The front of the premises to be searched is all glass,
some of it darkly tinted.  The glass windows bear the additional
signs "OLYMPIC GOLD & JEWELRY" and "US PRIVATE VAULTS."  The
premises to be searched is between the stores "Silver Nails" to
the east and "Mail Service" to the west, and is pictured in the
attached photographs:

1

**USAO 000016**

EXHIBIT 2 WARRANT APP.
PAGE 019





2

**USAO 000017**

EXHIBIT 2 WARRANT APP.
PAGE 020

1   **ATTACHMENT B--USPV**

2   **I. ITEMS TO BE SEIZED**

3     1.  The items to be seized are evidence, contraband, fruits, or

4 instrumentalities of violations of 18 U.S.C. §§ 371, 1343, and 1956;

5 21 U.S.C. §§ 841, 846; and 31 U.S.C. §§ 5324 and 5331 (money

6 laundering, distribution of controlled substances, wire fraud,

7 structuring, and conspiracy to commit the same) (the "SUBJECT

8 OFFENSES"), namely:

9     a.  Narcotics and controlled substances, such as cocaine

10 and THC, and related paraphernalia such as scales, pay-owe sheets,

11 packaging material such as vape cartridges, and documents referring

12 or relating to them, such as their manufacture or sale, or

13 maintaining premises for the same;

14     b.  Records referring or relating to countersurveillance

15 of law enforcement, obstructing investigations, warning persons of

16 law enforcement inquiries or activities such as serving subpoenas or

17 search warrants, or hiding, altering, or destroying evidence;

18     c.  Money counters, cash over $10,000, bitcoin and other

19 digital currency as well as related documents and programs, and

20 records referring or relating the preceding items or to IRS form

21 8300, Currency Transaction Reports and other Bank Security Act (BSA)

22 requirements, currency reporting requirements generally, structuring

23 transactions to circumvent those requirements, such as instructions

24 to keep transactions under $10,000 in cash, anti-money laundering

25 programs and how to evade them, investigations by financial

26 institutions and the closure or threatened closure of financial

27 accounts, and, since 2019, records of cash payments and receipts;

28               **USAO 000018**

1          d.   Firearms, ammunition, and related paraphernalia such

2    as holsters and magazines, and records referring or relating to the

3    same;

4          e.   Documents and records referring or relating to actual

5    or threatened violence, such as those to enforce a criminal debt;

6          f.   Documents and records referring or relating to the

7    conversion of cash to financial instruments such as checks and wire

8    transfers, and vice versa, for a percentage of the dollar value

9    converted, including such conversions when there is an intermediate

10   medium such as precious metals, whether real or purported;

11         g.   Records reflecting or relating to the escheatment of

12   property to the state of California including the requirement to do

13   so, returning property to a named designee, the disposition of

14   contents of abandoned/unpaid safety deposit boxes, and complaints

15   that items were missing from a safety deposit box;

16         h.   Records referring or relating to criminals, crimes,

17   prison, arrests, criminal investigations, criminal charges, and asset

18   forfeiture;

19         i.   Biometric scanning equipment and records, and

20   documents referring or relating to them;

21         j.   Digital or video security systems, recordings of

22   forcing open safety deposit boxes and the removal of contents of

23   boxes for any purpose including abandonment or incapacity of the

24   customer and documents referring or relating to the same, and, since

25   2019, surveillance video;

26         k.   Nests of safety deposit boxes and keys, and documents

27   and records referring or relating to them since 2019.  This warrant

28   does not authorize a criminal search or seizure of the contents of

USAO 000019

1  the safety deposit boxes.  In seizing the nests of safety deposit
2  boxes, agents shall follow their written inventory policies to
3  protect their agencies and the contents of the boxes.  Also in
4  accordance with their written policies, agents shall inspect the
5  contents of the boxes in an effort to identify their owners in order
6  to notify them so that they can claim their property;

7         l.   Records referring or relating to CARES Act relief
8  programs, such as the Paycheck Protection Program and Small Business
9  Administration loans;

10        m.   Records referring or relating to the ownership or
11 control of U.S. PRIVATE VAULTS or OLYMPIC GOLD & JEWELRY or parent or
12 subsidiary entity, including employment records, and records of
13 corporate actions such as corporate minutes and votes;

14        n.   Since 2019, documents and records referring or
15 relating to financial or monetary transactions involving U.S. PRIVATE
16 VAULTS or OLYMPIC GOLD & JEWELRY, including records referring to or
17 identifying their customers;

18        o.   Records referring or relating to Beltran or a cartel,
19 or since 2019 to MJ Real Estate Investors Inc. (MJRE), Emerald Fund
20 LLC, Alta Quality Growers, MGP Management, MGP Consulting, MGP
21 Filling and Packaging, Bachelor Valley Fund LLC, Antares Topanga
22 Group LLC, dba Valley Collective Care, Rogue Bioscience, and
23 Sportsware Inc.;

24        p.   Records relating to wealth and the movement of wealth
25 since 2019, such as tax returns and forms, crypto-currency accounts
26 and transfers, other digital wealth storage and transfer methods
27 including PayPal and Venmo, money orders, brokerage and financial
28 institution statements, wire transfers, currency exchanges, deposit

3

USAO 000020

**EXHIBIT B**
**46**

EXHIBIT 2 WARRANT APP.
PAGE 023

1    slips, cashier's checks, transactions involving prepaid cards, and/or
2    other financial documents related to depository bank accounts, lines
3    of credit, credit card accounts, real estate mortgage initial
4    purchase loans or loan refinances, residential property leases,
5    escrow accounts, the purchase, sale, or leasing of automobiles or
6    real estate, or auto loans, and investments, or showing or referring
7    to purchases or transactions for more than $1,000;

8         q.   Records or items containing indicia of occupancy,
9    residency or ownership of any location or vehicle being searched,
10   such as keys, rental agreements, leases, utility bills, identity
11   documents, cancelled mail, and surveillance video;

12        r.   Documents and records showing electronic and telephone
13   contacts and numbers called or calling, such as SIM cards, address
14   books, call histories, telephone bills, and Signal, ICQ, Telegram,
15   and email addresses.

16        s.   Any digital device which is itself or which contains
17   evidence, contraband, fruits, or instrumentalities of the Subject
18   Offenses, and forensic copies thereof.

19   2.   With respect to any digital device containing evidence
20   falling within the scope of the foregoing categories of items to be
21   seized:

22        a.   evidence of who used, owned, or controlled the device
23   at the time the things described in this warrant were created,
24   edited, or deleted, such as logs, registry entries, configuration
25   files, saved usernames and passwords, documents, browsing history,
26   user profiles, e-mail, e-mail contacts, chat and instant messaging
27   logs, photographs, and correspondence;

28

**USAO 000021**

4

**EXHIBIT B**

**47**

EXHIBIT 2 WARRANT APP.
PAGE 024

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

USAO 000022

5

**EXHIBIT B**
**48**

EXHIBIT 2 WARRANT APP.
PAGE 025

4.    As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing data in
digital form, including central processing units; desktop, laptop,
notebook, and tablet computers; personal digital assistants; wireless
communication devices, such as telephone paging devices, beepers,
mobile telephones, and smart phones; digital cameras; gaming consoles
(including Sony PlayStations and Microsoft Xboxes); peripheral
input/output devices, such as keyboards, printers, scanners,
plotters, monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy disks,
memory cards, optical disks, and magnetic tapes used to store digital
data (excluding analog tapes such as VHS); and security devices.

**II.   SEARCH PROCEDURE FOR DIGITAL DEVICES**

5.    In searching digital devices or forensic copies thereof,
law enforcement personnel executing this search warrant will employ
the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s) thereof to
an appropriate law enforcement laboratory or similar facility to be
searched at that location.  The search team shall complete the search
as soon as is practicable but not to exceed 120 days from the date of
execution of the warrant.  The government will not search the digital
device(s) and/or forensic image(s) thereof beyond this 120-day period
without obtaining an extension of time order from the Court.

**USAO 000023**

**EXHIBIT B**
**49**

EXHIBIT 2 WARRANT APP.
PAGE 026

1          b.   The search team will conduct the search only by using

2   search protocols specifically chosen to identify only the specific

3   items to be seized under this warrant.

4          i.   The search team may subject all of the data

5   contained in each digital device capable of containing any of the

6   items to be seized to the search protocols to determine whether the

7   device and any data thereon falls within the list of items to be

8   seized.  The search team may also search for and attempt to recover

9   deleted, "hidden," or encrypted data to determine, pursuant to the

10  search protocols, whether the data falls within the list of items to

11  be seized.

12         ii.  The search team may use tools to exclude normal

13  operating system files and standard third-party software that do not

14  need to be searched.

15         iii. The search team may use forensic examination and

16  searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit),

17  which tools may use hashing and other sophisticated techniques.

18         c.   If the search team, while searching a digital device,

19  encounters immediately apparent contraband or other evidence of a

20  crime outside the scope of the items to be seized, the team will not

21  search for similar evidence outside the scope of the items to be

22  seized without first obtaining authority to do so.

23         d.   If the search determines that a digital device does

24  not contain any data falling within the list of items to be seized,

25  the government will, as soon as is practicable, return the device and

26  delete or destroy all forensic copies thereof.

27         e.   If the search determines that a digital device does

28  contain data falling within the list of items to be seized, the

USAO 000024

7

**EXHIBIT B**

EXHIBIT 2 WARRANT APP.
PAGE 027

1  government may make and retain copies of such data, and may access

2  such data at any time.

3      f.   If the search determines that a digital device is (1)

4  itself an item to be seized and/or (2) contains data falling within

5  the list of other items to be seized, the government may retain the

6  digital device and any forensic copies of the digital device, but may

7  not access data falling outside the scope of the other items to be

8  seized (after the time for searching the device has expired) absent

9  further court order.

10      g.   The government may also retain a digital device if the

11  government, prior to the end of the search period, obtains an order

12  from the Court authorizing retention of the device (or while an

13  application for such an order is pending), including in circumstances

14  where the government has not been able to fully search a device

15  because the device or files contained therein is/are encrypted.

16      h.   After the completion of the search of the digital

17  devices, the government shall not access digital data falling outside

18  the scope of the items to be seized absent further order of the

19  Court.

20   6.   The review of the electronic data obtained pursuant to this

21  warrant may be conducted by any government personnel assisting in the

22  investigation, who may include, in addition to law enforcement

23  officers and agents, attorneys for the government, attorney support

24  staff, and technical experts.  Pursuant to this warrant, the

25  investigating agency may deliver a complete copy of the seized or

26  copied electronic data to the custody and control of attorneys for

27  the government and their support staff for their independent review.

28

**USAO 000025**

8

EXHIBIT 2 WARRANT APP.
PAGE 028

1       7.   In order to search for data capable of being read or
2  interpreted by a digital device, law enforcement personnel are
3  authorized to seize the following items:

4       a.   Any digital device capable of being used to commit,
5  further, or store evidence of the offense(s) listed above;

6       b.   Any equipment used to facilitate the transmission,
7  creation, display, encoding, or storage of digital data;

8       c.   Any magnetic, electronic, or optical storage device
9  capable of storing digital data;

10       d.   Any documentation, operating logs, or reference
11  manuals regarding the operation of the digital device or software
12  used in the digital device;

13       e.   Any applications, utility programs, compilers,
14  interpreters, or other software used to facilitate direct or indirect
15  communication with the digital device;

16       f.   Any physical keys, encryption devices, dongles, or
17  similar physical items that are necessary to gain access to the
18  digital device or data stored on the digital device; and

19       g.   Any passwords, password files, biometric keys, test
20  keys, encryption codes, or other information necessary to access the
21  digital device or data stored on the digital device.

22      8.   During the execution of this search warrant, law
23  enforcement is permitted to: (1) depress the thumbs and/or fingers of
24  MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, and HILLARY and STEVE
25  BARTH onto the fingerprint sensor of the device (only when the device
26  has such a sensor), and direct which specific finger(s) and/or
27  thumb(s) shall be depressed; and (2) hold the device in front of the
28  face of those persons with their eyes open to activate the facial-,

9

USAO 000026

**EXHIBIT B**
**52**

EXHIBIT 2 WARRANT APP.
PAGE 029

1  iris-, or retina-recognition feature, in order to gain access to the

2  contents of any such device.  In depressing a person's thumb or

3  finger onto a device and in holding a device in front of a person's

4  face, law enforcement may not use excessive force, as defined in

5  Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement

6  may use no more than objectively reasonable force in light of the

7  facts and circumstances confronting them.

8       9.   The special procedures relating to digital devices found in

9  this warrant govern only the search of digital devices pursuant to

10  the authority conferred by this warrant, and do not apply to any

11  other search of digital devices.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USAO 000027

10

**EXHIBIT B**
**53**

EXHIBIT 2 WARRANT APP.
PAGE 030

<u>A F F I D A V I T</u>

I, Lynne K. Zellhart, being duly sworn and under oath, hereby depose and say as follows:

<strong>AFFIANT'S BACKGROUND</strong>

1.   I am a Special Agent ("SA") with the FBI, and have been so employed since May 2004.  I am currently assigned to a White Collar Crime squad, which investigates money-laundering facilitation.  Prior to this assignment, I was assigned to the Southwest Border Anti-Money Laundering Task Force ("SWBAMLTF") in Los Angeles, which investigated large-scale, money-laundering activities associated with Mexican Criminal Enterprises ("MCE"), and was comprised of Special Agents from the FBI and deputies from the Los Angeles County Sheriff's Office.  Prior to my assignment with the SWBAMLTF, I was assigned to a Los Angeles High Intensity Drug Trafficking Area ("HIDTA") group, which investigated drug trafficking organizations.  I have also been assigned to a criminal enterprise (Bloods and Crips) task force in Los Angeles, as well as the Northern Ohio Law Enforcement Task Force, which is also engaged in investigations of drug trafficking organizations.  In addition to Special Agent training at Quantico, Virginia, I have attended DEA-sponsored Basic Narcotics Investigator School, a 40-hour intensive training for federal narcotics investigators.  I have also attended a 40-hour Asset Forfeiture/Money Laundering class, two week-long money laundering facilitation conferences and several other conferences sponsored by the various anti-money laundering interests.  I have made presentations on money laundering investigations at several training conferences including the *Asset Forfeiture Summit for Law Enforcement Executives* (March

<strong>USAO 000028</strong>

1

EXHIBIT 2 WARRANT APP.<br>PAGE 031

1  2018), the *Advanced Money Laundering Conference* (May 2018), and *Money*
2  *Laundering Across Investigative Programs* (October 2018).

3      2.   I have participated in numerous investigations of criminal
4  enterprises, including violent criminal street gangs, drug-
5  trafficking organizations, and businesses that are facilitating the
6  laundering of criminal proceeds.  During the course of these
7  investigations, I have identified co-conspirators through the use of
8  telephone records and bills, financial records, photographs, and
9  other documents.  I have directed and assisted in the handling of
10  confidential sources to successfully infiltrate various-sized
11  criminal enterprises via intelligence gathering, participation in
12  consensual recordings, and the monitored purchase of a controlled
13  substance.  I have participated in debriefings of cooperating
14  defendants.  I have executed search warrants for controlled
15  substances, documents, digital records and the proceeds of drug
16  trafficking and other crimes.  I have conducted physical and
17  electronic surveillance.  I have also conducted investigations in
18  which I have used Global Positioning System ("GPS") information to
19  locate and track persons who are the subjects of criminal
20  investigations.  I have directed and participated in investigations
21  involving the use of court-authorized interception of wire
22  communications.  I have engaged in extensive document-based
23  investigations, collecting, reviewing and analyzing bank documents,
24  wire transfers, employment records, e-mail, and database research.

25  **I.    PURPOSE OF AFFIDAVIT: SEARCH AND SEIZURE WARRANTS**

26      3.   This affidavit is made in support of search warrants for
27  the business U.S PRIVATE VAULTS ("USPV"), and the homes of USPV's
28  principals MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ (also known as

2

USAO 000029

**EXHIBIT B**

**55**

EXHIBIT 2 WARRANT APP.
PAGE 032

1  JORGE VASQUEZ), STEVE BARTH and HILLARY BARTH, for evidence of

2  violations of 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846;

3  and 31 U.S.C. §§ 5324 and 5331 (hereafter, the SUBJECT OFFENSES), as

4  described more fully in Attachment B, which is incorporated by

5  reference.  The locations to be searched (collectively, the "SUBJECT

6  PREMISES"), described more fully in Attachments A which are also

7  incorporated by reference, are:

8       a.   U.S. PRIVATE VAULTS, 9182 W. OLYMPIC BLVD., BEVERLY

9  HILLS, CALIFORNIA ("USPV").

10      b.   ███████████████████████████████████

11  ████████████████████████

12  ████  ███████████████████████████

13  ███████████████████████████

14  ████  ██████████████████████████████

15  █████████████████████████

16  ████  ████████████████████████████████

17  ██████████████████.

18      4.   This affidavit is also made in support of a seizure warrant

19  for the business computers, money counters, nests of safety deposit

20  boxes and keys, digital and video surveillance and security equipment

21  and biometric scanners located at USPV, 9182 West Olympic Blvd.,

22  Beverly Hills, CA 90212, which are subject to seizure pursuant to 18

23  U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C. § 5317(c) and

24  forfeiture pursuant to 18 U.S.C. § 1956 (money laundering), 21 U.S.C.

25  § 841 (drug trafficking) and 31 U.S.C. § 5324 (structuring) because

26  there is probable cause to believe that those items were used or

27  intended to be used to facilitate violations of 18 U.S.C. §§ 1956, 21

28  U.S.C. § 841 and 31 U.S.C. § 5324, and conspiracy to commit the same.

**USAO 000030**

3

**EXHIBIT B**

**56**

EXHIBIT 2 WARRANT APP.
PAGE 033

5.  The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

II.  **Summary of investigation**

6.  U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously.  It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses.  Its business model is designed to appeal to criminals for customers.  It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law enforcement investigations, and structure transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously.  USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers.  The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses.  By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering

USAO 000031

4

**EXHIBIT B**

**57**

EXHIBIT 2 WARRANT APP.
PAGE 034

## III. PROBABLE CAUSE

### A.   US PRIVATE VAULTS HAS BEEN INDICTED

7.    The Grand Jury indicted corporate defendant U.S. PRIVATE VAULTS INC. for Conspiracy to Launder Money, Conspiracy to Distribute Controlled Substances, and Conspiracy to Structure Transactions on March 9, 2021.  The indictment also contained forfeiture allegations against certain business equipment located at USPV, which the Grand Jury explicitly found were supported by probable cause.  The indictment is attached and incorporated by reference.  AUSA Andrew Brown informed me that:

a.    The Ninth Circuit held in *United States v. Seybold*, 726 F.2d 502, 504-05 (1983), that magistrates may consider the information contained in an indictment in making a subsequent probable cause determination, such as for search and seizure warrants.

b.    The legislative history of forfeiture statute 21 U.S.C. § 853 indicates that Congress intended a grand jury's finding in support of forfeiture to be given considerable weight:

> For the purposes of issuing a restraining order, the probable cause established in the indictment . . . is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based.

S. Rep. No. 225, 98th Cong., 2d Sess. 203 (1984), reprinted in 1984 U.S. Code Cong. & Administrative News 3182, 3386.

Here, the description of the USPV business equipment that I seek to seize by seizure warrant is identical to the description of the USPV business equipment that the Grand Jury found probable cause to forfeit in their indictment.

**USAO 000032**

5

**EXHIBIT B**
**58**

EXHIBIT 2 WARRANT APP. PAGE 035

**B.   INVESTIGATION BACKGROUND**

8.   In approximately 2015, several state and federal law enforcement agencies including the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), the United States Postal Inspections Service ("USPIS"), the Los Angeles Police Department ("LAPD"), and the Los Angeles County Sheriff's Department ("LASD") learned that the targets of criminal investigations were employing the services of U.S. PRIVATE VAULTS ("USPV") to store criminal proceeds.  Separate and unrelated investigations into drug trafficking, human trafficking, illegal gambling, racketeering, computer intrusion, insurance fraud and identity theft led investigators to the doorstep of USPV.  Search warrants executed on individual boxes within USPV consistently produced criminal proceeds and evidence of criminal conduct.

9.   The following individuals have an ownership or management interest in USPV as described:

a.   Mark PAUL – PAUL is the owner and founder of USPV. According to California Secretary of State records, PAUL is the CEO and registered agent of USPV.  PAUL has held himself out to be the owner of USPV publicly and privately.  PAUL told CS-1, discussed later in this affidavit, that he has the ability to monitor activities inside USPV remotely from his residence at ██████████ ████████████████████████████████.

b.   Michael POLIAK - In 2019 POLIAK became a co-owner of USPV.  POLIAK purchased a 50% interest in the business – 25% from Hilary BARTH (HILLARY BARTH) and Steve BARTH (STEVE BARTH) and 25% from Mark PAUL.  POLIAK himself stated that he paid $475,000 for his share of the business - "two-seventy-five clean; two hundred dirty."

6

USAO 000033

**EXHIBIT B**
**59**

EXHIBIT 2 WARRANT APP.
PAGE 036

1  Bank records show that in April 2019, Michael POLIAK transferred
2  $225,000 to USPV's business bank account. Agents believe the
3  remainder was paid in cash (i.e. "dirty") to PAUL and the BARTHs.
4  POLIAK was a USPV customer for two years before becoming an owner.

5       c.   George VASQUEZ - VASQUEZ is employed at USPV as
6  manager and armed guard.  He works Tuesday through Saturday during
7  business hours and handles new customers, sales, security, and all
8  matters of operation.  Secretary of State records (2019) list VASQUEZ
9  as "manager" of USPV.  The Beverly Hills Chamber of Commerce website
10 lists VASQUEZ as USPV's Vice President.

11      d.   Matt BONVICIN – BONVICIN is a partner at USPV and its
12 Chief Technology Officer.  Bank records show that BONVICIN's company,
13 SPORTSWARE INC., receives regular payments from USPV, including two
14 large payments after POLIAK bought in to the company in April 2019.

15      e.   HILLARY BARTH and STEVE BARTH owned a 25% interest in
16 USPV prior to POLIAK buying them out.  They operate OLYMPIC GOLD &
17 JEWELRY on a daily basis, and operate USPV on VASQUEZ's day off.
18 OLYMPIC GOLD & JEWELRY is located at the same physical location as
19 USPV and engages in buying and selling gold and silver, often to USPV
20 customers.  STEVE BARTH is listed on a 2016 Secretary of State filing
21 as "Secretary" of USPV.  HILLARY BARTH is listed as a
22 "representative" of USPV on the Beverly Hills Chamber of Commerce
23 website.

24     **C.   HOW USPV OSTENSIBLY OPERATES**

25    10.  According to its own advertising literature, website and
26 statements made to investigators, USPV operates as follows:

27

28 **USAO 000034**

7

EXHIBIT 2 WARRANT APP.
PAGE 037

1        a.   Customers may rent a safe deposit box ranging in size

2  in inches between 3 x 5 x 22 (smallest) and 10 x 10 x 22 (largest)

3  for $575 to $1,800 a year, respectively.

4        b.   An iris scan provides the customer with access to the

5  vault.  No personal information, social security number, driver's

6  license or other forms of identification are required to rent or

7  access a box.

8        c.   The customer keeps all keys.  The keys do not contain

9  or denote box numbers on them.

10        d.   A hand scan is taken as a second form of biometric

11  identification, in the event iris data is lost or a customer loses an

12  eye.

13        e.   A second person may have access to a box, if the

14  customer so chooses, and the second individual is present with the

15  customer when access is arranged; the second party's access is also

16  through iris scan; and the customer may revoke the second party's

17  access at any time.

18        f.   USPV has 24/7 electronic monitoring, 24/7 armed

19  response, and the vault is time locked when not open.

20        g.   In the event of non-payment for three months, USPV

21  will drill open the box.  USPV recommends that customers leave

22  contact information inside the box to account for this situation.

23  However, "If no contact information is found, we will store the

24  contents of your box in our private safe for three years. Thereafter,

25  we are required to escheat (forward) the contents to the State of

26  California."  (USPV Website, Frequently Asked Questions).

27

28                                          **USAO 000035**

**EXHIBIT B**

**61**

EXHIBIT 2 WARRANT APP.
PAGE 038

**D. US Private Vaults (USPV) Is Designed to Appeal to and Cater to Criminals**

11. USPV's primary pitch to customers is anonymity: "Complete Privacy; Biometric Identification; No ID Required.[1]"  By providing and promoting total anonymity, USPV caters to and attracts criminals, who seek to keep their identities and the source of their cash beyond the reach of banks, regulators, the IRS, and law enforcement.

12. On USPV's website[2], Chief Technology Officer Matt BONVICIN[3] boasts, "Our business is one of very few where we don't even want to know your name.  For your privacy and the security of your assets in our vault, **the less we know the better**."  The statement by USPV "the less we know, the better" suggests they know that their customers are using the vault for criminal purposes, such as storing illegal proceeds.  This practice appeals to those engaged in activities which they wish to hide from legal authorities and law-abiding financial institutions.

13. USPV puts forth a similar rationale with regard to use of USPV safe deposit boxes versus bank safe deposit boxes.  On its website, another USPV executive[4] posted "Four Reasons to Store Your Gold At USPV," asserting: "Banks require clients to provide their

---

[1] USPV website, www.usprivatevaults.com

[2] usprivatevaults.com/uspv-news

[3] This post on the USPV web page was written by Matt Bonvicin who is described at the end of the post as follows: "Matt is an entrepreneur, programmer, and database/systems admin who enjoys toying with technologies.  He is a partner at U.S. Private Vaults as well as its Chief Technology Officer."

[4] This post on the USPV website (usprivatevaults.com) was written by Kent Martin, who is described at the end of the post as follows: "A serial entrepreneur with a background in investment banking, Kent is a founding partner of U.S. Private Vaults and serves as its Chief Executive Officer."  We believe Martin is no longer USPV's Chief Executive Officer; however, the post remains on their website.

9

**USAO 000036**

1   social security number and a photo identification as a condition for

2   renting a safe deposit box. Your information is then filed in the

3   bank's central data system. This information can be easily accessed

4   by government agencies (such as the IRS) or attorneys armed with

5   court orders. If no one is aware you have a safe deposit box, the

6   contents (your gold) are much safer." By advocating a service which

7   circumvents the IRS and persons "armed with court orders," USPV

8   tacitly acknowledges that criminal proceeds (which the government has

9   a legitimate interest in) can be secreted at USPV, but not at banks

10   or law abiding financial institutions.

11      14.  In the same post ("Four Reasons to Store Your Gold At

12   USPV"), the same USPV executive wrote:  "As government chartered

13   institutions, banks are now required to file 'suspicious activity

14   reports.' . . . . U.S. Private Vaults is not subject to federal

15   banking laws and would only cooperate with the government under court

16   order."  In this way, USPV is marketing its service to criminals and

17   those operating outside the law.

18      15.  THE USPV website also contains a link to an article titled,

19   "The Los Altos Vault and Safe Deposit Co. up for sale."  The article

20   attributes the following comment to USPV owner MARK PAUL: "Another

21   growing segment of private safety deposit renters is legal cannabis

22   distributors. Although their business may be sanctioned in the state

23   of California, it's not legal on the federal level, so they can't

24   conduct business through banks."  In this statement, PAUL invites

25   those engaged in violations of federal law to utilize private vaults,

26   (such as USPV).  Additionally, as discussed in more detail later,

27   cannabis distributors operating legally under California law may

28   theoretically exist and use private vaults, but the reality is that

10

USAO 000037

**EXHIBIT B**

**63**

EXHIBIT 2 WARRANT APP.
PAGE 040

1  many engaged in secreting cannabis sale proceeds at USPV are acting

2  outside California law as well as federal law.  Indeed, all of the

3  identified marijuana traffickers and their associates linked to USPV

4  in this investigation are operating outside the law of California, as

5  described in more detail later.

6      **E.  Other Safety Deposit Box Companies Do Not Permit Anonymous Users as USPV Does**

7

8      16.  Private safe deposit boxes are not in and of themselves

9  illegal or suspicious.  In fact, investigators have identified

10  businesses which offer this service in a manner which does not cater

11  to or attract criminals.  For example, Ultra Vault[5] provides similar

12  services, but requires customers to fill out registration forms, and

13  provide sufficient information for Ultra Vault to conduct due

14  diligence or "Know Your Customer ("KYC")."  Conducting due diligence

15  or "KYC" would likely deter criminals, rather than attract them, as

16  this type of inquiry might expose the illegal source of funds;

17  customer's lack of employment or legitimate income; criminal history;

18  residence or citizenship; or other factors which a criminal customer

19  would not want known.  Additionally, Ultra Vault has some physical

20  locations, but also offers removable box pick-up and delivery.  While

21  this would be convenient to a law-abiding, legitimate customer, it

22  would not appeal to someone engaged in criminal activity, as it would

23  expose additional details about him/her such as address details, home

24  environment, family, etc.  Thus the policies and procedures of a

25  company such as Ultra Vault would likely repel, rather than attract,

26  criminal actors.

27

28      [5] https://www.ultra-vault.com/how-it-works/

USAO 000038

**EXHIBIT B**

**64**

EXHIBIT 2 WARRANT APP.
PAGE 041

17. Similarly, BlueVault, which has locations in San Diego and Orange County, provides similar services, including co-located gold and silver exchange. However, in contrast to USPV, BlueVault requires "An acceptable photo ID showing a US address[6]" in order to rent a safe deposit box or vault. Elsewhere on the website, it again notes "A valid US Driver's License (or equivalent) is required." Requiring both a photo ID and a valid address will deter criminals who do not want to be identified, who live outside the US and may be moving criminal proceeds across the border, or who do not want law enforcement to be able to identify or find them as part of a criminal investigation. Thus, in contrast to USPV, BlueVault has policies in place which would deter rather than attract criminal clientele.

18. Similarly, traditional banks and financial institutions which provide safe deposit boxes, do so in a manner which does not cater to and attract criminals. For example, many explicitly prohibit the storage of cash: Wells Fargo prohibits "cash, coin and currency;" JP Morgan Chase requires a renter to "agree not to use the box to store money, coin or currency unless it is of a collectable nature;" and HSBC requires renters to agree "that you will not place into the Box: cash, currency or legal tender of any country or jurisdiction.[7]" Furthermore, safe deposit box rental agreements at most major financial institutions explicitly advise that the bank will comply with all subpoenas, search warrants and legal process, and that the bank reserves the right to enter into the box if it has reason to believe that the box contains any prohibited or dangerous

---

[6] https://www.bluevaultsecure.com/

[7] Statements taken from Safe Deposit Box rental agreements

12

**USAO-000039**

**EXHIBIT B**

**65**

EXHIBIT 2 WARRANT APP.
PAGE 042

1  item.  Rental agreements also frequently include language referring

2  the "Know Your Customer" rules of identification, investigation and

3  due diligence, all of which would deter criminals from using their

4  safe deposit boxes in the manner employed by USPV customers.

5      19.  State banking regulations in New York and New Jersey also

6  prohibit *anonymous* safe deposit boxes.  Both Mark PAUL and Michael

7  POLIAK have acknowledged as much, during discussions about expanding

8  USPV to other states.  During such a discussion, which included PAUL,

9  POLIAK, VASQUEZ and a Confidential Source ("CS-1")[8], PAUL stated

10 explicitly that they could not open a branch in New York because of

11 the banking laws.  Similarly, POLIAK, who is from the New York/New

12 Jersey area told CS-1 that he hired attorneys to figure out a way to

13 open a business similar to USPV in New York or New Jersey and

14 concluded it was impossible, as the laws do not permit anonymity.

15 POLIAK emphasized that anonymity is the key to the business model.

16 POLIAK therefore decided NOT to expand to New York/New Jersey because

17 he determined that the laws preventing anonymity would have rendered

18 his business model for a private vault unprofitable.

19

20

21  ─────────────────────

22      [8] During the course of this investigation, agents obtained
    information and operational assistance from an undisclosed
23  Confidential Source (CS-1).  CS-1 has provided information to the
    USPIS since 2008.  CS-1 has provided information and expertise
24  regarding criminal investments, monetary practices, accounting and
    money laundering.  CS-1's information has led to the seizure of
25  assets, including $200,000 in a mortgage fraud case.  CS-1's
    information has been corroborated by independent sources such as law
26  enforcement database checks, review of other records, recordings,
    surveillance, interviews and other investigative activity.  CS-1's
27  information has never been found to be false or misleading.  CS-1
    has no criminal history.  I believe CS-1's information is highly
28  credible.

**USAO 000040**

13

**F.  USPV and its Principals Profit from Patrons' Willingness to Pay a Premium for Anonymity**

22.  A survey of safe deposit box pricing demonstrates that patrons of USPV could rent a safe deposit box at a major financial institution for a fraction of the cost.  For example, a 10 x 10 box at JP Morgan Chase rents for $350; at PNC for $146; at TD Bank for $150-$360 depending on location; and at Bank of America for $300-360 depending on location[9].  In November 2020, a representative from a Wells Fargo branch in Los Angeles advised that a 14 x 9 safe deposit box (most comparable size) rents for $200 a year.  By contrast, USPV charges between $1800 (if paid annually) and $2000 (if paid quarterly) for the same/similar 10 x 10 box.  USPV charges six to ten times what major banks charge, banks which offer security, a national presence, experience, years in business, and are often American institutions.  By contrast, USPV has been in business for ten years, is located in a strip-mall, and its owners are generally unknown to customers.  As discussed throughout this affidavit, USPV charges a premium for its services because it offers something which legitimate banks do not: anonymity, a place to store illegally obtained cash, counter-surveillance, tips and assistance for avoiding law enforcement, money laundering through the co-located gold and silver trade, and a stated willingness to look the other way with regard to all kinds of criminal conduct.

---

[9] "BANKING 101: WHAT DOES A SAFE DEPOSIT BOX COST? AVERAGE RATE BY SIZE" by Dillon Thompson.  March 1, 2020.  www.depsositaccounts.com

14

**USAO 000041**

**EXHIBIT B**

**67**

EXHIBIT 2 WARRANT APP.
PAGE 044

**G.   USPV Has, In Fact, Been Used By Criminals to Store Criminal Proceeds**

20.   As set forth above, USPV is designed to appeal to and cater to criminals, and has been successful in doing so.  Numerous federal, state and local investigations have led law enforcement to USPV repeatedly.  The contents of specific USPV boxes have been forfeited to the government because they are the proceeds of criminal activity.  The cases below exemplify this.  According to court documents and law enforcement reports:

a.   OWEN HANSON -- On September 9, 2015 federal agents executed a federal search warrant for three separate safe deposit boxes located at USPV. The boxes belonged to OWEN HANSON who was the leader and organizer of ODOG ENTERPRISE, an association existing for the purpose of importing and exporting controlled substances; conducting an illegal gambling business; bookmaking; promoting racketeering activities; and money laundering.  As part of the enterprise, HANSON's organization distributed methamphetamine, heroin, cocaine and ecstasy.  HANSON was indicted and pleaded guilty to Racketeering Conspiracy and Conspiracy to Distribute Illegal Narcotics.  As a result of the search warrants at USPV, agents seized a $5,000 bond; approximately 400 one-ounce silver coins; and twenty-six ten-ounce silver bars.  The contents of HANSON's USPV boxes were forfeited as criminal proceeds[10].

b.   CYRUS IRANI -- On October 28, 2015, federal agents executed a federal search warrant on Box 2105 at USPV.  The box belonged to CYRUS IRANI who was the master bookmaker and head of an

---

[10] UNITED STATES OF AMERICA v. OWEN HANSON, Case No. 15cr2310-WQH, U.S. District Court, Southern District of California.

15

USAO 000042

 1  illegal gambling organization.  IRANI's organization operated both
 2  internet and traditional bookmaking operations, and engaged in money
 3  laundering.  IRANI had well over 1500 gambling accounts under his
 4  ultimate supervision.  IRANI pleaded guilty to Enterprise Corruption;
 5  fourteen others in the IRANI organization were also convicted of
 6  various gambling, money laundering and enterprise corruption charges.
 7  As a result of the search warrant at USPV, agents seized $500,000 in
 8  U.S. currency; a box containing 15 gold coins and 22 gold bars; and
 9  documents.  The contents of IRANI's USPV box were forfeited as
10  criminal proceeds.

11         c.   NATHAN HOLTZ -- On November 3, 2015 a state search
12  warrant was executed at USPV on a box rented by NATHAN HOLTZ.  HOLTZ
13  had been arrested earlier that day for a violation of <u>California</u>
14  <u>Health & Safety code §11370.9</u> (possession of narcotics proceeds),
15  after leaving USPV. HOLTZ had $55,200 in his vehicle, as well as keys
16  to his USPV box.  A search of HOLTZ's USPV box resulted in the
17  seizure of an additional $200,100.  HOLTZ was on active probation for
18  a prior marijuana sales conviction and admitted that the cash was
19  proceeds of interstate transportation and sale of marijuana[11].  The
20  cash was forfeited as criminal proceeds.

21         d.   GERALD LEBOWITZ -- On November 12, 2015 GERALD
22  LEBOWITZ consented to a search of his box at USPV, stating at the
23  time that cash in the vault was brought into the country illegally to
24  avoid taxes.  Agents from the DEA seized $1,543,400 from LEBOWITZ's
25  box, which he disclaimed.  Further investigation into LEBOWITZ
26  revealed that he was part of a conspiracy to manufacture and

27  _____

28         [11] Note that these events pre-date the legalization of marijuana
    in California, and involve illegal interstate sales in any event.

16

USAO_000043

**EXHIBIT B**

**69**

EXHIBIT 2 WARRANT APP.
PAGE 046

1    distribute methaqualone, a controlled substance.  During the course

2    of the investigation, agents seized over 45 kilograms of methaqualone

3    powder and 12 canisters of the chemical o-Taluidine, both chemical

4    precursors.  In addition, agents seized over $4 million, beyond that

5    disclaimed at USPV.  In 2017 LEBOWITZ pleaded guilty to possession

6    with intent to distribute methaqualone and money laundering.  All

7    assets were forfeited as criminal proceeds[12].

8         e.   Prostitution Ring -- In 2014, FBI Newark initiated an

9    investigation into a network of individuals engaged in facilitation

10   of prostitution, including child prostitution; Mann Act violations;

11   money laundering and possession of child pornography.  FBI Newark

12   identified the leader of the organization (Newark Target Subject,

13   hereafter "Newark TS") who operated a high-end escort service and

14   provided prostitutes to clients nationally.  Based on information

15   from multiple confidential sources, investigators learned that Newark

16   TS has had as many as five different boxes at USPV.  Additionally,

17   investigators learned that Newark TS accessed his USPV boxes

18   approximately 50 times between July 2012 and December 2016.  On one

19   occasion, an FBI Confidential Source[13] ("CS-2") went to USPV with

20   _____

21        [12] UNITED STATES OF AMERICA v. GERALD LEBOWITZ, Case No. 2:17-cr-
     00053-CAS, U.S. District Court, Central District of California

22        [13] CS-2 provided information to FBI Newark.  The information CS-2
     provided to the FBI about Newark TS's prostitution business has proved to
23   be accurate and reliable based on corroboration from several independent
     sources.  For instance, CS-2's description of Newark TS's efforts to
24   recruit CS-2 for prostitution from the adult film industry has been
     corroborated by open sources of information, including social media
25   websites, identifying CS-2 as a performer in the adult film industry.
     Moreover, CS-2 contacted law enforcement of his/her own volition and
26   provided information concerning Newark TS's criminal activities and his/her
     criminal activities without any promise of immunity from prosecution,
27   remuneration, or other benefits.  Federal agents have been able to
     corroborate the vast majority of information provided by CS-2 through
28   public records, U.S. passport and foreign travel records, and business

USAO 000044

17

EXHIBIT 2 WARRANT APP.
PAGE 047

1  Newark TS and personally saw what he/she estimated to be $250,000 US
2  currency in Newark TS's USPV box. On a separate occasion, CS-2 went
3  to USPV with Newark TS and saw what he/she estimated to be $500,000
4  in US currency.  Further, CS-2 observed computer discs, digital
5  devices and back-up computer hard drives in Newark TS's USPV box.
6  CS-2 was aware that Newark TS used these digital devices to store
7  photos, videos and other data associated with prostitution,
8  pornography, and child pornography.  CS-2 was also aware that Newark
9  TS stored client lists, pornographic photos and pornographic videos
10 of clients, for possible use as leverage and/or blackmail.  Based on
11 business records obtained in January 2020, Newark TS continues to
12 rent a box at USPV.  FBI Newark's investigation into this subject is
13 on-going.

14           f.   MIKHAIL MALYKHIN -- On September 1, 2016 federal
15 agents executed a federal search warrant on box 5005 at USPV.  The
16 box belonged to MIKHAIL MALYKHIN who was the leader of an identity
17 theft/computer intrusion fraud ring.  MIKHAIL and others were
18 involved in a complex scheme which involved altering hacked "Flexible
19 Spending Account" debit cards from a health insurance provider and
20 altering the codes to cash out the debit cards.  MIKHAIL was also
21 involved in credit card fraud, ATM fraud, tax fraud, computer
22 intrusion and other similar crimes.  MIKHAIL was indicted for
23 conspiracy to commit access device fraud and pleaded guilty.  As a
24 result of the September 1, 2016 search warrant at USPV, agents seized
25 $266,150 United States Currency; four one-ounce gold bars; various
26
27 _____
   incorporation records, Internet searches of social media pages and
   websites, and information provided by other witnesses.  Accordingly, Your
28 Affiant submits that CS-2's information is credible and reliable under the
   totality of the circumstances.

18

**USAO 000045**

1  gift cards which had been loaded with over $20,000 in value; two
2  Russian passports; a car Certificate of Title for a 1966 Ford
3  Mustang; two digital devices (flash drives) containing evidence of
4  the offenses; and four more gold keys, identical to those used at
5  USPV.  Additional warrants were obtained for the additional USPV
6  boxes.  Those warrants resulted in the seizure of $592,450 US
7  Currency from one box and $435,190 from another.  The contents of all
8  of MIKHAIL's USPV boxes were forfeited as criminal proceeds and used
9  to pay restitution to victims[14].

10       g.   VINCENT RAMOS -- On March 6, 2018 federal agents
11  executed a federal Seizure Warrant for the contents of Box 314 at
12  USPV.  The box belonged to VINCENT RAMOS who was the CEO of Phantom
13  Secure, a criminal enterprise which facilitated the importation,
14  exportation and distribution, internationally, of wholesale
15  quantities of cocaine, heroin and methamphetamine.  Phantom Secure
16  provided encrypted communications devices to drug trafficking
17  organizations to further international drug trafficking, while
18  obstructing and impeding law enforcement.  RAMOS was indicted for and
19  pleaded guilty to Racketeering and Drug Trafficking.  As a result of
20  the search warrants at USPV, agents seized $101,080 in US Currency
21  and 26 one-ounce gold coins.  The contents of RAMOS's USPV box were
22  forfeited as criminal proceeds[15].

23       h.   ALLAN NEYMAN et al. -- On April 24, 2019, Victim S.S.
24  was kidnapped in San Diego, California and taken against his will to
25  a warehouse in Los Angeles.  While being held in the warehouse, S.S.

26  _____

27       [14] UNITED STATES v. MIKHAIL KONSTANTIVOV MALYKHIN, No. 16-0688-
     DMG, United States District Court, Central District of California
28       [15] UNITED STATES v. VINCENT RAMOS, Case No. 18CR1404-WQH, United
     States District Court, Southern District of California

19

USAO 000046

1   was brutally tortured.  He was hit with sticks and baseball bats;

2   stripped naked; tasered on his penis and testicles; hit with a hammer

3   on his toes; doused in a flammable liquid; set on fire; and anally

4   penetrated with a foreign object.  S.S. had been employed by a group

5   of people who were engaged in the distribution of counterfeit

6   marijuana vaping cartridges.  This group believed that S.S. stole a

7   suitcase full of cash, which a vape cartridge customer left at the

8   warehouse.  S.S. had a portion of the money with him in San Diego;

9   the rest was left with his ex-wife, who placed the cash in a safe

10  deposit box at USPV.  At the direction of the kidnappers, she

11  retrieved the cash from USPV and delivered it as ransom.  S.S.

12  eventually escaped from the warehouse.  Detectives identified ALLAN

13  NEYMAN and four others who participated in the kidnapping and

14  torture.  They were arrested and charged with violations of

15  California Penal Code 209(a) – Kidnap for Ransom; P.C 664/187(a) –

16  Attempt Murder; P.C. 206 – Torture; and P.C. 205 – Aggravated Mayhem.

17  Investigators believe that the money stored at USPV was the proceeds

18  of criminal activity; stolen; the cause of brutal violence; and used

19  as ransom.  During the course of this investigation, agents also

20  learned that NEYMAN is an associate of USPV owner Michael POLIAK.  In

21  conversations with CS-1, POLIAK described in detail, the April 2019

22  kidnapping/torture and attributed the crime to his business

23  associate, NEYMAN.  POLIAK told CS-1 that he purchased vape

24  cartridges and packaging (but not THC oil) from NEYMAN ("my guy who

25  owned the warehouse") for his marijuana vape business.  Furthermore,

26  POLIAK said to CS-1, "you want to hear the funny thing?  The money

27  was in my vault! His wife put money into my vault," explicitly

28  acknowledging USPV's role in the crime.  Additionally, on or about

USAO 000047

20

**EXHIBIT B**

**73**

EXHIBIT 2 WARRANT APP.
PAGE 050

1  January 27, 2020, CS-1 met NEYMAN with POLIAK and discussed various

2  internet-based fraud schemes which might generate income.  POLIAK and

3  CS-1 had previously discussed taking over NEYMAN's business interests

4  due to NEYMAN's pending incarceration.

5       i.   MATTHEW BEAVER -- On July 1, 2019, agents of the DEA

6  and LAPD seized $215,653 in US currency from MATTHEW BEAVER, who was

7  observed entering and leaving USPV.  BEAVER was arrested for

8  violations of California Health & Safety Code Section §11370.6,

9  transportation of narcotics proceeds greater than $100,000.  Pursuant

10  to his arrest, agents seized the cash, as well as eight cell phones

11  and keys which were similar to the keys which open boxes at USPV.  On

12  July 8, 2019 a state search warrant was served on USPV boxes #6515

13  and #7111.  Agents seized $1,448,700 from those boxes.  Subsequent

14  search warrants executed on BEAVER's phones revealed evidence of his

15  involvement in marijuana trafficking.  BEAVER has a criminal history

16  and is not licensed to distribute or grow marijuana in California or

17  any other state.  Per the California Employment Development

18  Department (EDD), BEAVER has no employment which would generate the

19  income represented by this cash seizure.  BEAVER admitted his

20  participation in an illegal marijuana business.  BEAVER admitted

21  that the cash was the proceeds of unlawful criminal activity.  The

22  cash was therefore forfeited.

23       j.   Between February 1, 2020 and February 26, 2021, agents

24  conducted surveillance at USPV.  Agents identified many current USPV

25  customers who, based on my training and experience, are likely

26  engaged in criminal activity and storing criminal proceeds or

27  evidence of crimes at USPV.  For example, on February 12, 2020,

28  agents observed a couple enter USPV who were subsequently identified

USAO 000048

**EXHIBIT B**

**74**

EXHIBIT 2 WARRANT APP.
PAGE 051

```
1   and linked to an FBI San Diego healthcare fraud investigation.
2   Similarly, agents observed subject H.T. at USPV on three separate
3   occasions; H.T. is the subject of a current healthcare fraud
4   investigation by FBI Los Angeles.  A third healthcare fraud suspect
5   appeared at USPV on May 28, 2020.  On June 9, 2020, agents identified
6   a USPV customer who was subsequently linked to a current, on-going
7   investigation into dark-web drug trafficking.  Agents also identified
8   a USPV customer who is closely associated with a group being
9   investigated for the theft of thousands of cell phones. Another
10  individual identified has been associated to an FBI Los Angeles
11  (Russian) counterintelligence investigation.  Another customer
12  identified in February 2021 was referred to FBI Los Angeles for a
13  possible Ponzi scheme.  Furthermore, on multiple occasions agents
14  observed USPV patrons in vehicles with out of state license plates,
15  specifically Illinois, Ohio and Nevada.  Based on my training and
16  experience in money laundering investigations, Chicago, Illinois is a
17  hub of both drug trafficking and money laundering.  I believe these
18  patrons were using their USPV box to store drug proceeds.  Agents
19  also observed a number of USPV patrons in rental cars.  Based on my
20  training and experience, drug traffickers often rent vehicles to
21  transport drugs and cash, in an effort to remain anonymous, and hide
22  their identities from law enforcement.
23
24
25
26
27
28
```

USAO 000049

22

**EXHIBIT B**
**75**

EXHIBIT 2 WARRANT APP.
PAGE 052

**H. USPV Principals Are Aware That Their Customers Are Engaged in Criminal Conduct and Store Criminal Proceeds at USPV**

    **1.** <u>MARK PAUL described his customers as bookies, prostitutes, and weed guys</u>

21. During the course of this investigation, agents spoke with a Cooperating Witness ("CW-1")[16]. According to CW-1, prior to his/her arrest and incarceration, CW-1 rented multiple safe deposit boxes at USPV. CW-1 became acquainted with USPV owner, MARK PAUL, and they became friends. Based on conversations CW-1 had with PAUL, PAUL was aware that USPV customers, including CW-1, were engaged in criminal activity. PAUL told CW-1 that his best USPV customers were "bookies," "prostitutes," and "weed guys." PAUL designed the business to appeal to people operating outside the law or "in the gray area." PAUL specifically told CW-1 that the business was designed to help people hide money from the IRS and the FBI. Based on their conversations, CW-1 described PAUL as an advocate of not paying taxes on one's cash.

22. CW-1 routinely discussed his/her illegal gambling business with PAUL, and PAUL was aware that CW-1 earned money from running an

---

[16] CW-1 has provided information to the FBI since 2015. CW-1 hopes to reduce his/her current sentence by providing information to the FBI. Specifically, CW-1 has provided information leading to the indictment of 5 individuals involved in drug trafficking and money laundering. The credibility of CW-1's testimony, however, is limited because CW-1 has omitted (and outright lied about) key facts when those facts implicated relatives or close friends who were continuing to run his/her criminal organization after his/her arrest. Although the United States does not possess any evidence to suggest CW-1 lied about the information discussed herein, CW-1's credibility is effectively limited to only testimony that can be corroborated by other independent evidence. To that end, much of CW-1's information has been corroborated by independent sources such as law enforcement database checks, interviews and evidence gathered in other related FBI investigations, review of business records, surveillance, and other investigative activity.

23

USAO 000050

1 | illegal gambling business.  PAUL was further aware that CW-1 used
2 | USPV to store the proceeds of that business.
3 |     23.  CW-1 also referred many clients to PAUL, including many
4 | bookies from CW-1's illegal gambling organization.  Based on
5 | conversations CW-1 had with PAUL, PAUL was aware that these
6 | individuals (USPV customers) also earned money from an illegal
7 | gambling business, and stored the proceeds of that business at USPV.
8 | On one occasion, PAUL asked CW-1 if he/she "had any more bookies"
9 | that CW-1 could refer to USPV.  This shows that PAUL was aware of the
10 | criminal activities of his clients and was eager to do more business
11 | with them.
12 |     24.  In addition to numerous individuals engaged in various
13 | aspects of illegal gambling, CW-1 also referred 1) an individual whom
14 | CW-1 personally knew to be a pimp; 2) a cocaine dealer; and 3) an
15 | individual involved in facilitating a sophisticated drug trafficking
16 | organization.  With regard to the pimp, CW-1 specifically described
17 | him as a "pimp" to PAUL and they discussed that he was engaged in
18 | promoting high-end prostitution.  Furthermore, CW-1 knows that the
19 | pimp in fact rented several boxes at USPV because CW-1 and PAUL
20 | discussed the pimp's efforts to negotiate a better price.
21 | PAUL told CW-1 that many of his USPV clients were "weed dealers."
22 | PAUL told CW-1 that he liked doing business with "weed guys" because
23 | they always rented the larger boxes which were more profitable for
24 | PAUL.  PAUL made similar statements to CS-1 in late 2019, thus
25 | corroborating CW-1's information.  On one occasion before the
26 | legalization of marijuana in California, CW-1 specifically referred
27 | an individual to PAUL, telling him the guy was "in the green
28 |

**USAO 000051**

24

**EXHIBIT B**

**77**

EXHIBIT 2 WARRANT APP.
PAGE 054

1  business," or words to that effect, by which CW-1 meant in the
2  marijuana business.
3       25.  PAUL also told CW-1 that he thought wealthy Beverly Hills-
4  based "Persians" or Iranians were hiding "dirty money" or "revolution
5  money" at USPV.  CW-1 did not know if PAUL had specific conversations
6  with those customers or if he was just speculating.  In either case,
7  however, it shows that PAUL had no objections or qualms about
8  facilitating clients who may have been violating federal or
9  international laws.
10      26.  PAUL was aware that CW-1 was laundering his/her illegal
11  proceeds through the purchase of gold and silver, and encouraged CW-1
12  to do this.  PAUL told CW-1 that he "liked what you are doing with
13  the gold" and "gold is the way to go" with regard to laundering
14  money.  CW-1 also purchased gold for others in order to assist them
15  in laundering their own criminal proceeds.  PAUL was aware of this
16  and handed out business cards advertising CW-1's gold-investment
17  "business," which CW-1 described as a front for laundering money.
18  Furthermore, CW-1 advertised the storage of gold as part of the
19  services of his/her "business" and listed 9182 Olympic Blvd., Beverly
20  Hills, California (location of USPV) as the storage location. PAUL
21  was aware of this and thus participated with CW-1 in the laundering
22  of other people's criminal proceeds.
23      27.  In November 2019, PAUL met with CS-1.  The meeting was
24  recorded and reviewed by investigators.  During the meeting, PAUL
25  told CS-1 that a lot of the USPV clientele came from the cannabis
26  industry and comprised approximately a third of the business at USPV.
27  Additionally, PAUL told CS-1, "Whatever you put in [the vault], I
28  don't want to know."

25

**USAO 000052**

**EXHIBIT B**

**78**

EXHIBIT 2 WARRANT APP.
PAGE 055

1    28.  During the same November 2019 meeting, PAUL also made a

2  number of exculpatory statements to CS-1, whom he had just met.  For

3  example, PAUL said a number of times that his business was on the up

4  and up; that he paid his taxes; that he declared all the cash he

5  deposited; and that he was in the business of self-storage with a

6  high level of security.  Based on my training and experience,

7  criminals who hold themselves out as legitimate businessmen often

8  falsely deny their criminality, particularly with persons they do not

9  know or trust.  This has proven to be the case with PAUL, who in

10  subsequent meetings with CS-1, admitted to participation in the

11  marijuana industry and tacit knowledge of money laundering and other

12  criminal conduct by his USPV business partner, Mike POLIAK.

13       2.  <u>MICHAEL POLIAK bragged about bringing drug traffickers
              to USPV as customers</u>

14

15  29.  On or about December 17, 2019, CS-1 met with Michael

16  POLIAK.  The meeting was consensually recorded and reviewed by

17  investigators.  During that conversation, POLIAK made the following

18  statements demonstrating his knowledge that criminal proceeds are

19  being stored at USPV:

20       a.  POLIAK told CS-1 that "Mark [PAUL] made no money until

21  I came in. . . . None! . . . For seven years, made nothing.  I

22  changed that whole business . . . he was making forty grand a year.

23  With me he makes fifteen thousand a month himself.  I turned it from,

24  from three thousand a month to thirty thousand a month[17].  The

25  business.  All I did was call marijuana lawyers and they sent me

26  ───────────────

27  [17] In September 2020, POLIAK told CS-1 that he was the best thing
     that ever happened to Mark PAUL, in that, prior to his co-ownership
     of USPV, PAUL was making $60,000 a year as a 100% owner; but now, as

28  a 50% owner, he is making $20,000 a month and the business is
     growing.

USAO 000053

26

EXHIBIT 2 WARRANT APP.
PAGE 056

1  customers.  That's all I did.  And those people, I met up with them
2  and they gave me referrals."  During this exchange about operating
3  USPV, CS-1 said, "Yeah, he [PAUL] was telling me, like, when, back
4  then, I didn't know you were his partner, he was saying 'my partner'
5  brought in, you know, a lot of marijuana, cocaine people who have,
6  who have money."  POLIAK replied, "Yeah."  Shortly after, POLIAK
7  said, "When I joined in, this guy [PAUL] had maybe one-third the
8  boxes full.  Two-thirds empty.  Now it's maybe sixty, sixty-three
9  percent full."  This clearly demonstrates not only that POLIAK is
10  aware that marijuana and cocaine proceeds are held at USPV, but that
11  this occurs by design, in order to make the business more profitable.
12      b.  Shortly after the exchange described above, POLIAK
13  added, **"Listen, you don't want every drug dealer in your place**
14  **either.  You need normal people too."**  The expressed idea that "you
15  need normal people too" suggests that drug dealers comprise the
16  majority of USPV customers, and the business has to make an effort to
17  attract a non-criminal clientele as well, so as not to be too obvious
18  a haven for criminals.
19      c.  While discussing the possibility of opening a second
20  location of USPV, POLIAK said, "You have to pre-sell one third of the
21  place to break even."  He asked CS-1, rhetorically, "who's your
22  customer base?  Five guys that are laundering money?  That's not
23  going to fill the business."  CS-1 said, "Not five. I have a lot."
24  POLIAK replied, "Thirty guys?  Still not gonna fill a business."
25  This exchange shows that POLIAK is aware of and specifically
26  anticipates USPV customers' use of the vault by criminals who need to
27  launder money. It further shows POLIAK's position that USPV needs to
28

**USAO 000054**

27

**EXHIBIT B**
**80**

EXHIBIT 2 WARRANT APP.
PAGE 057

1 attract more than money launderers – they also need drug dealers
2 storing cash.

3       d.    In September 2020, POLIAK and CS-1 met again.  That
4 meeting was recorded and reviewed by investigators.  During that
5 meeting, POLIAK told CS-1 that they planned to expand USPV by taking
6 over the Mail Boxes Etc. store immediately adjacent to USPV, further
7 indicating that POLIAK's strategy of bringing in drug
8 dealer/customers has been successful.  Moreover, POLIAK told CS-1 he
9 planned to turn one of two "privacy rooms" inside USPV (used by
10 customers to access their boxes in private) into a separately rented
11 secure space.  POLIAK plans to charge $10,000 a month for the room.
12 With regard to what POLIAK's customer was going to keep in the room,
13 POLIAK said, "I don't know.  I don't ask. But I'm charging ten grand
14 for that little room!  Hundred and twenty grand a year."  CS-1
15 commented that the room could hold $20 million dollars in cash.
16 POILIAK replied, "I really don't care what he do.  He might put gold
17 in there.  I don't know."

18            3.    POLIAK describes PAUL as a legitimate looking "face"
                     for USPV that obscures POLIAK's illegal conduct and
19                   ownership of USPV

20       e.    During the December 17, 2019 meeting, which was
21 recorded and reviewed by investigators, POLIAK told CS-1 that he was
22 a customer at USPV for two years before buying in to the business.
23 POLIAK told CS-1, "You know, I wanted Mark, [as a] partner.  I didn't
24 want to do it on my own.  Because again, **I have illegal businesses** at
25 the time, like my vape shit, and I was back doing everything from New
26 York, I wanted a face.  Mark's a great face."  Here, POLIAK admits
27 that he is personally engaged in "illegal businesses" and was storing
28 proceeds at USPV.  In fact, POLIAK told CS-1 he had approximately $8

                                    28

USAO 000055

**EXHIBIT B**
**81**

EXHIBIT 2 WARRANT APP.
PAGE 058

1  million stored in six boxes at USPV, and another $2 million which he

2  used to purchase property (discussed later).

3       4.  POLIAK remarks that it is funny that the drug money
           stolen from his business associate, which led to the
4          kidnapping and torture, happened to be stored at SPV

5       f.  During the December 17, 2019 meeting with CS-1,

6  discussed above, POLIAK described in great detail the kidnap and

7  torture event described above.  POLIAK admitted that he was doing

8  business with ALLAN NEYMAN who owned the warehouse and was present

9  throughout the torture.  POLIAK told CS-1, "He [the victim] left the

10 [stolen] money – you want to hear the funny thing?  The money was in

11 my vault!  His wife put the money into my vault."

12                **PROBLEMS WITH CS-3 IN A DIFFERENT CASE**

13     30.  From communicating with other law enforcement officers and

14 AUSAs, I learned that in a different investigation, on more than one

15 occasion, CS-3 exchanged sexts with the target.  CS-3 did not provide

16 these and other communications with the target to his handler. CS-3

17 later admitted to his handler and the government that he had deleted

18 some of his communications with the target that were sexual in

19 nature.  CS-3 failed to follow explicit instructions from a handler

20 on at least one instance, and failed to contemporaneously notify the

21 handler that he was doing so.  CS-3 falsely told the target that CS-3

22 had cancer to induce her to pay CS-3 thousands of dollars for

23 fictitious medical treatments.  CS-3 has informed the handler and the

24 government that he did this in an attempt recover money that CS-3 had

25 advanced on behalf of the target, but this "justification" has not

26 been verified.  CS-3 contacted the target from an unknown phone

27 number and email address, pretending to be other persons in order to

28 buttress his lies about the cancer treatment.  CS-3 failed to notify

**USAO 000056**

**EXHIBIT B**
**82**
EXHIBIT 2 WARRANT APP.
PAGE 059

1  his handlers of these issues before they came to light, and when

2  initially confronted, did not disclose the full scope of his conduct.

3  There is also evidence that CS-3 fraudulently used another person's

4  credit card.

5      31.  CS-3 has provided information to the DEA since 2018 and,

6  aside from the problems set forth above, has proven reliable.  His

7  work led the seizure of drugs and weapons.  In the instant

8  investigation, CS-3's information has been regularly corroborated by

9  independent sources such as law enforcement database checks, review

10  of other records, recordings, surveillance, interviews and

11  information and operational assistance provided by other Confidential

12  Sources, unknown to CS-3.  As described below, CS-3 was repeatedly

13  paired with an undercover task force officer, who was also a witness

14  to CS-3's undercover work.

15      <u>GEORGE VASQUEZ</u>

16      32.  CS-3 has had numerous conversations with USPV manager,

17  GEORGE VASQUEZ.  Many of those conversations reveal that VASQUEZ is

18  aware that USPV customers engage in unlawful activity and maintain

19  the proceeds of unlawful activity in their USPV safe deposit boxes.

20  Conversations between CS-3 and VASQUEZ on June 28, August 9, and

21  August 22, 2019, were all consensually recorded and reviewed by

22  investigators.  The following examples demonstrate VASQUEZ's

23  knowledge and awareness of the criminal activity which USPV

24  facilitates.

25      33.  On June 28, 2019 CS-3 spoke to VASQUEZ about the purchase

26  of marijuana vape cartridges (discussed more fully herein).  During

27  the conversation, CS-3 said, "I don't know about this shit [vape

28  cartridges].  I'm just the money laundering *mijo*.  The real big thing

USAO 000057

**EXHIBIT B**

**83**

EXHIBIT 2 WARRANT APP.
PAGE 060

1  is the other shit [drugs, not marijuana] for me." During this

2  conversation, CS-3 unambiguously stated that he/she is the "money

3  laundering *mijo*." This statement conveys specific knowledge to

4  VASQUEZ that CS-3 is engaged in criminal activity, specifically money

5  laundering. Additionally, CS-3 contrasts his/her ignorance of the

6  cannabis oil business with his/her conduct in "other shit." Based on

7  my training and experience, as well as a comprehensive de-brief of

8  CS-3, CS-3 was referring to hard drugs, not cannabis oil, when he

9  said "The real big thing is the other shit for me." Furthermore, CS-

10  3 believes that VASQUEZ was aware that CS-3 was referring to non-

11  cannabis drug trafficking.

12          5.    VASQUEZ warns CS-3 about "asset forfeiture"

13      34.  On August 9, 2019, CS-3 spoke to USPV manager GEORGE

14  VASQUEZ about difficulties in transporting cash. VASQUEZ told CS-3

15  that USPV owners planned to expand their business into other cities,

16  including Chicago[18]. CS-3 said, "So let me tell you what I'm doing.

17  I can't fuckin' drive with this kind of cash, from fuckin' east coast

18  down here . . . 'cause I get pulled over, just like you just said."

19

20  _____

21      [18] Based on my experience investigating drug trafficking and
    money laundering organizations, I know that drug trafficking and
    money laundering activities are concentrated in certain cities.

22  These include cities on or near the U.S.-Mexico border, such as
    Laredo, San Diego and Los Angles. In addition, other cities

23  throughout the United States serve as "hubs," or center points where
    drug distribution and money collection are concentrated. For example,

24  drugs are often sent to Chicago, Illinois, before being further
    distributed to other cities in the mid-west, such as Cleveland or

25  Milwaukee. Likewise, the proceeds of drug sales are often collected
    and concentrated in Chicago as well. Based on my experience

26  investigating money laundering, I know that millions of dollars in
    drug proceeds are processed through banks in Chicago. Adding a USPV

27  branch in Chicago would likely be profitable in that it would further
    facilitate drug trafficking and money laundering. USPV owner Michael

28  POLIAK expressed this to CS-1 numerous times during conversations
    with him/her in late 2019.

31

**USAO 000058**

1   VASQUEZ added, "Asset forfeiture."  CS-3 continued, "And I just have

2   to fuckin' walk away.  And I'm not trying to take that loss anymore.

3   . . . So anywhere that he's [MARK PAUL] willing, you know, to go in

4   to it [private vault business], I want dibs."  Based on my training

5   and experience, as well as a comprehensive debrief of CS-3, I believe

6   that CS-3 was telling VASQUEZ about the difficulties in transporting

7   drug proceeds (cash) across the United States, and the possibilities

8   of those proceeds being seized by law enforcement.  Further, I

9   believe that VASQUEZ was aware that CS-3 was referring to the

10  transport of criminal proceeds, and his comment, "Asset forfeiture"

11  demonstrates that he is aware that law enforcement can seize and

12  forfeit money that is criminally derived.

13          6.   VASQUEZ explains that USPV would not work in New York
                 because anonymous safety deposit box rentals there are
14               prohibited

15  35.  On August 9, 2019 CS-3 spoke to USPV manager GEORGE VASQUEZ

16  about expanding USPV's business.  During the course of the

17  conversation, VASQUEZ explained why USPV's business model would not

18  work in New York.  VASQUEZ said, "You know, we had already talked

19  about several cities, you know.  We tried New York . . . And it can't

20  be like us.  It can't be anonymous and private.  . . . In New York.

21  We tried that.  That's what Mike [POLIAK] wanted first[19].  New York

22  and Jersey and all that area around there."  Based on my training and

23  experience, as well as a comprehensive debrief of CS-3, I believe

24  VASQUEZ is aware of and referencing a New York state law which

25  prohibits operating private safe deposit box vault in the manner that

26

27  _____

28      [19] MICHAEL POLIAK is from the New York and New Jersey area and
    relocated to California.

32

USAO 000059

1   USPV operates, with anonymity, the particular quality which appeals

2   to criminals.

3          7.   VASQUEZ and CS-3 openly discuss drug trafficking,
              money movement and money laundering

4

5   36.   On August 22, 2019, CS-3 spoke to USPV manager GEORGE

6   VASQUEZ about crossing the US-Mexico border.  During the conversation

7   CS-3 asked VASQUEZ, "You drive through? [the US-Mexico border].

8   VASQUEZ replied, "Yeah."  CS-3 asked, "And they don't sweat you at

9   all?"  VASQUEZ replied, "Not really."  Later in the conversation,

10  VASQUEZ asked CS-3, "Do you go there [Mexico] much?"  CS-3 replied,

11  "I do, but now I got Primo who does that so like I'm not even trying

12  to fuck with any of that . . . he's the one who runs back and forth."

13  Based on my training and experience as well as a comprehensive

14  debrief of CS-3, CS-3 was discussing the challenges of crossing drugs

15  into the United States from Mexico. Further, CS-3 believes that

16  VASQUEZ understood that CS-3 was making references to smuggling drugs

17  across the US-Mexico border.

18  37.   On August 22, 2019, USPV manager GEORGE VASQUEZ spoke to

19  CS-3 about the need to hide money from both law enforcement and

20  people in one's own organization.  During the conversation CS-3 said,

21  ". . . buddy of mine just got fuckin' hit, not by fuckin' feds but by

22  fuck his own fuckin' team.  And what are you gonna do, call the

23  fuckin' cops?"  VASQEZ replied, "Yeah."  Later in the conversation

24  CS-3 said, "Doesn't even fuckin' trust anyone.  Everybody told him,

25  hey you're stupid, you fuckin', find a stash pad, something."

26  VASQUEZ replied, "Yeah.  That's what happened with Mike [POLIAK].

27  That's how Mike got here. You know.  He was referred by one of my

28  other clients . . . He's like, hey man, you're getting too big

**USAO 000060**

                                33

**EXHIBIT B**

**86**

EXHIBIT 2 WARRANT APP.
PAGE 063

1  already . . . You guys go put it away somewhere.  That's how he came

2  by.  Most of my clients are word of mouth, you know?"  Based on my

3  training and experience as well as a comprehensive debrief of CS-3,

4  CS-3 was talking to VASQUEZ about the difficulties in hiding criminal

5  proceeds both from law enforcement and from individuals in one's own

6  criminal organization.  Additionally, VASQUEZ's comments show that

7  USPV co-owner MIKE POLIAK had difficulty finding a place to put large

8  amounts of cash, presumably criminal proceeds.  Finally, VASQUEZ

9  confirmed that most of the USPV clients learn about USPV from other

10  clients, who may also be engaged in criminal activity.

11      38.  On August 22, 2019, CS-3 spoke to USPV manager GEORGE

12  VASQUEZ about needing to move money.  During the conversation CS-3

13  said, "My biggest thing right now is how do I fuckin' move it [money]

14  out.  . . . because I told you, I bought a fuckin' car, but actually

15  it gets old after a while . . . And I can only buy a certain amount

16  of cars before I need a fuckin' dealer's license."  Based on my

17  training and experience as well as a comprehensive debrief of CS-3,

18  CS-3 was talking to VASQUEZ about finding ways to launder criminal

19  proceeds, specifically drug money.  CS-3 referenced purchasing

20  vehicles as a method for laundering criminal proceeds, and the

21  difficulties that poses.  CS-3 believes that VASQUEZ was aware and

22  understood that CS-3 was talking about ways to launder criminal

23  proceeds.

24        8.   VASQUEZ acknowledges the likely storage of drug
               proceeds at USPV

25

26      39.  During the course of this investigation, agents obtained

  information and operational assistance from an undisclosed

27

28

**USAO 000061**

34

EXHIBIT 2 WARRANT APP.
PAGE 064

1  Confidential Source ("CS-4")[20].  On or about February 25, 2020, CS-4,

2  who had previously rented a large 10 x 10 box at USPV, spoke to

3  VASQUEZ about a sign at USPV saying they employed the use of drug-

4  sniffing dogs.  CS-4 asked VASQUEZ when was the last time they had a

5  drug dog in USPV, and VASQUEZ said he couldn't remember.

6      **I.  USPV Principals Brokered and Supplied Illegal Drugs (THC**
   **and Cocaine) from SUBJECT PREMISES Including USPV**

7

8      40.  In June 2019, CS-3 cultivated a friendly business

9  relationship with USPV manager GEORGE VASQUEZ.  During that time, CS-

   3 spoke to VASQUEZ about purchasing marijuana vaping products.

10 VASQUEZ offered to provide CS-3 with samples of vaping products.

11

12     1.  <u>USPV Manager VASQUEZ displayed marijuana cartridges</u>
   <u>for sale in the private view room of USPV</u>

13     41.  On June 28, 2019, CS-3 went to USPV in person to obtain the

14 vaping samples from VASQUEZ.  The meeting was consensually recorded

15 and subsequently reviewed by the Affiant.  At approximately 11:40

16 a.m. CS-3 arrived at USPV where he/she was immediately met at the

17 front door by VASQUEZ. VASQUEZ was holding a small cardboard box in

18 his hands and directed CS-3 back to the secure vault. VASQUEZ was

19 armed at the time of this transaction with a semiautomatic pistol

20 that was in an open carry holster on his right hip alongside an

21 unknown type of badge. Investigators have noticed that VASQUEZ is

22 always armed in this fashion during his work hours as part of his

23

24     [20] CS-4 has provided information to the FBI since 2015.
   Specifically, CS-4 has provided information which has identified

25 participants in various money-laundering schemes, as well as the
   methods for pursuing those schemes. CS-4's information and

26 operational assistance have been used in numerous investigations. CS-
   4's information has been corroborated by independent sources such as

27 law enforcement database checks, review of other records, recordings,
   surveillance, interviews and other investigative activity.  CS-4's

28 information has never been found to be false or misleading.  I
   believe CS-4's information is highly credible.  **USAO 000062**

1  purported duties as the security manager for USPV. VASQUEZ and CS-3
2  proceeded to the private viewing rooms in the back of the actual
3  vault.

4      42.   Once inside the room VASQUEZ placed the box on the small
5  desk and opened it revealing six small packages of various sizes with
6  different advertising boxes. CS-3 knew this to be the Butane Hash Oil
7  ("BHO") containing THC vape cartridges he/she was there to acquire
8  from VASQUEZ. The cartridges were packaged differently and displayed
9  different brand names and TCH yields on the packaging. They appeared
10 ready for retail sale in a marijuana dispensary.

11     43.   During the meeting, VASQUEZ said, "So I'll text you the
12 prices right now . . . They're like from ten to seven, the prices."
13 Later VASQUEZ said, "He [the supplier] told me do whatever you want.
14 He can make pretty much whatever you want."  CS-3 asked for
15 information about the product and VASQUEZ said, "that's Danka
16 [brand].  I think that's like seven.  . . . He says the ones that are
17 ten bucks, which is the Brass Knuckles [brand]—" CS-3 said, "Which is
18 probably the good stuff."  VASQUEZ agreed, "The good stuff . . . The
19 good quality . . . these others are kind of cheesy quality. . . . The
20 VSOP and Eurekas are the good stuff . . . so check it out."  CS-3
21 agreed and accepted the samples.

22         2.   <u>USPV Manager VASQUEZ hints that USPV Owner POLIAK is</u>
23              <u>the source of the marijuana cartridges</u>

24     44.   CS-3 then asked about making a larger purchase.  "Like, he
25 [supplier] got supply? . . . like could he produce the numbers?"
26 VASQUEZ replied, "I can tell you this.  He's a partner here."  CS-3
27 and VASQUEZ then discussed having CS-3 speak directly with the
28

**USAO 000063**

36

**EXHIBIT B**
**89**

EXHIBIT 2 WARRANT APP.
PAGE 066

1  supplier.  VASQUEZ referred to the supplier as "Mike·," subsequently

2  identified as MICHAEL POLIAK, co-owner of USPV.

3      45.  Immediately after the meeting, DEA agents took into custody

4  six samples of BHO containing THC vape cartridges.  The samples

5  included 1) Dank Vapes, Green Crack (90.66% THC); 2) Kingpen,

6  Trainwreck (71.72% THC); 3) Space Vape, V.S.O.P. (98.4% THC); 4)

7  Eureka, Purple Punch (92.3% THC); 5) Space Vape, Alien Alaskan

8  Thunderfuck (91.18% THC) and 6) Brass Knuckles, Jack Herer (1000 mg

9  cannabis distillate).

10          3.   <u>USPV Owner POLIAK meets a customer at USPV and then</u>
             <u>leads him to the USPV parking lot to view marijuana</u>
11           <u>cartridges</u>

12     46.  On July 26, 2019, CS-3 went to USPV to purchase a large

13  quantity of BHO THC containing vape cartridges.  The meeting was

14  consensually recorded and subsequently reviewed by the Affiant.

15  Shortly after arriving at USPV and making contact with VASQUEZ, CS-3

16  was introduced to MICHAEL POLIAK.  During the conversation, POLIAK

17  said, "Hey it's [the vaping cartridges] in my trunk, in boxes. . . .

18  Like five boxes, two hundred each."  About three minutes after

19  arriving at USPV, agents observed CS-3 and POLIAK in the USPV parking

20  lot at POLIAK's vehicle, a white 2017 BMW 740i four door sedan

21  bearing California license plate ██████████████████████

22  ████████████████████████████████████████████

23  ████████████████).  Agents observed CS-3 and POLIAK transfer five

24  boxes from POLIAK's vehicle into CS-3's vehicle.

25     47.  After transferring the boxes, CS-3 and POLIAK went back

26  inside USPV.  CS-3 asked, "You got a money counter here, right? Yeah,

27  there it is right there.  Eight."  CS-3 then gave POLIAK $8,000 for

28  the five boxes, as previously agreed.  POLIAK said, "I can feel money

37

**USAO 000064**

1   already." CS-3 said, "I'll let you know how it goes and I'll put in

2   a bigger one for you, okay?" CS-3 departed from USPV and provided

3   DEA agents with 1000 units of BHO vape cartridges containing THC that

4   was purchased by from Michael POLIAK and George VASQUEZ at USPV. DEA

5   took the boxes into evidence, and the DEA Lab determined that the

6   products contained THC.

7         4.   USPV Owner POLIAK sold 1000 marijuana cartridges from the parking lot of POLIAK'S RESIDENCE

8

9     48. On October 31, 2019, CS-3 purchased an additional 1000

10   units of BHO THC-containing vape pen cartridges from USPV owner

11   Michael POLIAK. The operation was consensually recorded and reviewed

12   by investigators. CS-3 met POLIAK in the parking lot of ████████

13   ████████████████████████ adjacent to the residence of Michael

14   POLIAK. CS-3 purchased vape pen cartridges with brand name KingPen.

15   KingPen has been identified by the California Department of Consumer

16   Affairs (CDCA), Department of Investigations, as one of the several

17   unlicensed brands of vape pen cartridges that have led to multiple

18   hospitalizations nationwide. Through this investigation, agents have

19   determined that POLIAK is not a licensed marijuana distributor in

20   California.

21     49. The cartridges were immediately taken into DEA custody and

22   sent to the DEA lab for analysis, where they tested positive for THC.

23     50. Additionally, DEA sent eight samples of vape cartridges

24   seized from each of the three transactions described above (June 28,

25   July 26, and October 31) to the California Department of Public

26   Health, Food and Drug Laboratory Branch for additional testing. The

27   testing showed that five of the eight samples contained Vitamin E

28   acetate oil, which the Center for Disease Control has linked to lung

**USAO 000065**

38

**EXHIBIT B**

**91**

EXHIBIT 2 WARRANT APP.
PAGE 068

1   damage and death.[21] This health crisis was particularly acute in the

2   summer and fall of 2019, when POLIAK and VASQUEZ sold these products

3   to CS-3.  At least one sample from each of the three transactions

4   tested positive for Vitamin E acetate oil.

5       51.  Based on conversations POLIAK had with CS-1 on December 17,

6   2019, which were recorded and reviewed by investigators, POLIAK is

7   clearly aware of the unlawful and dangerous nature of the BHO THC-

8   containing products he was selling.  During that meeting POLIAK told

9   CS-1, "I don't have anything.  Nothing to move.  I shut everything

10  down.  I'm not doing anything right now."  CS-1 asked, "Why?"  POLIAK

11  replied, "I don't want the liability.  . . . I mean, enough [money].

12  It's never enough, but I don't want the liability this stage of my

13  life cause I was making vapes.  . . . They brought lung diseases now.

14  People are having–– there's commercials, you know? I don't need the

15  liability."  This demonstrates POLIAK's awareness that the product he

16  was recently selling was linked to "lung diseases" and potential

17  liability.  POLIAK also seems to be referring to Public Service

18  Announcements (PSAs) alerting the public to the dangers of marijuana

19

20      [21] See *The New York Times*, "Vaping Illnesses are Linked to
21  Vitamin E Acetate, C.D.C. Says," Denise Grady, November 8, 2019;
    www.nytimes.com/2019/11/08/health/vaping-illnes-cdc.html;

22      "A form of vitamin E has been identified as a 'very strong
    culprit' in lung injuries related to vaping THC, health officials
23  reported on Friday, a major advance in a frightening outbreak that
    has killed 40 people and sickened 2,051.  . . . The outbreak has
24  revealed the existence of a vast, unregulated, shadowy marketplace of
    illicit or bootleg vaping products that are essentially a stew of
25  unknown chemicals concocted, packed and sold by unknown manufacturers
    and sellers.  . . . Hundreds of state and federal health
26  investigators have been deployed to find out what has cause such
    extensive damage to patients' lungs, which researchers have likened
27  to the chemical burns suffered by soldiers attacked with mustard gas
    in World War I.  . . . Many of the products used by those who became
28  ill were illicitly obtained, public health experts have said, by
    patients who bought them from friends or on the street.

USAO 000066

39

EXHIBIT 2 WARRANT APP.
PAGE 069

1   vape products.  Additionally, during a discussion about the

2   kidnap/torture event (discussed above), POLIAK said, "He [NEYMAN] was

3   the one selling the cartridges and the packaging.  Not the oil, you

4   know?  I would make my own oil and inject."  Because the oil itself

5   is believed to be causing the lung damage, POLIAK effectively

6   admitted his role in manufacturing this dangerous product.

7        5.  USPV Owner POLIAK discussed with a USPV customer
         selling flavored cocaine while at POLIAK'S RESIDENCE

8

9      52.  In October 2019, CS-3 and USPV co-owner MICHAEL POLIAK

10  first discussed the sale of "flavored cocaine" or "Flavado."  On or

11  about October 11, 2019, CS-3 and POLIAK met for lunch.  After lunch,

12  they returned to POLIAK's RESIDENCE at ███████████████████

13  ███.  While approaching POLIAK's unit, they passed the mailboxes and

14  POLIAK commented to CS-3 about the cocaine residue on his mailbox

15  key.  POLIAK explained that he uses the key routinely to snort

16  cocaine, and the key therefore has coke residue.  CS-3 expressed an

17  interest in purchasing cocaine.

18     53.  POLIAK then told CS-3 about "Flavado," with which CS-3 was

19  unfamiliar.  POLIAK described it as flavored cocaine which softens

20  the drug's effects, without diluting them.  POLIAK told CS-3 that

21  women love it and he recommended the strawberry flavored coke. CS-3

22  expressed an interest in purchasing flavored cocaine.  POLIAK called

23  "Casey" in the presence of CS-3 and identified "Casey" as the person

24  who could "hook [CS-3] up."  POLIAK told CS-3 that he would connect

25  CS-3 with Casey when CS-3 was ready to buy, and CS-3 should just let

26  POLIAK know.

27     54.  On or about November 5, 2019, CS-3 contacted POLIAK and

28  asked him if he could hook CS-3 up with Casey in order to purchase

**USAO 000067**

40

1   the flavored cocaine they had previously discussed.  POLIAK asked how
2   much CS-3 needed and CS-3 told him he was looking for "a zip" [one
3   ounce].  POLIAK told CS-3 that Casey didn't sell it like that—- he
4   breaks it down into per-use quantities.  CS-3 asked for $1000 worth
5   and POLIAK agreed.

6      55.  On or about November 15, 2019, CS called POLIAK to follow-
7   up on the requested cocaine purchase.  POLIAK advised that he was
8   having family issues he was dealing with, and didn't have time to
9   arrange the deal.

10     56.  On or about December 11, 2019, CS-3 and POLIAK again
11  discussed the purchase of flavored cocaine.  During that phone
12  conversation, POLIAK suggested CS-3 communicate with him using a
13  wireless application called "Signal."  CS-3 agreed, and further
14  discussion about the flavored cocaine purchase occurred over Signal,
15  an encrypted application popular with drug traffickers. POLIAK and
16  CS-3 continued to discuss the cocaine deal over Signal, often
17  including the third-party supplier; however, POLIAK never allowed CS-
18  3 to deal directly with anyone – POLIAK was always involved.  CS-3
19  believes this was intentional in order for POLIAK to protect his
20  financial cut in the deal.

21          6.  <u>USPV Owner POLIAK set up a cocaine deal at USPV, but
22              then moved it when USPV Manager VASQUEZ Objected to
              the location</u>

23     57.  On or about December 16, 2019, POLIAK told CS-3, "Come to
24  the vault [USPV]; we'll do it [cocaine deal] here."  CS-3 agreed.
25  However, a little later, George VASQUEZ called CS-3 and expressed his
26  objection to CS-3 and POLIAK conducting a cocaine deal at USPV.
27  VASQUEZ felt that POLIAK was not being careful and that he was
28  possibly bringing unwanted attention from law enforcement onto the

41

USAO 000068

**EXHIBIT B**
**94**

EXHIBIT 2 WARRANT APP.
PAGE 071

1  business.  VASQUEZ told CS-3 to "do the deal quickly – pick it up and
2  get out of here," or words to that effect. Shortly after, POLIAK
3  contacted CS-3 and said they could not do the deal at USPV.

4      58.  On or about December 18, 2019, in a conversation with CS-3,
5  which was recorded and reviewed, POLIAK instructed CS-3 to meet with
6  an unknown associate of his at ██████████████████████████████
7  ████████████  in order to obtain one ounce of flavored cocaine.  CS-3
8  was able to make arrangements for a DEA Task Force Officer, working
9  in an undercover capacity ("TFO-UC"), and posing as an associate of
10 CS-3, to make the purchase for $2,200.  TFO-UC arrived at the
11 location and met with an individual who was later identified as
12 Daniel SAVAGE and obtained a quantity of suspected cocaine in a white
13 shopping bag, hidden beneath a pair of black gym shorts.  DEA agents
14 took custody of the suspected cocaine which was in a clear plastic
15 sandwich baggie that had been tied in a knot.  The white substance
16 and the sandwich baggies weighed 29 grams.  The suspected cocaine was
17 sent to the DEA lab for processing.  The substance tested positive
18 for cocaine HCL.

19     **J.   USPV Owner Mark PAUL Leases Property for the Purposes of**
20          **Manufacturing, Producing and Distributing Controlled**
           **Substances**

21     59.  On or about February 20, 2020, PAUL met with CS-1.  The
22 meeting was consensually recorded and reviewed by investigators.
23 During that meeting, PAUL told CS-1, "I've been doing cannabis
24 deals," but then described himself as "just a landlord."  PAUL went
25 on to describe one location as an "amazing property" that everyone in
26 the marijuana business wanted because of its location.  However, it
27 was located near a Gymboree – a business which falls under California
28 Health & Safety Code 11362.3(3), prohibiting marijuana possession

42

**USAO 000069**

within 1,000 feet of a school, day care or youth center – so no one in the cannabis business could buy the location.  PAUL then explained how he bought the Gymboree, left the signage in place, and then bought the "amazing property" for the dispensary.  He did not remove the Gymboree sign until the dispensary was open for business. PAUL told CS-1 that he paid $250,000 for the Gymboree (which he closed), and $4.5 million for the other property, as well as $700,000 in improvements.  PAUL told CS-1 that he earns $62,000 a month renting the property to the dispensary owners[22].

60.  During the same consensually recorded meeting in February 2020, PAUL said, "I have another deal – I have a dispensary--" then he stopped speaking abruptly, as though he thought better of admitting that he had a marijuana dispensary.  PAUL then changed the focus of his comments to the company in Oregon rather than his role. PAUL went on to describe "the largest marijuana processing company in Oregon" with whom he partnered.  PAUL told CS-1 that this business could process 5 to 10 million pounds of marijuana a month with the use of a kiln that quickly dries wet hemp.  Further, he told CS-1 that the group was conducting $2 million a month in business, but had contracts for $10 million a month that they could not meet.  PAUL told CS-1 that he invested $5.5 million in the business.

---

[22] Based on specific descriptions, agents have identified the marijuana dispensary as The Atrium at 5441 Topanga Canyon, Woodland Hills.  Mike POLIAK corroborated PAUL's association with this business to CS-1 in September 2020, telling CS-1 that PAUL purchased land "up north" for a marijuana grow, but refused to finance the equipment.  Now, according to POLIAK, PAUL's partners are having trouble paying the lease on the land, their "finance guy" has taken over the Atrium dispensary, and there is a power struggle for control.

43

USAO 000070

61.  On or about April 22, 2020, CS-4 spoke with George VASQUEZ while at USPV to pay rent on a safe deposit box.  This conversation was not recorded, but was reported to the Affiant immediately after it occurred.  VAQUEZ informed CS-4 that "his boss" recently purchased six or seven hundred acres in Colorado for the cultivation of marijuana and was looking for individuals interested in providing security.  Based on conversations VASQUEZ has had with CS-3 and CS-4, VASQUEZ refers to Mark PAUL as his boss.

62.  During the course of this investigation, investigators reviewed and analyzed PAUL's business, banking and financial activity.  PAUL's businesses include MJ Real Estate Investors Inc. ("MJRE")[23], a marijuana real estate investment company; Emerald Fund, LLC; Bachelor Valley Fund LLC; and Mark Paul Holdings, Inc.  An analysis of banking records shows over $700,000 in transactions between MJRE and Antares Topanga Group, LLC, aka Valley Collective Care, which public records show doing business as The Atrium, a marijuana dispensary.  MJRE also conducts business with Emerald Fund LLC (both owned by PAUL).  Emerald Fund remitted funds for a 67-acre purchase in Oregon. Emerald also has financial transactions with Rogue Bioscience, a Medford-Oregon based industrial hemp processor. Bachelor Valley Fund has financial transactions with a company in Denver, Colorado. This analysis supports statements PAUL and VASQUEZ made to CS-1 and CS-4.

63.  Based on information provided by the California Department of Consumer Affairs - Cannabis Enforcement, which enforces marijuana

---

[23] USPV former owner and OLYMPIC GOLD & JEWELRY owner, Steve BARTH, is also a principal at MJRE.

USAO 000071

44

EXHIBIT 2 WARRANT APP.
PAGE 074

laws in California, PAUL is not licensed to "have a dispensary" or otherwise participate legally in the cannabis industry.

**K.    USPV Owner Michael POLIAK is a Professional Criminal**

POLIAK's Criminal Activity

64.    In addition to brokering a cocaine deal for CS-3 and selling 1000 units of BHO THC-containing vape pen cartridges on two occasions (discussed above), POLIAK continues to engage in criminal activity.  The following examples demonstrate this:

1.    POLIAK studied how to commit deceptive online marketing

a.    During a December 2019 meeting with CS-1, which was recorded and reviewed by investigators, POLIAK described a possible new business deal, which involved fraud: "I have a guy that's a master at driving traffic on-line.  . . . But he does deceptive marketing.  He'll fake some shit, like he'll put Dr. Oz promoting his product or Ellen [DeGeneres] or some shit like that.  And he'll sell the fuck out of it, but you burn a lot of merchant accounts. . . . But merchant accounts is the problem.  It's – you burn a lot of them. You constantly need a flow of merchant accounts.  Cause the [credit card] charge-backs are gonna be like crazy."  POLIAK advised that he had a business meeting arranged with this person for the following day, in order to learn how to take over his business, before he goes to jail[24].  In January 2020, POLIAK introduced CS-1 to Allen NEYMAN, and they discussed possible business deals.  That meeting was recorded and reviewed by investigators.

---

[24] The person running the fraud scheme as described by POLIAK is ALLAN NEYMAN who was involved with the torture/kidnapping discussed above.

45

USAO 000072

1          2.   <u>POLIAK's Paycheck Protection Program scheme</u>

2         b.   On or about September 15, 2020 CS-1 met with POLIAK.

3 The meeting was consensually recorded and reviewed by investigators.

4 During the meeting, POLIAK described obtaining almost $70,000 from

5 Payroll Protection Plan (PPP) for his "employment" at MGP Management.

6 POLIAK admitted to CS-1 that he only made $1,000 a month, and didn't

7 have any employees, but submitted an application and received

8 $68,700. When CS-1 asked how he did it, POLIAK replied "Cause I

9 filed. That I had hardships."  Additionally, POLIAK applied for and

10 received three SBA (Small Business Administration) loans for his

11 other businesses, though he acknowledged they were loans.  POLIAK

12 described them as "free money," and at an interest rate of 3.75%,

13 could earn more than that through one of his "investments."

14 Throughout this conversation, POLIAK bragged to CS-1 about committing

15 fraud.

16         3.   <u>POLIAK's marijuana trafficking</u>

17         c.   On or about January 27, 2020 CS-1 met with POLIAK.

18 The meeting was consensually recorded and reviewed by investigators.

19 During the meeting, POLIAK spoke to Memory Buss using the speaker

20 function on his cell phone.  CS-1 witnessed both sides of the

21 conversation.  Based on my review of the conversation, as well as

22 information provided by the California Department of Consumer Affairs

23 ("CDCA"), Buss is licensed under CalCannabis for Provisional Adult

24 Use – Nursery; Processor; and Specialty Indoor – but not retail or

25 manufacturing.  Further, POLIAK leases property in Los Angeles which

26 he subleases to Buss for use in her Cannabis business.

27         d.   Buss recently ended a partnership in her Cannabis

28 business because her partners were operating outside the law.  She

46

USAO 000073

**EXHIBIT B**

**99**

EXHIBIT 2 WARRANT APP.
PAGE 076

told POLIAK, "I'm staying compliant by getting rid of them.  I would have lost my license if they would have stayed because they broke the law so many times."

     e.   During the conversation, POLIAK offered to sell Buss filling machines for $5,000 each.  He first denied having any, "I just got rid of everything when I closed out.  They weren't legal anyway."  But then he said, "I have three laying around," which she asked to buy.  Based on information provided by CDCA, "filling machines" are outside the scope of Buss's license; POLIAK is not licensed to possess these machines at all.

     f.   POLIAK also offered to broker the sale of 20,000 pre-rolled joints.  While POLIAK was adamant that he did not want to "hold" more than a few samples –"you can drop off samples.  But I don't need to store fuckin' tons of shit.  A couple samples, yeah, no problem.  I'll just hand it over to the guy."  As the conversation is wrapping up, POLIAK tells Buss to bring the samples and he'll give them to a couple of guys.

     g.   This demonstrates POLIAK's on-going business dealings in the marijuana industry which are outside California law, as he is not licensed.

     4.   <u>USPV Owner POLIAK bragged about his drug cartel connections</u>

    65.   In December 2019, POLIAK discussed with CS-1 his various business deals, including one involving the import of produce from Mexico.  During that conversation, which was recorded and reviewed by investigators, POLIAK told CS-1 that he was affiliated with the Beltran-Leyva drug cartel.  During a conversation, CS-1 said, "These guys [referring to CS-1's phone], their mother is from cartel."

47

**USAO 000074**

1  POLIAK responded, "That's how I am. I'm Beltran.  Beltran are my
2  people.  Google Beltran, you'll see how big they are.  Guadalajara."
3  POLIAK then told CS-1 that the cartels control everything in Mexico
4  and you can't work there without them.  POLIAK's self-proclaimed
5  association with a well-known Mexican drug cartel suggests his
6  participation in money laundering or drug trafficking.  While POLIAK
7  refers to the subject of this business as involving "produce" or
8  "avocadoes," based on my training and experience, produce is often
9  used by Mexican drug cartels as a "cover" load to disguise transport
10 of drugs or currency.

11     66.  During the course of this investigation, agents have
12 obtained and reviewed financial records related to USPV principals,
13 including records related to Michael G. POLIAK and numerous business
14 entities associated with him (e.g. MGP Consulting, MGP Management).
15 A review of financial records associated with MGP Consulting revealed
16 a January 25, 2019 check for $125,000 payable to AA Consulting Group,
17 Inc.  Public records show that AA Consulting Group, Inc. belongs to
18 Aram Abgaryan, who was arrested and charged with murder in October
19 2019.  Those charges stem from Abgaryan's involvement in an explosion
20 at a sophisticated cannabis extraction plant in Chatsworth,
21 California, which resulted in the death of one of the participants[25].
22
23 ─────────────────────
24 [25] See www.nbclosangeles.com\news, "Five Men Charged For Deadly Honey
   Oil Lab Explosion in Chatsworth," October 31, 2019.
25
26 "Five men have been charged with murder following a deadly explosion at an illegal honey oil lab in
   September that killed a man they were working with, authorities announced Thursday.
27
28 The defendants and the victim had been operating a lab in Chatsworth, where they extracted THC, the
   high-inducing chemical found in marijuana, from cannabis plants for at least two months, the Los

USAO 000075

48

1    That POLIAK was participating in this illegal and dangerous

2 enterprise is supported not only by the check he wrote to AA

3 Consulting, but by statements he made to CS-1 in December 2019. In a

4 conversation between POLIAK and CS-1, which was recorded and reviewed

5 by investigators, POLIAK described an "unlucky" guy who used to "make

6 oil" for him using solvents. According to POLIAK, the man had a

7 heart attack prior to the chemical explosion, but the others were

8 being charged with murder anyway because the death occurred during

9 the commission of a crime.

10    <u>POLIAK's Money Laundering</u>

11    67. In multiple conversations with CS-1, which were

12 consensually recorded and reviewed by investigators, POLIAK admits to

13 laundering money, often referring to money as "clean" or "dirty," and

14 speaking plainly about the need to "clean my money." The following

15 provide specific examples from conversations between CS-1 and POLIAK:

16

17 _____

18 Angeles district attorney's office said in a statement.

19 The lab exploded Sept. 21 while four of the men and the victim, Dados Aroutiounov, 62, were inside.
   Aroutiounov's remains, burned beyond recognition, were found the following day under a pile of debris

20 after investigators received information that someone may have been killed in the fire.

21 The cannabis allegedly was being turned into a potent concentrate known as hash oil or honey oil that
   can be used in vape pens, edibles, waxes and other products.

22

23 A rise in vaping illnesses nationwide has caused federal investigators to probe the black market for
   THC products, especially illegal vaping cartridges.

24

25 Aram Abgaryan, 30, Vadim Klebanov, 59, Arsen Terejyan, 43, Rafael Mailyan, 32, and Stepan
   Mailyan, 65, were arrested Tuesday and charged with murder and manufacturing a controlled

26 substance, concentrated cannabis. Authorities also seized $3.2 million and gold bars Tuesday from a
   storage unit connected to the case.

27

28 Each faces 23 years to life in prison. They remain in jail on $2 million bail."

**USAO 000076**

**EXHIBIT B**
**102**

EXHIBIT 2 WARRANT APP.
PAGE 079

1           a.   During a meeting in December 2019, POLIAK told CS-1

2    that he has monthly income in the form of a $50,000 check.  "I get

3    checks for fifty-thousand a month.  Forty-five gets me fifty."  Later

4    in the conversation, CS-1 asked, "But how do you have fifty a month?"

5    POLIAK replied, "I'm telling you, between like all my things I'll

6    make like six hundred this year."  CS-1 asked, "You give them cash,

7    they give you check, is that what—"  POLIAK replied, "***No, no that's***

8    ***just to clean my money . . . that I don't even count as income.***"

9          5.   <u>USPV Owner POLIAK admits he uses a shell business to</u>
     <u>launder money</u>

10      68.   POLIAK further discussed both the "forty-five-for-fifty"

11   deal, and other aspects of money laundering with CS-1 on or about

12   January 27, 2020, during a meeting which was recorded and reviewed by

13   investigators.  After a detailed description of his involvement in

14   the cannabis industry, POLIAK said, "I took home 200-something

15   thousand in key money and ten thousand a month income every month."

16   CS-1 asked, "So how do you manage, where do you put your money?"

17   POLIAK exclaimed, "I own a vault!"  CS-1 asked, "I'm not talking

18   about the cash."  POLIAK replied, "It's all cash!  It's all cash.

19   Why do you think I bought the vault?"   POLIAK then described some of

20   his shell corporations: "I have MGP.  ***Because I have to clean the***

21   ***money.***  Put money into MGP so I can pay half the rents.  Half the

22   rent is in cash and half the rent is clean."

23      69.   Later in the same conversation with CS-1, POLIAK said, "I

24   wash $50,000 through my consulting.  Remember, I pay 45 for 50?"

25   POLIAK continued, "So fifty thousand--" CS-1 finished, "you put into

26   MGP."  POLIAK corrected, "No, I put into MGP Consulting.  MGP

27   Consulting pays MGP Management for rent.  Talking about $10,000 a

28                                                   **USAO 000077**

USAO 000077

**EXHIBIT B**

**103**

EXHIBIT 2 WARRANT APP.
PAGE 080

1  month.  And that goes to the landlords." CS-1 said, "So you're paying
2  the landlords--" POLIAK finished, "--through my consulting." CS-1
3  said, "So you're getting paid cash . . . you give some fucker cash--"
4  POLIAK finished, "He cuts me a check.  Fifty thousand for forty-five
5  cash."  It is important to note POLIAK's use of various shell
6  corporations such as MGP Management and MGP Consulting.  Based on my
7  training and experience investigating money laundering organizations,
8  I know that it is common for criminals to create multiple "shell"
9  corporations to "layer" criminal proceeds, thereby obscuring their
10  criminal origins.  Additionally, in this exchange, POLIAK again
11  openly admits cleaning his money, something which does not need to be
12  done with lawfully earned income.

13      70.  A review of Michael POLIAK's bank accounts (specifically
14  MGP Consulting) corroborates his description of this activity.
15  Between February 15, 2018 and January 2020, MGP Consulting received
16  $50,000 a month (forty-two $25,000 checks) from Corporation A and
17  Corporation B, both owned by the same individual.  I learned through
18  conversations with FBI agents that the individual is the target
19  subject of a current FBI Healthcare Fraud investigation (hereafter TS
20  HCF)[26].  TS HCF's signature is on checks from both companies.  Based
21  on conversations I've had with agents who investigate healthcare
22  fraud, I know that those engaged in healthcare fraud schemes often
23  need cash and will pay a premium for it (e.g. $50,000 for $45,000 in
24  cash) because they need to make cash payments to "patients" seeking
25  healthcare services which are being over-billed.  They cannot

26  _____

27      [26] FBI agents who are investigating TS HCF asked that the
    identity of the target of their investigation, as well as his/her
28  related business entities, remain undisclosed in order to protect the
    integrity of their investigation.

USAO 000078

51

EXHIBIT 2 WARRANT APP.
PAGE 081

1  withdraw the amount of cash they need without bringing attention to
2  their scheme.  This leads them to look for other sources of cash.
3      71.  POLIAK has a large amount of cash which he stores at USPV.
4  On or about December 17, 2019, CS-1 met with Michael POLIAK.  The
5  meeting was consensually recorded and subsequently reviewed by
6  investigators.  During the meeting POLIAK told CS-1 that as a
7  customer of USPV (prior to buying in to the business), POLIAK had
8  four boxes at USPV.  He further stated that he now has "six boxes in
9  the place myself!  I was a customer.  I'm telling you, I have six
10 ten-by-tens myself."  POLIAK added, "Let me put it this way, the
11 reason also why I wanted to buy it [USPV], I got a lot of fucking
12 money now."  Earlier in the conversation, POLIAK said, "I wish I had
13 fifty [million] right now.  That would be nice."  CS-1 replied,
14 "Yeah?  In your twenties or what?"  POLIAK said, "No, not even, bro.
15 Like ten.  . . .  I have like **two clean**, **eight like dirty**.  I put
16 most of it in the house."  Based on my review of the recording and a
17 debrief of CS-1, I believe that POLIAK has $10 million: $2 million
18 which he laundered through the purchase of property (discussed below)
19 and $8 million in cash stored in six 10 x 10 boxes at USPV.
20 Additionally, POLIAK himself describes the $8 million as "dirty," by
21 which I believe he means it was not legally derived and in the form
22 of cash – not laundered to appear legitimately earned.
23     72.  Based on my training and experience, my review of bank
24 records and recordings, I believe that the cash POLIAK is sending to
25 TS-HCF is the proceeds of his self-professed "illegal businesses,"
26 likely drug trafficking, which he stores at USPV.  Thus, drug
27 trafficking proceeds are being used to further healthcare fraud; and
28

**USAO 000079**

**EXHIBIT B**
**105**

EXHIBIT 2 WARRANT APP.
PAGE 082

1  the fraud proceeds are being further laundered by POLIAK to make

2  purchases (such as USPV) and advance his other criminal interests.

3      73.   Michael POLIAK described efforts to launder his money

4  through a real estate purchase to CS-1.  On or about December 17,

5  2019 and again on September 15, 2020, Michael POLIAK met with CS-1.

6  The meetings were consensually recorded and reviewed by

7  investigators.  During those meetings, POLIAK described to CS-1 his

8  plans to launder cash through the purchase, renovation and sale of

9  property located at ███████████████████████████████████.

10     74.   During the earlier conversation, POLIAK told CS-1 that the

11  property was listed at $2 million, but he offered the sellers $1.7

12  million "tomorrow – no inspection."  POLIAK said, "I literally did

13  one day close. Can you imagine?  One day close?"  In the subsequent

14  meeting, POLIAK further explained that he put $600,000 down and took

15  out a mortgage of about $1.2 million[27].  He also told CS-1 that he

16  spent about $1.5 million renovating the property.

17     75.   In September 2020, with renovations complete, POLIAK told

18  CS-1 he was listing the property for $3.6 million, but expected a

19  bidding war.  POLIAK believed the property was worth closer to $4

20  million.

21     76.   With regard to the property purchase and massive renovation

22  under way when CS-1 first saw the property in December 2019, CS-1

23  commented, "You could, basically what you could do is, one-point-

24  seven, you could easily clean your money through it."  POLIAK

25  replied, "That's what I'm doing with the construction.  Why do you

26  think I'm doing half a million construction?"  CS-1 said, "Half a

27  _____

28     [27] This is supported by financial analysis which revealed a
   mortgage on this property.

53

USAO 000080

1  million cash." POLIAK said, "I want to do one or two projects like
2  this a year." CS-1 said, "That's a million dollar give-away. And
3  you-" POLIAK interrupted, "Ten-thirty-one-exchange[28]." POLIAK added,
4  "And I can wash it off the construction company. On top of the ten-
5  thirty-one exchange." CS-1 asked, "You're giving him cash?" POLIAK
6  said, "I write off Jacob," referring to his contractor. CS-1 said,
7  "Yeah, you take his check. You give him cash." POLIAK said, "Yep.
8  . . . We do profit sharing . . . Yeah, on the house. It's gonna be
9  like this and it comes back clean . . . I pay all his subs in cash.
10 I've been paying all his subs in cash all year already."

11      77. It is worth noting that POLIAK himself uses phrases such as
12 "I can **wash** it" and "it comes back **clean**," showing his own awareness
13 and acknowledgement of money laundering. Additionally, when CS-1
14 says "you could easily **clean** your money through it," POLIAK eagerly
15 agrees, saying "That's what I'm doing with the construction. Why do
16 you think I'm doing half a million construction?" Finally, by
17 admitting that he is paying sub-contractors ("subs") in cash and has
18 been doing so all year, POLIAK is specifically describing how he uses
19 (illegal) cash to increase the value of his property which he will
20 later sell for a profit and claim as legitimate income, thus
21 "cleaning" his "dirty" money.

22      78. Finally, during their September 2020 meeting, which was
23 recorded and reviewed, CS-1 inquired whether POLIAK's asking price
24 would be reduced if a buyer came in with a million or two million in
25 cash. POLIAK told CS-1 he would require "a premium" if someone came
26
27 _____

28      [28] A 1031 Exchange refers to section 1031 of the IRS Code which
    allows a real estate investor to avoid capital gains taxes as long as
    the profit is used to purchase another "like kind property."

USAO 000081

54

**EXHIBIT B**

**107**

EXHIBIT 2 WARRANT APP.
PAGE 084

1  in with cash – he would charge $4.2 million.  "I don't— Nobody needs
2  cash.  . . . I have a ton of cash.  . . . I'm doing business to get
3  rid of my cash."  This further demonstrates POLIAK's on-going efforts
4  to laundering money through his various projects.

5  **L.   USPV Owner Michael POLIAK Used Criminal Proceeds to Buy His Interest in USPV**

7  79.  In April 2019, Michael POLIAK purchased a 50% ownership in
8  USPV.  POLIAK described the deal to CS-1 in a consensually recorded
9  conversation which investigators reviewed.  During that conversation,
10  CS-1 asked, "How did you meet him [PAUL], turn around and become a
11  partner? . . . Did you have to pay him?"  POLIAK replied, "Yeah, I
12  gave him $475,000.  . . . two-seventy-five clean.  Two hundred
13  dirty."  Later in the conversation, POLIAK explained, "Mark [PAUL]
14  owned 75%.  Hillary [BARTH] and her husband [STEVE BARTH] owned 25%.
15  I bought twenty-five from Mark, and I bought twenty-five from them.
16  I said, 'Mark, I can't buy the place unless I get at least 50%.'"

17  80.  A review of bank records supports POLIAK's claim.  On April
18  2, 2019, $225,000 was deposited into USPV's JP Morgan Chase bank
19  account ending in #7511.  The deposit included a Wells Fargo Bank
20  cashier's check in the amount of $125,000, payable to U.S. Private
21  Vaults, purchased by Michael POLIAK; and a check issued from Michael
22  POLIAK's Wells Fargo Bank account #7496 in the name of MGP Consulting
23  LLC, for $100,000, payable to U.S. Private Vaults.  Based on POLIAK's
24  statements, agents believe that the remainder of the $475,000 was
25  paid in cash.  Agents also believe STEVE BARTH and HILLARY BARTH were
26  paid in cash.

27  81.  As set forth above, there are numerous factors which
28  indicate that all of POLIAK's income is derived from illegal sources.

**USAO 000082**

55

**EXHIBIT B**

**108**

EXHIBIT 2 WARRANT APP.
PAGE 085

1  The cash in particular cannot be sourced to any lawful pursuit.

2  However, close examination of POLIAK's bank records reveal the

3  following:

4      a.   The check for $100,000 from MGP Consulting LLC, can be

5  traced to healthcare fraud, as described above.  Between February 15,

6  2019 and April 1, 2019, POLIAK received three checks from Corporation

7  A, and one from Corporation B., each for $25,000, payable to MGP

8  Consulting. These checks are part of the "forty-five-for-fifty"

9  healthcare fraud/money laundering scheme POLIAK himself described.

10  These deposits funded the $100,000 check from MGP Consulting to U.S.

11  Private Vaults.

12      b.   In addition, the $125,000 cashier's check from

13  POLIAK's Wells Fargo account can be traced to a $300,000 E-deposit

14  made in New York on 10/20/2018.  Financial investigators traced this

15  check to Alta Quality Growers, LLC of Elgin, Illinois, whose

16  principal is John Fasano of Brooklyn, NY.  Fasano has a criminal

17  history which involves drug trafficking (marijuana and ecstasy), as

18  well as a financial history which includes a pattern of structured

19  deposits and withdrawals and large wires to Mexico, with no business

20  purpose.  Additionally, Alta Quality Growers, LLC has no website and

21  little internet presence.  It's notable that the company, supposedly

22  located in Illinois, has a (956) area code phone number – 956 covers

23  much of the Texas-Mexico border.  Based on my training and experience

24  in both drug and money laundering investigations, I believe that Alta

25  Quality Growers, LLC is a drug/money laundering front.  The money

26  therefore which funded POLIAK's Wells Fargo Bank account and was used

27  in part to purchase USPV, is likely also criminal proceeds.

28

USAO 000083

**EXHIBIT B**
**109**

EXHIBIT 2 WARRANT APP.
PAGE 086

**M. None of the Individuals Associated with USPV, as Principals or Patrons, who are Participating in the Marijuana Industry, is Licensed by the State of California to do so.**

82. During the course of this investigation, federal agents consulted with the California Department of Consumer Affairs, Cannabis Enforcement. Through that consultation, we learned that none of the following individuals is licensed to participate in the California cannabis trade, either with regard to cultivation, manufacture, or retail[29]: MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, STEVE BARTH, HILLARY BARTH, Allan NEYMAN, Matthew BEAVER, Aram ABGARYAN, Alta Quality Growers, John FASANO.

**N. USPV Principals Have Counseled Clients on Strategies to Circumvent BSA Reporting Requirements and Have Themselves Failed to Comply with Reporting Requirements**

    1. USPV Manager VASQUEZ instructs a customer to structure gold purchases to avoid currency transaction reports

83. On August 9, 2019, CS-3 talked to USPV manager GEORGE VASQUEZ about buying gold at OLYMPIC GOLD & JEWELRY. The conversation was consensually recorded and reviewed by investigators. During the conversation, CS-3 said, "My Primo's gonna want to talk to her [HILLARY BARTH] because we spoke about buying some gold. . . . He [Primo] needs to get rid of a lot of shit . . . and I'm hoping you guys have some fuckin' creative ideas on how to do it." VASQUEZ clarified, "Well, depends on—what—okay—he's got to get rid of some money?" CS-3 replied, "Yeah." VASQUEZ said, "He wants to buy gold?" CS-3 said, "Yes." VASQUEZ said, "Okay. **Keep it at under ten thousand dollars.**" CS-3 asked, "How often?" VASQUEZ replied, "About – I would—it's, it's supposed to be every 24 hours . . . but I

---

[29] Valley Collective Care (Antares Topanga Group) which operates The Atrium at 5441 Topanga Canyon Blvd., Woodland Hills, CA discussed herein is a licensed cannabis retailer. **USAO 000084**

57

1   suggest at least 48 hours." VASQUEZ added, "Yeah. But not all the

2   time. **So let's say like 9,000 or 9,500.**" CS-3 said, "**Break it**

3   **down.**" VASQUEZ replied, "Break it down . . . Cause **you don't want**

4   **that paperwork shit.**" (Emphasis added.) Based on my training and

5   experience, as well as a comprehensive debrief of CS-3, CS-3 was

6   talking to VASQUEZ about laundering criminal proceeds through the

7   purchase of gold. Furthermore, I believe that VASQUEZ understood

8   that CS-3 was talking about laundering criminal proceeds. Finally,

9   it is indisputable from this conversation that VASQUEZ was coaching

10   CS-3 how to "structure[30]" his purchases in order to avoid the Bank

11   Secrecy Act (BSA) reporting requirements, specifically telling CS-3

12   to "keep in under $10,000" because "you don't want that paperwork

13   shit."

14      84. In addition to coaching CS-3 on how to avoid BSA

15   requirements, VASQUEZ's statements show a clear knowledge of and

16   participation in money laundering. USPV is using its co-located

17   business, OLYMPIC GOLD & JEWELRY as an outlet for USPV customers to

18   launder criminal proceeds, by exchanging cash for gold or silver.

19   That there is a pattern and practice of this is evidenced by the

20   seizure of gold and silver from USPV boxes in the cases described

21   earlier. Furthermore, based on my training and experience

22   investigating money laundering, I know that the purchase and sale of

23   gold and silver is a common method which criminals employ to launder

24   criminal proceeds. Gold and silver are difficult to trace, portable,

---

[30] Structured deposits refers to multiple deposits under $10,000, made on the same day or consecutive days, which add up to over $10,000 – generally structured in order to avoid Bank Secrecy Act (BSA) requirements, such as providing identification and filing a Currency Transaction Report (CTR) or IRS Form 8300.

USAO 000085

58

1  fairly easy to re-sell, and often traded in a manner which, like

2  USPV, caters to criminals' need for anonymity.

3              2.    HILLARY BARTH and VASQUEZ instruct a customer to
                     structure gold purchases to avoid currency transaction
4                    reports

5       85.   On or about January 13, 2020 CS-4 went to USPV to pay rent

6  on a previously-rented safe deposit box.  While there, CS-4 spoke to

7  HILLARY BARTH about the possibility of investing approximately

8  $20,000 in gold or silver.  This conversation was not recorded, but

9  was reported to the Affiant immediately after it occurred.  HILLARY

10 BARTH, who had never previously met CS-4, told CS-4 that it didn't

11 matter whether CS-4 purchased gold or silver – one came in coins, the

12 other in bars – but he/she should not purchase $20,000 at one time.

13 HILLARY BARTH specifically advised CS-4 not to purchase more than

14 $10,000 worth of gold or silver at a time, otherwise, CS-4 would have

15 to fill out the paperwork[31].   This shows that HILLARY BARTH is

16 coaching USPV/OLYMPIC GOLD & JEWELRY clients on strategies for

17 evading BSA reporting requirements.  It's important to note that

18 HILLARY BARTH had not previously met CS-4, because this suggests that

19 she gives this advice to *all* USPV/OLYMPIC GOLD & JEWELRY clients.

20      86.   On February 25, 2020, CS-4 went to USPV to access a

21 previously-rented box.  While there, CS-4 spoke to George VASQUEZ

22 about the possibility of purchasing gold.   This conversation was not

23 recorded, but was reported to the Affiant immediately after it

24 occurred.  VASQUEZ asked how much CS-4 wanted to purchase and CS-4

25 said he/she might have about $23,000 to invest. CS-4 relayed to

27      [31] Note, CS-4 was not coached or prompted in any way to inquire
   about breaking up a purchase. CS-4 was instructed to mention that
28 he/she expected to have $20,000 to invest and would like information
   about purchasing gold or silver.

                                   59

USAO 000086

EXHIBIT 2 WARRANT APP.
PAGE 089

1    VASQUEZ what Hillary BARTH had previously told CS-4 -- that he/she

2    should keep the purchases under $10,000 in order to avoid doing

3    paperwork. VASQUEZ agreed with that and told CS-4 that he could help;

4    specifically, CS-4 could deposit $9,000 and give the rest to VASQUEZ,

5    who would make the deposits, so no paperwork would be filed. VASQUEZ

6    added that CS-4 should "throw me a little," meaning of the cash

7    because "I help you, you help me." VASQUEZ said he had such an

8    arrangement with someone else and it worked well[32]. VASQUEZ also added

9    that CS-4 would not even have to put his/her name on the receipt for

10   the gold; he/she could just use initials, and that way no one would

11   know -- there would be no paperwork.

       3.   STEVE BARTH and VASQUEZ instruct a customer to
            structure gold purchases to avoid currency transaction
            reports

14   87.   Similarly, on January 28, 2020, a DEA employee, posing as a

15   potential customer, went to USPV to discuss purchasing gold.  The

16   meeting was recorded and reviewed by investigators.  The DEA Agent

17   first told George VASQUEZ that he wanted to purchase $18,000 worth of

18   gold. VASQUEZ then advised the Agent that, "You can buy that but I

19   advised you to buy under 10 [$10,000]. Because if you're buying under

20   10 [$10,000], we don't have to do paperwork. No information is going

21   to IRS. So you could buy 9 [$9,000], and a couple days, come buy

22   another 9 [$9,000]."  VASQUEZ then logged on the computer and showed

23   the Agent the gold prices[33].  A few minutes later, STEVE BARTH arrived

---

[32]   Note this conversation took place after the
January/February gold purchase, discussed below, in which VASQUEZ was
"tipped" in cash for his assistance.
[33]   The fact that VASQUEZ was able to go behind the counter of
OLYMPIC GOLD AND JEWELRY and log onto the computer led the Agent to
believe that the VASQUEZ was an employee of both USPV and OLYMPIC
GOLD AND JEWELRY and/or the two businesses were essentially one.

**USAO 000087**

**EXHIBIT B**
**113**

EXHIBIT 2 WARRANT APP.
PAGE 090

1 at the business. VASQUEZ introduced STEVE BARTH to the Agent and

2 departed the display room. STEVE BARTH told the Agent that he sells

3 gold, silver, platinum and different types of gold. The Agent told

4 STEVE BARTH that he wanted to purchase $18,000 worth of gold. STEVE

5 BARTH advised the Agent, if someone gives you $10,000 or more there's

6 a form you have to fill out. "If you buy less than $10,000 then

7 there's no form." The Agent then told STEVE BARTH that he didn't

8 have any problem with filling out the form. STEVE BARTH then told the

9 Agent that, "Some people don't want to alert the IRS or whatever, so

10 they keep it under, most people." STEVE BARTH then advised the Agent,

11 "If you like to, you can buy $9,000 one day and then $9,000 you

12 know." The Agent then asked STEVE BARTH if he could purchase $9,000

13 of gold in one day then do another $9,000 worth of gold the very next

14 day. Steve BARTH said, "Yes, you could do that." Later, STEVE BARTH

15 added, "I recommend you stay under 10,000 in cash and then you could

16 just do some one day and a few days later you could do the other.

17 That's what I would recommend." STEVE BARTH then said, "Anytime,

18 there's more than 10,000 dollars in cash, they get suspicious, so

19 they want to know. You fill out the form and the form goes to the

20 government and even though, it's legitimate."

21     88. In addition to coaching customers on methods for evading

22 BSA requirements, HILLARY BARTH violated 31 U.S.C. §5331 by failing

23 to file IRS Form 8300 after conducting a cash transaction at OLYMPIC

24 GOLD & JEWELRY. On or about December 4, 2019, CS-1 purchased

25 jewelry from OLYMPIC GOLD & JEWELRY[34]. CS-1 and HILLARY BARTH

26 ───────────────

27

28    [34] The purchase was not recorded, but CS-1 exchanged text
messages with HILLARY BARTH negotiating and leading up to the

USAO 000088

61

**EXHIBIT B**

**114**

EXHIBIT 2 WARRANT APP.
PAGE 091

1  negotiated the sale for approximately $11,900.  CS-1 paid for the

2  jewelry in cash.  HILLARY BARTH gave CS-1 a document certifying that

3  the jewelry was authentic.  However, HILLARY BARTH did not provide an

4  invoice or obtain the information necessary to complete the Form 8300

5  (CS-1's identification, etc.). No Form 8300 was in fact filed, based

6  on a database search for any Form 8300s filed (at any time) by either

7  STEVE or HILLARY BARTH.  I believe HILLARY BARTH is aware of the

8  requirement to file Form 8300 for cash transactions in excess of

9  $10,000 based on her discussions with CS-4 and others.  Moreover,

10  HILLARY BARTH's failure to provide CS-1 with a receipt, invoice or

11  other paperwork suggests that the sale was "under the table" and that

12  any income earned from the cash transaction was not declared to the

13  IRS.

14  **O.  USPV Principals Laundered Cash Represented to be Criminal
       Proceeds Through OLYMPIC GOLD & JEWELRY**

15  1.  <u>January/February 2020 Gold Buy</u>

16  89.  On or about January 29, 2020, CS-3 and TFO-UC (posing as an

17  associate of CS-3) went to USPV to discuss the purchase of gold with

18  cash purportedly derived from the sale of methamphetamine.  The

19  meeting was recorded and reviewed by investigators.

20  a.  After discussing the difference between gold coins and

21  gold bars, CS-3 told George VASQUEZ that gold bars were more

22  desirable for melting down, and mentioned that TFO-UC needed the gold

23  bars as payment for a debt.  CS-3 then asked VASQUEZ about crossing

24  gold "down south" [Mexico].  VASQUEZ asked CS-3, "How much are you

25  planning to take?" He then instructed CS-3 to, "Keep it under 10,"

26

27  purchase; investigators received and reviewed copies of the text
    messages.

28

**USAO 000089**

1    referring to the monetary value of $10,000 in cash, when purchasing

2    gold. VASQUEZ then instructed CS-3 and TFO-UC to conduct two separate

3    "orders" under the amount of $10,000 each, when purchasing the gold.

4    CS-3 then asked VASQUEZ, "What do you mean?" VASQUEZ then continued,

5    "Yeah, if you keep it under $10,000, there is no paperwork. That way

6    you don't have to give no social security, no ID. All that shit goes

7    to the IRS." At this time, CS-3 and TFO-UC simultaneously expressed

8   

9    their interest in conducting the gold purchase without having to fill

10    out paperwork.

11         b.   CS-3 stated, "Nah.. Nah.. Nah.. fuck that! This is all

12    'skante' money. I can't even fuck with that." VASQUEZ then

13    reiterated, "Keep it under 10. You want to buy gold? Keep it under

14    10."  Based on training and experience, TFO-UC recognized "skante[35],"

15    to be street vernacular commonly utilized for crystal

16    methamphetamine.

17         c.   At this time, TFO-UC asked VASQUEZ, "Does she

18    [HILLARY] know the get down?" TFO-UC was referring to HILLARY BARTH's

19    understanding of the structuring of gold purchases under $10,000 to

20    avoid any reporting paperwork. VASQUEZ responded, "Yeah.. Yeah..

21    Yeah.. She will tell you." VASQUEZ then referred to HILLARY BARTH'S

22    husband, STEVE BARTH.  CS-3 indicated that STEVE BARTH instructed

23    them on purchasing under $10,000 of gold at a time to avoid paperwork

24    during a previous phone conversation.  VASQUEZ continued to instruct

25    CS-3 and TFO-UC to "keep it under 10."  CS-3 then asked VASQUEZ if

26

27 _____

28    [35] The Urban Dictionary defines "skante" as slang for crystal
meth. The DEA Drug Slang Code Words 2018 also defines "skante" as
crystal meth.

USAO 000090

**EXHIBIT B**

**116**

EXHIBIT 2 WARRANT APP.
PAGE 093

1   HILLARY BARTH would question them in regards to where they obtained
2   the money. VASQUEZ responded by saying, "She don't need to know. She
3   ain't gonna ask you."

4          d.    TFO-UC then asked VASQUEZ what the turn-around was on
5   an order of gold. TFO-UC expressed to VASQUEZ he was under time
6   constraints. VASQUEZ indicated the gold would be ready by the
7   following morning, referring to January 30, 2020. TFO-UC stated he
8   needed to get the gold down to Mexico. VASQUEZ then asked, "You guys
9   are going to pay whoever you guys owe in gold? I am just curious."
10  CS-3 then explained to VASQUEZ, "I moved a bunch of skante, and I did
11  really good. The guy who fronted us is down south. He's gotta take
12  the paper back. We don't wanna go down with paper 'cause I got
13  pinched like that." VASQUEZ replied, "Right, so you'll take the
14  gold." CS-3 responded, "Gold, cause the fuckin' dog won't pick up on
15  it. VASQUEZ replied, "Right. Right. Whichever you like."

16         e.    Based my training and experience and a debrief of TFO-
17  UC, it was clear to TFO-UC that CS-3 was explaining to VASQUEZ that
18  the money was obtained by selling crystal methamphetamine.
19  Furthermore, CS-3 explained that the individual who sourced the
20  crystal methamphetamine was in Mexico, and expecting payment for the
21  crystal methamphetamine. CS-3 explained that TFO-UC was tasked with
22  paying the source of the methamphetamine, adding that CS-3 and TFO-UC
23  did not want to drive the bulk U.S. currency down to Mexico because
24  CS-3 had previously been detained transporting narcotic proceeds, and
25  lost the proceeds. Furthermore, CS-3 explained their desire to
26  convert the narcotic proceeds into gold to repay the outstanding drug
27  debt because the gold would more easily avoid detection by trained
28  narcotic detecting K9's utilized by law enforcement personnel

64

USAO 000091

**EXHIBIT B**

**117**

EXHIBIT 2 WARRANT APP.
PAGE 094

f.   Following the above referenced conversation, VASQUEZ escorted CS-3 and TFO-UC to HILLARY BARTH, who was waiting at the display of OLYMPIC GOLD AND JEWELRY.  TFO-UC told HILLARY BARTH he wanted to convert $16,000 in cash into a gold purchase. TFO-UC stated there were time constraints due to needing to get the gold bars delivered. HILLARY BARTH expressed an ability to have the gold by the following morning. HILLARY BARTH then went on to describe the different types of gold product they offered and the current value. HILLARY BARTH then explained, "Now up to $10,000 cash, uh, up to that, uh, is not reportable. If you go, if you buy more than that with cash, there is a form you need to fill out, the government requires because they want to know where this cash is going. Uh, so anything under ten thousand there is no paperwork to fill out except that you're signing the purchase order for me, for my records. So that I show I am making a buy for a client. Uh, if you want to do your sixteen thousand all at once, uh, if you want to wire it, uh, I don't believe you have to fill out that form. It's a cash buy. We don't do credit, nobody would take a credit card or a check until it clears for bullion."  HILLARY BARTH then explained for $10,000 TFO-UC could buy approximately "six," referring to ounces of gold, depending on what gold product TFO-UC was interested in purchasing. TFO-UC expressed an interest in purchasing the gold bars.

g.   CS-3 asked HILLARY BARTH how long TFO-UC would have to wait to conduct a second purchase of gold, following the initial purchase of under $10,000. TFO-UC told HILLARY BARTH he was not interested in filling out any paper work for the gold purchase. HILLARY BARTH recommended waiting until "next week, a few days," adding, "it's not recommended, they say, don't come in every day."

65

USAO 000092

**EXHIBIT B**
**118**

EXHIBIT 2 WARRANT APP.
PAGE 095

1  HILLARY BARTH went on to say, "what they look for is a pattern of
2  someone who with intention is trying to get around..." HILLARY BARTH
3  did not finish her sentence. Instead, she added, "I am just
4  disseminating information." During this communication, it was
5  apparent TFO-UC that HILLARY BARTH appeared uneasy with the
6  conversation. HILLARY BARTH consistently looked up and away from CS-3
7  and TFO-UC. Furthermore, HILLARY BARTH became selective in her word
8  choice, referring to "they" repeatedly when referring to the cash
9  transaction report process.

        2.   <u>VASQUEZ suggests splitting the $16,000 Cash Purchase between CS-3 and TFO-UC to avoid the $10,000 reporting requirement</u>

12       h.   During the conversation between HILLARY BARTH, CS-3,
13  and TFO-UC, VASQUEZ stood approximately five feet west of the Olympic
14  Gold and Jewelry display, listening to the transaction take place. As
15  HILLARY BARTH explained to keep the purchase under $10,000, she
16  advised TFO-UC he could purchase six gold bars for $9,840. TFO-UC
17  explained again, his time constraints to get all $16,000 worth of
18  gold delivered by Friday referring to January 31, 2020. At this time,
19  VASQUEZ motioned over to CS-3 to come talk to him. CS-3 approached
20  VASQUEZ, who in Spanish instructed CS-3 to have TFO-UC purchase "8"
21  referring to $8,000 in gold, and CS-3 purchase the other "8"
22  referring to $8,000 in gold. Thereby making two simultaneous
23  transactions by two parties that would both fall under the $10,000
24  threshold.

25       i.   CS-3 then returned to the display where BARTH was
26  explaining to TFO-UC that the purchase of nine gold ounce bars would
27  amount to approximately $14,760. She then reiterated if TFO-UC
28  conducted the purchase on one transaction "paper work," would have to

66

**USAO 000093**

**EXHIBIT B**
**119**

EXHIBIT 2 WARRANT APP.
PAGE 096

1   be filled out. At this time, CS-3 motioned to TFO-UC to go and talk

2   to VASQUEZ. TFO-UC approached VASQUEZ, who instructed TFO-UC to split

3   the gold purchase into two separate transactions of $8,000. While

4   TFO-UC was speaking with VASQUEZ, HILLARY BARTH was explaining to CS-

5   3 that any cash transaction over $10,000 would require the cash

6   transaction report. HILLARY BARTH further explained, the cash

7   transaction report was the result of the Patriot Act. She added, she

8   "never" utilizes the cash transaction reporting form because her

9   clients do not typically purchase greater than $10,000.

10          3.   HILLARY BARTH agrees to the structuring so long as CS-
                 3 and TFO-UC hand her the cash separately

11

12          j.   At this time, TFO-UC returned and asked HILLARY BARTH

13  if he could split the purchase into two separate transactions

    conducted separately by TFO-UC and CS-3. TFO-UC proposed that he

14  could purchase five gold bars and CS-3 could purchase four gold bars.

15  HILLARY BARTH indicated she would have to inquire to confirm if she

16  was capable of conducting such a transaction. She then proceeded to

17  operate her cellular phone through text messaging. She then stated,

18  "Yes, as long as you hand me the money," meaning separately. She then

19  explained she would fill out a receipt for the two separate

20  transactions, which would only require a first name and last initial.

21  HILLARY BARTH stressed the receipt was only for internal bookkeeping.

22          k.   CS-3 then asked if he/she would have to be present to

23  pick up the gold bars. HILLARY BARTH explained it would be okay for

24  TFO-UC to take possession of the total purchase by presenting both

25  receipts.  HILLARY BARTH explained to TFO-UC that he would have to

26  sign the receipts at the time of pick up. Following the agreement to

27  conduct the purchase of $14,760 worth of gold in two separate orders,

28

**USAO 000094**

67

EXHIBIT 2 WARRANT APP.
PAGE 097

1  HILLARY BARTH suggested they conduct the transaction in the back

2  office for "privacy."

3         l.   At this time, HILLARY BARTH, TFO-UC, CS-3, and VAZQUEZ

4  entered the back office.  Once inside the office, TFO-UC sat next to

5  HILLARY BARTH to conduct the first gold purchase. HILLARY BARTH

6  advised TFO-UC the first transaction of six one ounce Suisse bars

7  would total $9,843. TFO-UC retrieved 99 one hundred dollar bills in

8  U.S. currency ($9,900) of Official Advanced Funds (OAF) from a black

9  backpack and handed it to HILLARY BARTH as payment for the gold bars.

10 HILLARY BARTH placed the U.S. currency in a money counter and

11 confirmed the total. HILLARY BARTH then asked TFO-UC for a first name

12 and last initial for a hand written receipt for the transaction. TFO-

13 UC advised BARTH his name was, "Andres V."  HILLARY BARTH proceeded

14 to hand write a receipt for the purchase (ORDER # 1001). HILLARY

15 BARTH then instructed TFO-UC to sign the "received by," section of

16 the handwritten receipt. TFO-UC then initialed "AV" in cursive

17 writing.

18        m.   For the second transaction, CS-3 sat down in the chair

19 closest to HILLARY BARTH. HILLARY BARTH advised CS-3 that the

20 transaction of three one ounce Suisse bars would total $4,920. TFO-UC

21 retrieved 61 one hundred dollar bills in U.S. Currency ($6,100) of

22 OAF from a black backpack and handed it to CS-3 in plain and direct

23 sight of HILLARY BARTH. At this time, CS-3 asked TFO-UC, "How much is

24 it?" TFO-UC responded, "61," referring to $6,100 in U.S. currency.

25 CS-3 then removed 11 one hundred bills in U.S. currency ($1,100) from

26 the OAF and handed it back to TFO-UC. CS-3 then handed HILLARY BARTH

27 50 one hundred dollar bills, ($5,000) as payment for the three gold

28 bars. HILLARY BARTH placed the U.S. currency in a money counter and

USAO 000095

confirmed the total. HILLARY BARTH then asked CS-3 for a first name

initial and last name for a hand written receipt for the transaction.

CS-3 advised HILLARY BARTH to write, "D.Rossi."  HILLARY BARTH

proceeded to hand write a receipt for the purchase (ORDER # 1002).

HILLARY BARTH did not instruct CS-3 to sign the "received by" section

of the handwritten receipt. CS-3 then handed the receipt to TFO-UC in

direct and plain sight of HILLARY BARTH.

n.   TFO-UC confirmed with HILLARY BARTH that he, alone,

would be picking up the full order of gold the following day, January

30, 2020. HILLARY BARTH confirmed the entire order, nine gold Suisse

bars, would be available for pick up before 12:00 p.m.  The following

day, January 30, 2020, TFO-UC received nine ounces of gold bullion

from HILLARY BARTH at USPV.

87.  On February 5, 2020, TFO-UC returned to USPV and

compensated George VASQUEZ for his assistance in facilitating the

gold deal the previous week.  TFO-UC gave VASQUEZ $1000 cash and

said, "This is for you man.  I appreciate you walking us through that

shit.  It worked out fucking perfect, so uh . . . we'll probably do

it again."  TFO-UC suggested that he might conduct another gold

transaction soon.  VASQUEZ said he would let the BARTHS know ahead of

time.  TFO-UC said, "Just as long as I keep it under—" and VASQUEZ

interjected, "Yeah, yeah.  Keep it under 10.  And if you have to, do

it twice.  Now let's say you need more than 10, but you're by

yourself.  Come in.  Call me and say, "Hey George, I am gonna need

15.  Give me whatever, what else.  Break it in half.  Give me half.

And I'll have her buy it for me, and then I'll give it to you right

there."

USAO 000096

EXHIBIT 2 WARRANT APP.
PAGE 099

**P.   VASQUEZ and STEVE BARTH Arrange to Launder Cash for Wire Transfers for CS-3 for 15%**

90.   In October 2020, CS-3 approached VASQUEZ about conducting a second gold purchase through OLYMPIC GOLD & JEWELRY.  CS-3 stressed to VASQUEZ that while he/she was cool with the earlier transaction, it had "too many moving parts" and he/she was looking for something simpler. CS-3 met VASQUEZ on or about October 8, 2020 to discuss this.  The meeting was recorded and reviewed by investigators, which showed:

   a.   During the meeting CS-3 suggested to VASQUEZ that he/she provide VASQUEZ with the total amount of cash CS-3 wanted to use to purchase gold and VASQUEZ could structure the cash payment (under $10,000) over multiple days, on behalf of CS-3, so that CS-3 did not have to go to USPV multiple times in the same week.  VASQUEZ agreed to this saying, "that's my point, I don't want you to have to go all the time."

   b.   CS-3 then said, "you don't even have to go get it. Just cut me a receipt that I purchased it, and then tax me whatever the fuck it is," i.e. charge a fee for converting the cash into a clean financial transfer.  VASQUEZ replied, "run that by me again. Do you want the gold or not?"  CS-3 indicated that he/she did not want the gold.  "I just want the receipt and then I sell it back to you, and you take your cut however it is."  CS-3 asked if this was possible, and VASQUEZ said, "Maybe."  He later added ". . . maybe, but I'm not sure.  I will have to talk to Steve, Hillary's husband." As noted elsewhere STEVE BARTH and HILLARY BARTH own and run OLYMPIC GOLD & JEWELRY.  CS-3 told VASQUEZ to "find out (from STEVE BARTH) and get back to me."

**USAO 000097**

70

1       c.   CS-3 and VASQUEZ continued discussing the proposed

2  deal and VASQUEZ clarified, "you just want to clean it."  CS-3

3  replied, "that's exactly what it is."  CS-3 added that he/she did not

4  want to continue laundering money through casinos, auctions and car

5  dealerships.  VASQUEZ said, "Let me talk to Steve (BARTH), I don't

6  know, cause Steve is – as much as he can—" CS-3 said, "I get it," and

7  indicated that if they had to do it the way they did last time

8  (referring to the February 2020 transaction) that was fine, but "it's

9  about moving parts."

10      d.   Later in the conversation, VASQUEZ suggested CS-3

11 speak to Steve BARTH.  CS-3 indicated that he/she preferred VASQUEZ

12 to speak to STEVE BARTH on his/her behalf.  Your Affiant believes

13 this indicates that the decision to launder CS-3's money is STEVE

14 BARTH's decision and that VASQUEZ is subordinate to BARTH.

15      e.  VASQUEZ and CS-3 continued to discuss details such as

16 the percentage that CS-3 would be charged, whether CS-3 would receive

17 one check or multiple checks.  VASQUEZ stated that the purchases

18 would have to be "under ten total. . . . I mean no paperwork and all

19 that stuff."  CS-3 confirmed that the transaction would not be

20 reported.  VASQUEZ said, "they have to at least take your first name

21 down."  VASQUEZ added that he would "talk to Steve.  I won't talk to

22 Hillary."  Finally, VASQUEZ concluded, "we can do it.  I think we

23 can.  We do it that way a couple of times and it helps you out.  We

24 all make a little bit."

25      f.   As the meeting was wrapping up, VASQUEZ said, "I will

26 talk to Steve."  CS-3 said, "if you can do me a favor, just try to

27 fucking wash my shit."  VASQUEZ said he would try.

28

USAO 000098

71

91.   On or about November 12, 2020 CS-3 met with VASQUEZ at USPV to confirm the previously-discussed money laundering operation.   The meeting was recorded and reviewed by investigators.   During the meeting, CS-3 indicated that the money would be ready the following week, and they discussed the date and time for the transaction.   They also discussed the percentage which would be charged and VASQUEZ stated he still needed to talk to Steve (BARTH) to finalize that aspect.   As VASQUEZ walked CS-3 to the door, CS-3 told VASQUEZ he/she appreciated the arrangement because he/she just sold a large load of "skante" for some people down south and he/she needed to clean the money as soon as possible.   VASQUEZ told CS-3 not to worry about it and it would be taken care.

92.    On or about November 17, 2020 CS-3 and TFO-UC went to USPV with $25,000 U.S. currency.   They met with VASQUEZ.   The meeting was recorded and reviewed by investigators.   The following took place:

a.   CS-3 asked VASQUEZ what percentage of the $25,000 would OLYMPIC GOLD AND JEWLERY charge, if they laundered all $25,000 at one time. VASQUEZ stated approximately 12 percent. CS-3 and TFO-UC initially balked at such a high percentage being charged. VASQUEZ replied by saying, "Well, first, we are not even supposed to be doing this, right? Second . ."  VASQUEZ then stopped talking and utilized a calculator to determine the amount of money OLYMPIC GOLD AND JEWLERY would charge at a 12 percent rate. VASQUEZ then stated, "it's about three grand. We are going to go with 12 percent at this time, because we are going to have to go buy it (referring to the gold bullion)." VASQUEZ then inquired if CS-3 and TFO-UC were still interested in conducting the laundering of the $25,000.   TFO-UC told VASQUEZ that he still wanted to do the transaction.

USAO 000099

72

**EXHIBIT B**

**125**

EXHIBIT 2 WARRANT APP.
PAGE 102

1        b.   TFO-UC then retrieved the $25,000 from a backpack and

2 handed it to VASQUEZ. VASQUEZ took possession of the U.S. currency

3 and placed it in a money counter on his desk. Upon verifying the

4 amount of $25,000, VASQUEZ remained in possession of the money.

5 VASQUEZ inquired if TFO-UC wanted a receipt for the transaction.

6 TFO-UC said that he did not want any paperwork at all.

7        c.   VASQUEZ then went on to explain based on the daily

8 fluctuation of the price of gold and that they won't know exactly how

9 much the business may earn and / or lose when purchasing and

10 reselling the gold bullion, which is why Steve [BARTH] is charging 12

11 percent for the transaction[36].  VASQUEZ explained that OLYMPIC GOLD

12 AND JEWLERY would utilize the $25,000 to purchase gold bullion, in

13 multiple structured purchases under $10,000 to avoid mandated

14 reporting paperwork.  VASQUEZ stated once the gold bullion is

15 purchased from a third party source, OLYMPIC GOLD AND JEWLERY would

16 then "sell" the gold bullion, and wire the transaction amount to an

17 account belonging to CS-3.  CS-3 and TFO-UC expressed to VASQUEZ they

18 did not want to touch nor see the gold bullion, and were only

19

20 ───────────

21 [36] CS-3's initial understanding of the deal, based on
conversations with VASQUEZ (which were not recorded) was that CS-3
would give the cash to VASQUEZ who would give it to BARTH, who would

22 disguise the placement of the funds into the OLYMPIC GOLD AND JEWLERY
business account as legitimate precious metals sales.  VASQUEZ told

23 CS-3 that STEVE BARTH would structure the funds to avoid reporting
requirements and disguise the transactions on paper as anonymous gold

24 and silver purchases.  VASQUEZ assured CS-3 that no gold would
actually change hands.  VASQUEZ further told CS-3 that once the money

25 had been structured into the OLYMPIC GOLD AND JEWLERY business
account that a wire transfer, or series of wire transfers could be

26 utilized to return the money to CS-3 into a bank account that CS-3
would provide VASQUEZ.  VASQUEZ told CS-3 that the wire transfer

27 would be made to look like a sale of precious metals to OLYMPIC GOLD
AND JEWLERY.  VASQUEZ told CS-3 that the entire circle of

28 transactions would exist on paper only and would be clean and
disguised as normal commerce.

USAO 000100

73

1   interested in a time frame in which they could expect the money to be

2   wired to the account.  VASQUEZ stated he understood and gave an

3   approximate two week time frame for the approximate $22,000 to be

4   wired to the account.  VASQUEZ explained the time frame depended on

5   how much bullion was in stock at OLYMPIC GOLD AND JEWLERY and how

6   much would have to be purchased from the third party source. VASQUEZ

7   further stated he could only conduct one cash purchase of gold

8   bullion under $10,000 a day and that OLYMPIC GOLD AND JEWLERY is only

9   open twice a week.

10          d.   CS-3 then provided VASQUEZ with account information to

11  receive the wire transfer.  VASQUEZ then inquired if TFO-UC wanted

12  the $3,000 charge to come out of the $25,000 that he just handed

13  VASQUEZ, or did he want to pay that separate, so that VASQUEZ knew

14  how to structure the purchases.  CS-3 and TFO-UC advised VASQUEZ to

15  take the 12 percent charge ($3,000) out of the $25,000 that TFO-UC

16  just handed VASQUEZ.  VASQUEZ acknowledged he understood and

17  indicated he would be in contact with CS-3 about updates.

18          e.   As TFO-UC and CS-3 were leaving USPV, CS-3 handed

19  VASQUEZ $500 for facilitating the transaction.   VASQUEZ accepted the

20  money.

21          f.   On or about December 2, 2020 CS-3 went to USPV to ask

22  VASQUEZ when CS-3 would see the money.  This meeting was not

23  recorded, but CS-3 reported it to investigators the same day, and

24  also provided a "screen shot" of a later communication which

25  corroborated his account, discussed below.  During the meeting,

26  VASQUEZ told CS-3 he needed the address on CS-3's bank account

27  because Steve BARTH needed it to complete the wire transfer.  CS-3

28  provided the information to VASQUEZ.  Later that day, CS-3 received a

74

USAO 000101

**EXHIBIT B**

**127**

EXHIBIT 2 WARRANT APP.
PAGE 104

1  text message from VASQUEZ with a picture of a computer screen.  On

2  the screen CS-3 saw a tracking number – 0W0001073359382 and the words

3  "bullion purchase" and "pending."  Agents have preserved and reviewed

4  the photo which VASQUEZ sent.  In the photo, agents observed a

5  reflection of VASQUEZ looking over the shoulder of someone who

6  appears to be STEVE BARTH.

7      g.   VASQUEZ advised that the first wire transfer was for

8  $10,000.  The rest would follow.

9          h.   On December 4, 2020 agents received confirmation that

10  two wires, one for $10,000 and one for $12,000 had been wired into

11  the under-cover bank account which was being utilized for this

12  operation.

13      **Q.   USPV Principals Help Its Customers Evade Law Enforcement**

14      95.   During the period of time in which CW-1 rented safe deposit

15  boxes at USPV (2012-2015), federal agents were investigating CW-1 and

16  contacted MARK PAUL about CW-1's boxes.  According to CW-1, PAUL told

17  CW-1 that he stalled in replying to the FBI and instructed GEORGE

18  VASQUEZ to "slow down in order to alert people."  PAUL specifically

19  told CW-1 to get his/her stuff out of USPV because the FBI had come

20  by.  Furthermore, PAUL told CW-1 to call another USPV customer whom

21  CW-1 had referred, to tell that customer to remove the contents of

22  his boxes quickly before the FBI could execute warrants.

23      96.   On August 9, 2019, USPV manager GEORGE VASQUEZ counseled

24  CS-3 on how to evade law enforcement.  During a recorded conversation

25  between VASQUEZ and CS-3, VASQUEZ said, "Piece of advice for you.

26  You know where you keep that [USPV safety deposit box] key, here?

27  [indicating under his shirt on a chain around his neck] . . . Called,

28  uh, asset forfeiture.  You ever heard about that?"  CS-3 said, "No,

75

**USAO 000102**

1   what?" VASQUEZ explained, "Well. Let's say you get pulled over for a
2   [unintelligible], right? Cop checking you out, things like that.
3   Hey, empty your pockets. They see your key, they know it's a safe
4   deposit box. They don't know where. But then, they escalate it
5   towards – they'll call someone from their department, say hey, you
6   know what, we got this guy for whatever, whatever. . . . And then
7   they start looking in to things. You know, and then they'll say, oh
8   well, we'll confiscate whatever you have, this and that, and then
9   they'll scare you and say hey, you know, you don't tell us where this
10   key belongs to, you know, you're gonna do twenty, fifteen years."
11   Later in the conversation, VASQUEZ added, "It's happened before.
12   Just to let you know. . . . Yeah, just to give you a heads up.
13   That's why we—we make sure we – I take care of our people, man."
14   Based on my training and experience as well as a comprehensive
15   debrief of CS-3, I believe that VASQUEZ was coaching CS-3 on how to
16   evade law enforcement.
17      97. On August 30, 2019, CS-3 spoke to USPV manager GEORGE
18   VASQUEZ. The conversation was recorded and reviewed by
19   investigators. During the conversation VASQUEZ coached CS-3 on how
20   to evade law enforcement. VASQUEZ said, "Like I told you. Be
21   careful when you go out. This is between us. Mike [POLIAK]—you know
22   he—he saw somebody get pulled over." CS-3 asked, "Is it hot here or
23   what? Should I be worried?" VASQUEZ replied, "No, no, no. No it's
24   just the people that do stuff." CS-3 asked, "They get followed in?"
25   VASQUEZ replied, "Yeah! They're fuckin' stupid. You know. Not,
26   not, not the place itself." Later in the conversation, CS-3
27   remarked, "You got to tell everybody to fuckin', shit, fuckin' watch
28   their back." VASQUEZ replied, "I tell everybody . . . I take care of

USAO 000103

76

**EXHIBIT B**

**129**

EXHIBIT 2 WARRANT APP.
PAGE 106

people, man." Later VASQUEZ, discussing a person who was pulled over
and then let go said, "But it's just that I tell them, even though
they let him go, like, why did they pull you over in the first place?
Has to be a reason . . . Cause you did something fuckin' stupid . . .
And one other guy said oh he had tinted windows – too tinted.  One
didn't have a fuckin' front license plate . . . Little shit."  CS-3
agreed, saying, "They'll find something to fuckin' jam you up and
then they find something and from that they run."  VASQUEZ replied,
"That's what I tell them, *perro*!  But what do I know?  Right?"

98.  In July 2019, CS-3 was at USPV.  While there, George
VASQUEZ showed CS-3 the USPV security monitors and pointed out a
number of vehicles which VASQUEZ said he believed belonged to law
enforcement.  VASQUEZ, in fact, identified a number of law
enforcement vehicles which were in the area due to CS-3's presence
there.  VASQUEZ explained to CS-3 that he looks for vehicles parked
in one spot too long; vehicles which park, but no one exits; tinted
windows; and other factors.

99.  On or about October 21, 2020, George VASQUEZ explicitly
warned CS-4 that law enforcement officers were asking about him/her
and that he/she should remove the contents of his/her box.  The
meeting between VASQUEZ and CS-4 was recorded and reviewed by
investigators.

a.  Specifically, on or about October 16, 2020 local law
enforcement officers went to USPV and represented themselves to be
narcotics investigators seeking information about a person they
asserted they had followed to USPV.  The officers presented VASQUEZ
with a photograph of CS-4.  VASUQEZ first indicated that he could not
give information about clients.  As the officers were leaving,

77

USAO 000104

however, VASQUEZ walked them out and stated that he had seen the
person in the photo at USPV.  He added that customers often remove
the contents of their boxes and never return.

     b.   Shortly after the local law enforcement officers left
USPV, VASQUEZ contacted CS-3, who had talked about coming to USPV to
see VASQUEZ that day.  Using coded language and communicating via
text message, VASQUEZ told CS-3 not to come, that the area was "hot"
right now.

     c.   On or about October 19, 2020, CS-4 sent VASQUEZ a text
message indicating that CS-4 intended to pay rent on his/her box that
week.  VASQUEZ replied via text message and told CS-4 to delete all
text communications between them.  This communication has been
reviewed and preserved.

     d.   On October 21, 2020, CS-4 went to USPV to pay
quarterly rent on his/her box.  VASQUEZ spoke to CS-4 in the office[37]
area and coached him/her through a dialogue whereby VASQUEZ said,
"Pay close attention, okay? Pay attention.  It's going to be $5,000."
CS-4 expressed surprise and confusion.  VASQUEZ said, "Yes.  Pay
attention.  You say it's too expensive and you'd rather not do
business with me.  Okay?"  CS-4 was confused by this charade, but
followed VASQUEZ's instructions. When CS-4 asked why, VASQUEZ said,
"I'm doing you a favor, man.  . . .  I'm doing you a favor, dude,
don't say anything. Okay?"  VASQUEZ added, "When you leave here,
delete my number.  I'm doing you a favor, okay?  If you want to go in
the bathroom and leave something for me, that's fine."  CS-4

---

[37]   Conversations between CS-4 and VASQUEZ occurred in Spanish.
Calls were translated into English by Spanish-language translators
working on behalf of the FBI.

78

USAO 000105

1   continued to press for an explanation.  VASQUEZ said, "I'm telling

2   you, the heat is hot.  . . . Things are hot here, I want you to

3   cancel your box.  . . . They're after you, man."  CS-4 asked, "Who?"

4   VASQUEZ replied, "The cops, dude."  CS-4 asked whether he/she could

5   rent a box later.  VASQUEZ said, "Another day, later on.  While

6   things clam down. . . . I'm doing you a favor.  They'll come again.

7   . . . They showed me your photo and everything, so."  CS-4 asked,

8   "And the owners are the ones who made the decision?"  VASQUEZ said,

9   "No, man.  I'm making it, to protect you, man. . . . I'm just telling

10  you because if they come here, they're after you.  Okay? . . .

11  They're going to come.  They already said that when they're after

12  you, they're going to come back."  CS-4 asked again about renting a

13  box later.  VASQUEZ concluded with "I know, dude.  They're looking

14  for you.  I don't know.  The cops are looking for you, for real.  I'm

15  not going to lie to you."  CS-4 agreed and left.  Conversations

16  between VASQUEZ and law enforcement, as well as CS-4 were

17  consensually recorded and reviewed.  Text messages have been reviewed

18  and preserved.

19          e.   On November 12, 2020, VASQUEZ related these events to

20  CS-3, as well[38].  This communication between VASQUEZ and CS-3 was

21  recorded and reviewed by investigators.  During that conversation,

22  VASQUEZ described how the police had come to USPV looking for a USPV

23  customer (CS-4).  VASQUEZ speculated that the police had stopped the

24  customer and found his/her key or followed him/her to USPV.  VASQUEZ

25  assured CS-3 that he/she shouldn't worry about it, as the police had

26  not returned.

27

28  ─────────────────
          [38] CS-3 and CS-4 are completely unknown to each other.

USAO_000106

79

EXHIBIT 2 WARRANT APP.
PAGE 109

100. Based on discussions Michael POLIAK had with CS-1, it appears part of his motivation in buying into USPV was to protect both his own money, and that of his "friends." In a December 2019 meeting which was recorded and reviewed by investigators, POLIAK told CS-1, "the reason why I wanted to buy it [USPV], I got a lot of fucking money now.  Not only – I don't just want to be a customer, I wanted to be the owner . . . cause that way, if anything fucking happens, I know first.  And it's good for all my customers that I know first.  Cause I'm not Mark [PAUL]." CS-1 said, "You see, I mean, you only yourself have what, ten million, eight million?" POLIAK said, "Yeah."  CS-1 continued, "And your friends?"  POLIAK replied, "A lot."  CS-1 said, "Think about that. Your friends.  . . . It's your ass.  It's your friends." CS-1 said, "Worry-wise I don't care, but again, you have to have your eyes in there because you have to monitor their money,  But if you're a client—"  POLIAK added, "But it's also – how many people trust anybody with that kind of money? Anonymously?  **I mean, it's not like we're Chase Bank.  . . . So why do they come?**  Cause of me. They're like, Mike {POLIAK}?  You're there, okay.  I'm good with that." This exchange suggests that POLIAK anticipates being able to warn his "friends" if there is some reason their money is in jeopardy.

101. On or about September 16, 2020, in a conversation which was recorded and reviewed by investigators, Michael POLIAK told CS-1 that he would remove all but $5,000 of the contents of a client's box, for that client, if he became aware of pending legal process. Specifically, POLIAK and CS-1 were talking about having "a guy like me [POLIAK]" watching customers' money. POLIAK indicated that if someone had a problem he would "move it to another box . . . . I

80

**USAO 000107**

**EXHIBIT B**

**133**

EXHIBIT 2 WARRANT APP.
PAGE 110

1   would leave like five grand in the box.  . . .  Five grand.  Take it.

2   See you later. At least they can't say 'Oh, it was empty.'"  POLIAK

3   then told CS-1 about agents from Homeland Security who came to USPV

4   with a subpoena.  POLIAK said the agents showed a picture of the

5   person whose box they were interested in, but POLIAK told them that

6   USPV has no information about who holds which box and the agents

7   needed to bring the person to USPV, physically, to have his eye

8   scanned.

9       **R.   It Would Be Irrational for Non-Criminal Customers to Choose**
            **USPV**

10      102.   As suggested above by USPV owner POLIAK, there is no

11  reason for non-criminal clients to use USPV, whose selling points

12  are: anonymity, instructions on how to structure cash transactions to

13  evade cash reporting requirements, tips on how to avoid asset

14  forfeiture, and ownership and management by drug traffickers.

15  Legitimate customers need not pay to store cash, but can receive

16  interest and insurance by depositing it in a money market or other

17  financial account.  Only those who wish to hide their wealth from the

18  DEA, IRS, or creditors would instead chose to *pay* to store actual

19  cash at a single storefront operation owned by the likes of MARK PAUL

20  and MICHAEL POLIAK who might go bankrupt, close the business for any

21  reason, or steal their valuables and run off.  No organization stands

22  behind the boxes at USPV in the way that Chase Bank, which has a

23  nearly 150-year history and almost 200,000 employees, stands behind

24  its safety deposit boxes, to say nothing of its bank accounts, which

25  are insured by the FDIC.  As stated by USPV owner POLIAK, it is his

26  standing among drug traffickers, as well as USPV's criminal-friendly

27

28

**USAO 000108**

81

**EXHIBIT B**
**134**

EXHIBIT 2 WARRANT APP.
PAGE 111

1   policies, that entice criminals to store their millions in cash, as

2   described earlier in the previous forfeitures section, at USPV.

3   **S.   USPV Falsely Claims It Either Returns the Unclaimed**
      **Contents of Boxes to a Designee, or Escheats it to the**
4     **State.**

5       103. On its company website USPV claims that the contents of

6   unclaimed boxes will be turned over to a designee or to the State of

7   California.  Specifically, under "Frequently Asked Questions – What

8   happens to the contents of my box if I die or become physically or

9   mentally incapacitated?" – USPV states,

10      "You should provide your attorney, beneficiary, or custodian

11      with information about the existence of your box (for an example

12      letter, visit our Customer Resources page). However, knowledge

13      of the existence of your box does not constitute permission to

14      access it. USPV will require a court authorization letter to

15      release the contents of your box to ANYONE other than the

16      renter.

17      "If you choose not to provide this information, USPV will open

18      your box due to nonpayment of rent (after a six month grace

19      period has elapsed). If you have provided contact information

20      within your box (suggested), USPV will attempt to locate you. If

21      no contact information is found, we will store the contents of

22      your box in our private safe for three years. Thereafter, we are

23      required to escheat (forward) the contents to the State of

24      California."

25      104. USPV employee GEORGE VASQUEZ, made similar statements to

26   FBI agents during an interview on or about July 1, 2016.

27   Specifically, VASQUEZ told agents that if a client fails to pay for

28   his/her safety deposit box for three months, USPV will drill out the

82

USAO 000109

**EXHIBIT B**

**135**

EXHIBIT 2 WARRANT APP.
PAGE 112

1 lock and try to contact the client if they find identifying

2 documentation on the box. If not, USPV will keep the contents on hold

3 for three years and then forfeit it to the State of California.

4    105. CW-1 alleged that these assertions by USPV and its

5 principals are false.  CW-1 reported that he/she and another

6 individual rented a USPV box to which CW-1 had both keys. CW-1 also

7 paid all the rent and fees for the box.  Furthermore, CW-1 affixed a

8 sticker onto the box with instructions for CW-1's spouse or father to

9 be contacted in the event that CW-1 failed to pay rent on the box.

10 CW-1 has not paid rent on the box in five years because CW-1 is

11 incarcerated.  Neither CW-1's spouse nor father were ever contacted.

12 The other person whose biometrics were used to rent the box has

13 passed away.  The U.S. government did not seize the contents of the

14 box, and there is no record of the property being forfeited to the

15 State of California (which should not have happened because a

16 designee was identified).  Thus it appears that USPV may have kept

17 the contents of CW-1's box.  Furthermore, statements MARK PAUL made

18 to CW-1 support this, described below.

19    106. PAUL told CW-1 that in the event of non-payment, after

20 allowing a grace period, PAUL would drill open the box, a process he

21 said he would video record.  In the absence of contact instructions,

22 he would place the contents into his own safe deposit box.  CW-1

23 reported that PAUL himself has several USPV boxes.  CW-1 believes

24 that PAUL keeps the contents of these boxes for himself.  CW-1

25 believes that the USPV stated policy concerning unpaid rent is false.

26        1.  USPV Has Never Escheated Property

27    107.  Based on information obtained from the California State

28 Controller's Office – Unclaimed Property division, USPV has never

USAO 000110

**EXHIBIT B**

**136**

EXHIBIT 2 WARRANT APP.
PAGE 113

1  escheated property to the state[39].  USPV has been in business since
2  2012; discounting the six month and three year waiting periods, this
3  means that in approximately five years, no one who failed to identify
4  a contact person has ever 1) abandoned a box; 2) failed to pay rent
5  on a box; 3) been arrested; 4) been deported; 5) died; or 6) become
6  incapacitated.  This seems unlikely, particularly given the types of
7  customers using USPV, as described herein.  A more logical
8  explanation is that PAUL places the contents of abandoned boxes in
9  his own safe deposit box for the three-year waiting period, but never
10 releases them to the state.

11      **T.   NOTIFYING USPV CUSTOMERS HOW TO CLAIM THEIR PROPERTY**

12      108. The search and seizure warrants the government seeks list
13 the nests of safety deposit boxes at USPV among the items to be
14 seized.  These nests of safety deposit boxes are evidence and
15 instrumentalities of USPV's criminality.  The warrants authorize the
16 seizure of the nests of the boxes themselves, not their contents.  By
17 seizing the nests of safety deposit boxes, the government will
18 necessarily end up with custody of what is inside those boxes
19 initially.  Agents will follow their written inventory policies to
20 protect their agencies from claims of theft or damage to the contents
21 of the boxes, and to ensure that no hazardous items are unknowingly
22 stored in a dangerous manner.  Agents will attempt to notify the
23 lawful owners of the property stored in the boxes how to claim their
24 property, such as by posting that information on the internet or at

25

26      [39] I ran a search on the Unclaimed Property Website and spoke
    with a representative from the State Controller's Office, who also
27  ran a search.  Both searches revealed no results.  In other words,
    USPV has never escheated property to the State of California, as it
28  claims.

**USAO 000111**

84

**EXHIBIT B**
**137**

EXHIBIT 2 WARRANT APP.
PAGE 114

USPV itself, or by contacting the owners directly.  In order to

notify the owners directly, agents will, in accordance with their

policies regarding an unknown person's property, look for contact

information or something which identifies the owner.[40]   (USPV

recommends that box renters include their or their designees'

telephone numbers on a note in the box in the event that USPV removes

the contents for nonpayment of rental fees.)

**U.     REQUEST FOR AFTER-HOURS SEARCH WARRANT FOR USPV LOCATION
        ONLY**

109.    I request permission to complete the search and seizure

warrants at the USPV location outside of normal searching hours.

Because that facility is secured and advertises that it is on a time-

lock, agents will not be able to begin executing any warrants there

until after its normal opening time, 10:00am.  Further, because it is

secured, I expect that removing some business equipment, especially

the nests of safety deposit boxes, will be unusually time consuming,

so that agents may not be able to complete their tasks before

10:00pm.  Accordingly, for the USPV location only, I request

permission for agents to continue executing search and seizure

warrants beyond 10:00pm.

**USPV OWNER MARK PAUL LIVES AT PAUL'S RESIDENCE**

110.    ███████████████████████████████████████████

████████████████████████████████    ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[40] The FBI policy regarding taking custody of an unknown person's
property provides, in part, that agents "inspect the property as
necessary to identify the owner and preserve the property for
safekeeping."  The inspection "should extend no further than
necessary to determine ownership."

**USAO 000112**

85



1

2

3

4　．

5　　　**USPV OWNER MICHAEL POLIAK LIVES AT POLIAK'S RESIDENCE**

6　111.

7

8

9

10

11

12

13

14　．

15　　　**USPV MANAGER GEORGE VASQUEZ LIVES AT VASQUEZ'S RESIDENCE**

16　112.

17

18

19

20

21

22

23

24　．

25　　　**HILLARY AND STEVE BARTH LIVE AT THE BARTHS' RESIDENCE**

26　113.

27

28

USAO 000113

**EXHIBIT B**
**139**

EXHIBIT 2 WARRANT APP.
PAGE 116

1 ███████████████████████████████

2 ████████     ████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████

5 ████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████

8 ██████████ .

9 **TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES**

10     114. In my training and experience, persons involved in money

11 laundering, drug trafficking, and structuring must maintain records

12 of their activities just to manage their day-to-day criminal business

13 affairs, and to keep track of their finances.  Commonly they maintain

14 both written and electronic records, usually on computers and smart

15 phones or tablets.  Typically they store these records where they

16 feel is safe and near at hand, most often their residences, places of

17 business, and vehicles.  Persons with illicit wealth often attempt to

18 hide it from the authorities by storing it in the form of cash,

19 precious metals, or digital currencies such as bitcoin.  Persons

20 involved in criminal conspiracies must of necessity maintain the

21 contact information of their co-conspirators in the form of telephone

22 numbers, email addresses, and user names for communication

23 applications, such as Signal, WhatsApp, and Facebook.  Most often

24 they maintain this contact information on their computers or smart

25 phones.

26     **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

27     115. Based on my training, experience, and information from

28 those involved in the forensic examination of digital devices, I know

87

**USAO 000114**

1  that the following electronic evidence, inter alia, is often
2  retrievable from digital devices:

3          a.   Forensic methods may uncover electronic files or
4  remnants of such files months or even years after the files have been
5  downloaded, deleted, or viewed via the Internet.  Normally, when a
6  person deletes a file on a computer, the data contained in the file
7  does not disappear; rather, the data remain on the hard drive until
8  overwritten by new data, which may only occur after a long period of
9  time.  Similarly, files viewed on the Internet are often
10  automatically downloaded into a temporary directory or cache that are
11  only overwritten as they are replaced with more recently downloaded
12  or viewed content and may also be recoverable months or years later.

13          b.   Digital devices often contain electronic evidence
14  related to a crime, the device's user, or the existence of evidence
15  in other locations, such as, how the device has been used, what it
16  has been used for, who has used it, and who has been responsible for
17  creating or maintaining records, documents, programs, applications,
18  and materials on the device.  That evidence is often stored in logs
19  and other artifacts that are not kept in places where the user stores
20  files, and in places where the user may be unaware of them.  For
21  example, recoverable data can include evidence of deleted or edited
22  files; recently used tasks and processes; online nicknames and
23  passwords in the form of configuration data stored by browser, e-
24  mail, and chat programs; attachment of other devices; times the
25  device was in use; and file creation dates and sequence.

26          c.   The absence of data on a digital device may be
27  evidence of how the device was used, what it was used for, and who
28  used it.  For example, showing the absence of certain software on a

88

USAO 000115

**EXHIBIT B**
EXHIBIT 2 WARRANT APP.
PAGE 118

1   device may be necessary to rebut a claim that the device was being

2   controlled remotely by such software.

3          d.   Digital device users can also attempt to conceal data

4   by using encryption, steganography, or by using misleading filenames

5   and extensions.  Digital devices may also contain "booby traps" that

6   destroy or alter data if certain procedures are not scrupulously

7   followed.  Law enforcement continuously develops and acquires new

8   methods of decryption, even for devices or data that cannot currently

9   be decrypted.

10      116. Based on my training, experience, and information from

11   those involved in the forensic examination of digital devices, I know

12   that it is not always possible to search devices for data during a

13   search of the premises for a number of reasons, including the

14   following:

15         a.   Digital data are particularly vulnerable to

16   inadvertent or intentional modification or destruction.  Thus, often

17   a controlled environment with specially trained personnel may be

18   necessary to maintain the integrity of and to conduct a complete and

19   accurate analysis of data on digital devices, which may take

20   substantial time, particularly as to the categories of electronic

21   evidence referenced above.  Also, there are now so many types of

22   digital devices and programs that it is difficult to bring to a

23   search site all of the specialized manuals, equipment, and personnel

24   that may be required.

25         b.   Digital devices capable of storing multiple gigabytes

26   are now commonplace.  As an example of the amount of data this

27   equates to, one gigabyte can store close to 19,000 average file size

28   (300kb) Word documents, or 614 photos with an average size of 1.5MB.

USAO 000116

89

1    117. The search warrant requests authorization to use the

2    biometric unlock features of a device, based on the following, which

3    I know from my training, experience, and review of publicly available

4    materials:

5        a.   Users may enable a biometric unlock function on some

6    digital devices.  To use this function, a user generally displays a

7    physical feature, such as a fingerprint, face, or eye, and the device

8    will automatically unlock if that physical feature matches one the

9    user has stored on the device.  To unlock a device enabled with a

10   fingerprint unlock function, a user places one or more of the user's

11   fingers on a device's fingerprint scanner for approximately one

12   second.  To unlock a device enabled with a facial, retina, or iris

13   recognition function, the user holds the device in front of the

14   user's face with the user's eyes open for approximately one second.

15       b.   In some circumstances, a biometric unlock function

16   will not unlock a device even if enabled, such as when a device has

17   been restarted or inactive, has not been unlocked for a certain

18   period of time (often 48 hours or less), or after a certain number of

19   unsuccessful unlock attempts.  Thus, the opportunity to use a

20   biometric unlock function even on an enabled device may exist for

21   only a short time.  I do not know the passcodes of the devices likely

22   to be found in the search.

23       c.   Thus, the warrants I am applying for would permit law

24   enforcement personnel to, with respect to any device that appears to

25   have a biometric sensor and falls within the scope of the warrant:

26   (1) depress the thumb and/or fingers of MARK PAUL, MICHAEL POLIAK,

27   GEORGE VASQUEZ, and HILLARY and STEVE BARTH on the device(s); and

28   (2) hold the device(s) in front of those persons' faces with their

90

USAO 000117

**EXHIBIT B**
**143**

EXHIBIT 2 WARRANT APP.
PAGE 120

1  eyes open to activate the facial-, iris-, and/or retina-recognition
2  feature.

3      118. Other than what has been described herein, to my knowledge,
4  the United States has not attempted to obtain this data by other
5  means.

6                              **CONCLUSION**

7      119. Based upon the foregoing facts and my training and
8  experience, I believe there is probable cause to believe that
9  evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as
10 listed in Attachment B, will be found at the SUBJECT PREMISES.  I
11 further respectfully submit that there is probable cause to believe
12 that the business computers, money counters, nests of safety deposit
13 boxes and keys, digital and video surveillance and security equipment
14 and biometric scanners located at USPV, 9182 West Olympic Blvd.,
15 Beverly Hills, CA 90212 were used or intended to be used to
16 facilitate violations of 18 U.S.C. § 1956, 21 U.S.C. § 841, and 31
17 U.S.C. § 5324, and conspiracy to commit the same.  As a result, those
18 items are subject to seizure and forfeiture to the United States
19 pursuant to 18 U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C.
20 § 5317(c).

21
22 Attested to by the applicant in accordance
   with the requirements of Fed. R. Crim. P. 4.1
23 by telephone on this __17__ day of March, 2021.

24

25

26 _____

27 STEVE KIM
   UNITED STATES MAGISTRATE JUDGE
28

                              91

USAO 000118

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:_____DM_____DEPUTY

1

2

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10             January 2020 Grand Jury

11 UNITED STATES OF AMERICA,       CR 2:21-cr-00106-MCS

12        Plaintiff,           I N D I C T M E N T

13           v.            [18 U.S.C. § 1956(h): Conspiracy to Launder Money; 21 U.S.C. § 846:

14 U.S. PRIVATE VAULTS, INC.,     Conspiracy to Distribute California Corporate         Controlled Substances; 18 U.S.C.

15 Number C3405297,           371: Conspiracy to Structure Transactions; 18 U.S.C.

16        Defendant.         § 982(a)(1), 21 U.S.C. §§ 853 and 881(a)(6), 28 U.S.C. § 2461(c) and

17                                31 U.S.C. § 5317(c): Criminal Forfeiture]

18

19     The Grand Jury charges:

20                  COUNT ONE

21             [18 U.S.C. § 1956(h)]

22 A.    INTRODUCTORY ALLEGATIONS

23     1.   At times relevant to this Indictment:

24        a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada

25 Corporation registered with the California Secretary of State, was in

26 the business of renting safety deposit boxes to individuals who

27 wished to do so anonymously.

28        b.   Co-conspirator USPV Officer was an officer of USPV and

USAO 000119

1  one of its owners.  USPV Officer dealt in marijuana, in violation of

2  the laws of California, as well as cocaine.

3       c.  Co-conspirator USPV Manager was the manager of USPV.

4  USPV Manager helped USPV Officer arrange drug deals within USPV, and

5  helped USPV customers avoid detection by law enforcement, including

6  by advising them to structure their cash purchases to avoid reporting

7  requirements.

8       d.  Co-conspirator Gold Business was a dealer in precious

9  metals and jewelry, and shared the same space as USPV, as well as

10 some employees.  Gold Business helped USPV customers convert their

11 cash into gold, and structured their cash transactions to avoid

12 federal reporting requirements.

13      e.  Co-conspirator USPV Representative One was a

14 representative of USPV, and an owner of co-conspirator Gold Business.

15 USPV Representative One instructed USPV customers how to structure

16 transactions to avoid federal reporting requirements.

17      f.  Co-conspirator USPV Representative Two was a

18 representative of USPV, and an owner of co-conspirator Gold Business.

19 USPV Representative Two instructed USPV customers how to structure

20 transactions to avoid federal reporting requirements.

21 B.  THE OBJECTS OF THE CONSPIRACY

22      2.  Beginning in or before 2019, and continuing through the

23 date of this Indictment, in Los Angeles County, within the Central

24 District of California, and elsewhere, defendant USPV conspired with

25 others known and unknown to the Grand Jury to launder money, in

26 violation of Title 18, United States Code, Section 1956, namely:

27      a.  to knowingly conduct and attempt to conduct financial

28 transactions involving the proceeds of a specified unlawful activity,

2

**USAO 000120**

**EXHIBIT B**

**146**

EXHIBIT 2 WARRANT APP.
PAGE 123

1    that is, the distribution of controlled substances, with the intent

2    to promote the carrying on of that specified unlawful activity, in

3    violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4         b.   to knowingly conduct and attempt to conduct financial

5    transactions involving the proceeds of specified unlawful activity,

6    that is, the distribution of controlled substances, knowing that the

7    transactions were designed in whole or in part to conceal and

8    disguise the nature, location, source, ownership, and control of the

9    proceeds of specified unlawful activity, in violation of Title 18,

10   United States Code, Section 1956(a)(1)(B)(i); and

11        c.   to knowingly conduct and attempt to conduct financial

12   transactions involving the proceeds of specified unlawful activity,

13   that is, the distribution of controlled substances, knowing that the

14   transactions were designed in whole or in part to avoid a transaction

15   reporting requirement under Federal law, in violation of Title 18,

16   United States Code, Section 1956(a)(1)(B)(ii).

17   C.   MANNER AND MEANS OF THE CONSPIRACY

18        3.   The objects of the conspiracy were carried out and were to

19   be carried out, in substance, as follows:

20        a.   Defendant USPV would adopt business practices that

21   attracted customers in possession of proceeds from criminal offenses,

22   including drug trafficking, and not law-abiding persons.  Such

23   practices included: (1) touting the anonymity of the safety deposit

24   rentals that defendant USPV would provide, including by advertising

25   "we don't even want to know your name"; (2) boasting that, unlike

26   banks, its anonymous safety deposit box rentals did not require

27   customer information that "can be easily accessed by government

28   agencies (such as the IRS)"; (3) making arrangements for the payment

3

USAO 000121

**EXHIBIT B**

**147**

EXHIBIT 2 WARRANT APP.
PAGE 124

1  of the rental fees in cash and other ways that would be untraceable;
2  (4) issuing safety deposit box keys that were unmarked and unnumbered
3  so that law enforcement could not determine that the keys unlocked
4  safety deposit boxes at USPV; and (5) charging safety deposit box
5  rental rates several times higher than those at banks.

6         b.   USPV Officer would capitalize defendant USPV with the
7  proceeds of his illegal drug trafficking.

8         c.   USPV Officer would invite other drug traffickers who
9  knew and trusted him because of his illegal drug trafficking to store
10 the proceeds of their drug trafficking at defendant USPV.

11        d.   Employees of defendant USPV would conduct counter
12 surveillance of the neighborhood and warn customers when they
13 observed law enforcement.

14        e.   Agents of defendant USPV would instruct customers to
15 structure transactions to avoid currency transaction reports
16 including by purchasing gold and other precious metals through Gold
17 Business, which would structure transactions and not file required
18 currency reports.

19        f.   If agents of defendant USPV learned that law
20 enforcement was interested in searching or seizing the contents of a
21 particular customer's safety deposit box, they would attempt to warn
22 the customer, delay law enforcement, or even remove all but a nominal
23 amount of cash from the box for the customer, to prevent law
24 enforcement from discovering and seizing the bulk of the cash.

25        g.   Defendant USPV would deposit the cash proceeds it
26 received from its customers for safety deposit box rentals, which
27 included proceeds from the distribution of controlled substances,
28 into its bank account, and then use those proceeds to maintain USPV's

USAO 000122

1  anonymous storage facilities for its criminal customers.

2          h.   USPV Officer and USPV Manager would negotiate drug

3  deals illegal under California law within the secured space of USPV,

4  and USPV Officer would store the cash proceeds from drug deals within

5  a safety deposit box at USPV.

6          i.   USPV Manager would accept cash purportedly from

7  illegal drug sales, and structure transfers of it to Gold Business in

8  amounts not greater than $10,000 at a time in exchange for wire

9  transfers that purported to be for the sale of precious metals.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**USAO 000123**

5

**EXHIBIT B**
**149**

EXHIBIT 2 WARRANT APP.
PAGE 126

COUNT TWO

[21 U.S.C. § 846]

4.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

5.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.    MANNER AND MEANS OF THE CONSPIRACY

6.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

7.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

6

USAO 000124

**EXHIBIT B**
**150**

EXHIBIT 2 WARRANT APP.
PAGE 127

1    defendant USPV could provide in bulk.

2        Overt Act No. 2:  On July 26, 2019, USPV Officer met

3    Confidential Informant 3 within USPV to sell him 1,000 vape

4    cartridges containing THC.  USPV Officer delivered the cartridges in

5    the parking lot of USPV, and received in exchange $8,000 in cash

6    within USPV's business location.

7        Overt Act No. 3:  On or about December 11, 2019, during

8    discussions for the sale of cocaine, USPV Officer instructed the

9    buyer, Confidential Informant 3, to use a wireless communication

10   application called "Signal," which is encrypted to communicate with

11   him regarding the transaction.

12       Overt Act No. 4:  On or about December 16, 2019, USPV Officer

13   instructed Confidential Informant 3 to come to USPV to complete the

14   exchange.

15       Overt Act No. 5:  On or about December 16, 2019, USPV Manager

16   called Confidential Informant 3 and explained that co-conspirator

17   USPV Officer was not being careful enough, and could bring unwanted

18   law enforcement attention to defendant USPV by conducting this drug

19   deal onsite.

20       Overt Act No. 6:  On or about December 18, 2019, USPV Officer

21   sold an ounce of cocaine to Confidential Informant 3 through

22   intermediaries.

23

24

25

26

27

28

**USAO 000125**

7

**EXHIBIT B**
**151**

EXHIBIT 2 WARRANT APP.
PAGE 128

COUNT THREE

[18 U.S.C. § 371]

8.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

9.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.   MANNER AND MEANS OF THE CONSPIRACY

10.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

11.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

USAO 000126

not limited to the following:

    Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

    Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

    Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

    Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

    Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

**USAO 000127**

9

**EXHIBIT B**
**153**

EXHIBIT 2 WARRANT APP.
PAGE 130

1   $10,000: "Don't come in every day. . . . what they look for is a
2   pattern of someone who with intention is trying to get around . . ."

3       <u>Overt Act No. 6</u>:  On January 29, 2020, when Undercover Officer
4   explained that he needed more than $10,000 worth of gold quickly,
5   USPV Manager suggested that he split the purchase between himself and
6   Confidential Informant 3, so that each purchase would be under
7   $10,000 individually.  USPV Representative One agreed to the ruse "as
8   long as you hand me the money" separately and fill out receipts for
9   two separate transactions.  USPV Representative One also agreed that
10  Undercover Officer could pick up the total gold purchase alone the
11  following day.

12      <u>Overt Act No. 7</u>:  On January 29, 2020, USPV Representative One
13  accepted first $9,900 in cash from Undercover Officer and then
14  another $5,000 which Undercover Officer handed to Confidential
15  Informant 3, who then handed it to USPV Representative One.

16      <u>Overt Act No. 8</u>:  On January 30, 2020, USPV Representative One
17  delivered nine ounces of gold bullion to Undercover Officer.

18      <u>Overt Act No. 9</u>:  On November 17, 2020, USPV Manager accepted
19  $25,000 in cash from Confidential Informant 3, who said it was from
20  the sale of "skante" (methamphetamine), and structured the transfer
21  of it to Gold Business in exchange for wire transfers of $10,000 and
22  $12,000, purportedly from the sale of gold, to launder the cash.

23
24
25
26
27
28

**USAO 000128**

**EXHIBIT B**
**154**

EXHIBIT 2 WARRANT APP.
PAGE 131

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

     a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

     b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

     a.   The business computers;

     b.   The money counters;

     c.   The nests of safety deposit boxes and keys;

     d.   The digital and video surveillance and security equipment; and

     e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

**USAO 000129**

1  defendant USPV shall forfeit substitute property, up to the value of

2  the property described in paragraph 2 above if, as the result of any

3  act or omission of defendant USPV, the property described in

4  paragraph 2 above or any portion thereof (a) cannot be located upon

5  the exercise of due diligence; (b) has been transferred, sold to, or

6  deposited with a third party; (c) has been placed beyond the

7  jurisdiction of the court; (d) has been substantially diminished in

8  value; or (e) has been commingled with other property that cannot be

9  divided without difficulty.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USAO 000130

12

**EXHIBIT B**
**156**

EXHIBIT 2 WARRANT APP.
PAGE 133

1    FORFEITURE ALLEGATION TWO

2    [21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

3    and 21 U.S.C. § 853]

4    1.    Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby

5    given to defendant U.S. PRIVATE VAULTS, INC. that the United States

6    will seek forfeiture as part of any sentence in accordance with Title

7    21, United States Code, Section 881(a)(6), Title 28, United States

8    Code, Section 2461(c), and Title 21, United States Code, Section 853,

9    in the event of defendant USPV's conviction under Count Two of this

10   Indictment.

11   2.    Defendant USPV shall forfeit to the United States the

12   following property:

13        a.    All right, title, and interest in any and all property,

14   real or personal:

15             i.    constituting, or derived from, any proceeds

16   obtained, directly or indirectly, as a result of the offense set

17   forth in Count Two of this Indictment, including, without limitation,

18   the property set forth in paragraph 3 below; or

19             ii.   used, or intended to be used, in any manner or

20   part, to commit, or to facilitate the commission of the offense set

21   forth in Count Two of this Indictment, including, without limitation,

22   the property set forth in paragraph 3 below; and

23        b.    A sum of money equal to the total value of the property

24   described in subparagraph a above.

25   ///

26

27

28

**USAO 000131**

13

**EXHIBIT B**

**157**

EXHIBIT 2 WARRANT APP.
PAGE 134

1      3.   The Grand Jury finds probable cause to believe that the

2   following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST

3   OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on

4   one or more of the grounds set forth in paragraph 2 above:

5         a.   The business computers;

6         b.   The money counters;

7         c.   The nests of safety deposit boxes and keys;

8         d.   The digital and video surveillance and security

9   equipment; and

10         e.   The biometric scanners.

11      4.   Pursuant to Title 21, United States Code, Section 853(p),

12   as incorporated by Title 28, United States Code, Section 2461(c),

13   defendant USPV shall forfeit substitute property, up to the value of

14   the property described in paragraph 2 above if, as the result of any

15   act or omission of defendant USPV, the property described in

16   paragraph 2 above or any portion thereof (a) cannot be located upon

17   the exercise of due diligence; (b) has been transferred, sold to, or

18   deposited with a third party; (c) has been placed beyond the

19   jurisdiction of the court; (d) has been substantially diminished in

20   value; or (e) has been commingled with other property that cannot be

21   divided without difficulty.

22

23

24

25

26

27

28

USAO 000132

14

**EXHIBIT B**

**158**

EXHIBIT 2 WARRANT APP.
PAGE 135

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

     a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

     b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

     a.   The business computers;

     b.   The money counters;

     c.   The nests of safety deposit boxes and keys;

     d.   The digital and video surveillance and security equipment; and

     e.   The biometric scanners

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

USAO 000133

**EXHIBIT B**
**159**

EXHIBIT 2 WARRANT APP.
PAGE 136

1   5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),

2   defendant USPV shall forfeit substitute property, up to the value of

3   the property described in paragraph 2 above if, as the result of any

4   act or omission of defendant USPV, the property described in

5   paragraph 2 above or any portion thereof (a) cannot be located upon

6   the exercise of due diligence; (b) has been transferred, sold to, or

7   deposited with a third party; (c) has been placed beyond the

8   jurisdiction of the court; (d) has been substantially diminished in

9   value; or (e) has been commingled with other property that cannot be

10  divided without difficulty.

11                          A TRUE BILL

12                          _/S/_____

13                          Foreperson

14  TRACY L. WILKISON
    Acting United States Attorney

15

16

17  BRANDON D. FOX
    Assistant United States Attorney
18  Chief, Criminal Division

19  RANEE A. KATZENSTEIN
    Assistant United States Attorney
20  Chief, Major Frauds Section

21  ANDREW BROWN
    Assistant United States Attorney
22  Major Frauds Section

23

24

25

26

27

28
                                              **USAO 000134**
                          16

**EXHIBIT B**
**160**

EXHIBIT 2 WARRANT APP.
PAGE 137

# EXHIBIT 3

UNITED STATES DISTRICT COURT           JS-6

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | *Louis Loe v. United States of America, et al.* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Jennifer Graciano | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

**Proceedings:**      **(IN CHAMBERS) Order Re: Defendants' Motions to Dismiss [DEs 56, 57, and 63]**

## I.  INTRODUCTION

On August 24, 2021, an individual proceeding under the fictitious name Louis Loe ("Plaintiff")[1] filed a Second Amended Complaint ("SAC") against: (1) the United States of America; (2) Tracy L. Wilkison in her official capacity as Acting United States Attorney for the Central District of California; and (3) Kristi Koons Johnson ("Johnson"), individually and in her official capacity as the Assistant Director in Charge ("ADIC") of the Los Angeles Field Office of the FBI (collectively, "the Government"). Plaintiff also sued several Special Agents in their individual capacity: (1) FBI Special Agents Justin Palmerton, Kathryn E. Baily Dress, and Lynne E. Zellhart; (2) Federal Law Enforcement Agent Dezmond Beverly; and (3) FBI Supervisory Special Agent Jessie Murray (collectively, the "Special Agent Defendants," and together with the Government and Johnson, "Defendants"). Plaintiff's claims arise from the Government's allegedly unlawful seizure and search of Plaintiff's personal property which was located in safe deposit box number 2300 on the premises of non-party United States Private Vaults.

Presently before the Court are three motions: (1) the Government's Motion to Dismiss ("Government Motion"); (2) Defendant Johnson's Motion to Dismiss ("Johnson Motion"); and (3) the Special Agent Defendants' Motion to Dismiss ("Special Agent Motion"). (ECF Nos. 56, 57, and 63.). For the reasons that follow, the Court **GRANTS** Defendants' Motions.

---

[1] Plaintiff filed this lawsuit under a fictitious name, and makes no representations about Plaintiff's gender, to protect herself or himself from the risk of criminal prosecution, harassment, retaliation, and embarrassment. (SAC ¶ 1 n. 1, ECF No. 53.)

EXHIBIT 3 L. LOE ORDER
PAGE 138

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|----------|------------------------|------|------------------|
| Title | *Louis Loe v. United States of America, et al.* | | |

## II.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts are alleged in the SAC:

Non-party United States Private Vaults ("USPV") offers its customers a unique service. The company, located at a strip mall in Beverly Hills, California, rents safe deposit boxes. But USPV's offerings, designed to provide customers with increased privacy and security, differ from those available at a typical bank in several material ways. First, USPV does not keep keys to its customers' boxes. Customers maintain all keys to their boxes and can access the vault containing their boxes only through a biometric data reader. Second, USPV offers 24/7 monitoring by the ADT security company. Finally, USPV offers insurance for each safe deposit box, which banks do not offer.

USPV has several hundred safe deposit boxes which it rents to hundreds of different customers. Plaintiff rented box number 2300, where Plaintiff kept property—namely, currency.

USPV's business model attracted the Government's attention. A grand jury indicted USPV for conspiring with its customers to launder money, distribute drugs, and structure financial transactions to avoid currency reporting requirements. (Gov't Mot. at 2, ECF No. 56.) From March 22 through March 26, 2021, federal law enforcement agents acting at the direction of the United States Attorney's Office ("USAO") for the Central District of California conducted a search of USPV and seized every safe deposit box contained in the facility, including box number 2300. Plaintiff alleges that the affidavit used to obtain the search and seizure warrant was obtained via false and misleading statements by Special Agent Zellhart.

On March 23, 2021, Plaintiff's counsel visited USPV and attempted to ascertain whether there was a warrant authorizing the search and seizure operation for Plaintiff's boxes and, if so, to request a copy of it. The Assistant U.S. Attorney in charge of the investigation refused to provide a copy unless counsel disclosed Plaintiff's name, which was at the time unknown to USPV and the Government.

Plaintiff alleges, based on communications with the Assistant U.S. Attorney, that the Government always intended to refuse to return the property of any USPV box holder who refused to waive his or her Fifth Amendment right against self-incrimination. Specifically, Plaintiff alleges that the Government intended to subject every box holder that came forward to claim his or her property to a criminal investigation. Only if Plaintiff (and other box owners) could convince the USAO that they legally obtained their property would the Government return it to them. Thus, for Plaintiff to vindicate his or her Fourth Amendment right to be free from unreasonable searches and seizures, Plaintiff would have to forego his or her Fifth Amendment right against self-incrimination.

EXHIBIT 3 L. LOE ORDER
PAGE 139

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | *Louis Loe v. United States of America, et al.* | | |

Since March 26, 2021, USPV's Beverly Hills storefront has been closed. Affixed to the door is a sign that bears the seal of the FBI and states: "Please go to the following link to initiate a claim for your US Private Vaults box: **forms.fbi.gov/uspvclaims**[.]" (SAC ¶ 50, ECF No. 53.) The website, in turn, states: "To make a claim for property stored at U.S. Private Vaults in Beverly Hills, California, please provide the following information. An FBI agent will contact you for additional details." Below this statement is a form that requires a claimant to provide his or her first name, middle name, last name, and "best contact number." (*Id.* ¶ 51.)

Around May 20, 2021, the FBI began administrative forfeiture proceedings against the boxes it had seized, requiring that claimants file a claim by June 24.  Plaintiff filed a Declaration and Claim with the FBI on June 16, 2021. On June 22, 2021, in a related case, this Court found that the FBI's administrative forfeiture notices were unconstitutional due to the FBI's failure to disclose: (1) the factual basis for seizing the individual boxes; and (2) the specific statutory provision alleged against box holders. *See Snitko v. United States, et al.*, 2:21-cv-04405-RGK-MAR, 2021 WL 3139707 (C.D.Cal. June 22, 2021). After the Court's order, Plaintiff sent a "Demand for Immediate Return of Property," to which the Government has not responded.

To date, Plaintiff's property remains in the Government's possession. The currency that was located in Plaintiff's box is the subject of a judicial forfeiture proceeding currently pending before this Court.  *See United States v. $250,000 in U.S. Currency*, 2:21-cv-07188-RGK-MAR.

## III.   JUDICIAL STANDARD

### A.    12(b)(1): Dismissal for Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and are "presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Reservation,* 873 F.2d 1221, 1225 (9th Cir. 1989). A party may move to dismiss a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When subject matter jurisdiction is challenged under Federal Rule of Civil Procedure ("Rule") 12(b)(1), the plaintiff has the burden of establishing jurisdiction. *Kingman Reef Atoll Invs., L.L.C. v. United States,* 541 F.3d 1189, 1197 (9th Cir. 2008).

### B.    12(b)(6): Dismissal for Failure to State a Claim Upon Which Relief Can be Granted

Under Rule 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570

EXHIBIT 3 L. LOE ORDER
PAGE 140

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | *Louis Loe v. United States of America, et al.* | | |

(2007)). A claim is plausible if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable. *Iqbal*, 556 U.S. at 678. A plaintiff need not provide detailed factual allegations, but must provide more than mere legal conclusions. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When ruling on a Rule 12(b)(6) motion, the Court must accept well-pled factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *See Autotel v. Nev. Bell. Tel. Co.*, 697 F.3d 846, 850 (9th Cir. 2012). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

## IV.   DISCUSSION

Plaintiff's SAC alleges the following claims: (1) return of property pursuant to Federal Rule of Criminal Procedure ("Criminal Rule") 41(g); (2) damages under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); (3) a declaratory judgment that all Defendants violated Plaintiff's Fourth and Fifth Amendment rights; and (4) an injunction requiring that the Government Defendants provide an inventory of Plaintiff's seized property. Plaintiff does not oppose dismissal of his fourth claim.

In their Motions, Defendants present various arguments for dismissal of the SAC. The Government Defendants argue that the Court should dismiss Plaintiff's first and third claims for lack of subject matter jurisdiction or, alternatively, because the Court should exercise its discretion to abstain from hearing them. Johnson (in her individual capacity) and the Special Agent Defendants argue that the Court should dismiss Plaintiff's second claim because Plaintiff presents a new *Bivens* context, and the Court should not create a claim for the new context. The Court addresses each of Plaintiff's claims in turn.

### A.   Claim 1: Return of Property

Plaintiff seeks a return of his seized property pursuant to Criminal Rule 41(g). Motions for return of property, as well as complaints seeking return of property under Criminal Rule 41(g), are generally "used to seek the return of seized property after an indictment has been issued." *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993). But district courts have the power to entertain, in civil cases, "motions to return property seized by the government when there are no criminal proceedings pending against the movant." *Id.* A court's power to adjudicate such demands for relief is equitable in nature and must therefore be exercised with "caution and restraint." *Id.*

EXHIBIT 3 L. LOE ORDER
PAGE 141

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | *Louis Loe v. United States of America, et al.* | | |

 

Courts consider four factors in deciding whether to exercise equitable jurisdiction under Criminal Rule 41(g): whether "(1) the Government displayed a callous disregard for the constitutional rights of the movant; (2) the movant has an individual interest in and need for the property he wants returned; (3) the movant would be irreparably injured by denying return of the property; and (4) the movant has an adequate remedy at law for the redress of his grievance." *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (quoting *Ramsden*, 2 F.3d at 324–25). A pending judicial forfeiture proceeding provides the movant with an adequate remedy at law, and therefore weighs heavily against an exercise of equitable jurisdiction. *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1235 (9th Cir. 1988).

As a threshold matter, the fourth factor clearly cuts against exercise of jurisdiction here. The only relief Plaintiff seeks with this claim is equitable relief ordering the Government to return his property, and Plaintiff may obtain this relief in the judicial forfeiture proceeding pending before this Court. Courts tend to find the existence of a concurrent judicial forfeiture dispositive when determining whether to exercise equitable power over requests for return of property, because the forfeiture action functions as an adequate remedy at law. *See, e.g.*, *In re Return of Seized Property, Specifically All Funds Seized from BoundlessRise, LLC Wells Fargo Bank Account Number 'XXXX*, SACV 17-00771-CJC(JCGx), 2017 WL 4180149, at *1 (C.D. Cal. Aug. 30, 2017) ("A civil forfeiture proceeding gives the claimant 'an adequate remedy at law, *precluding* exercise of the district court's equitable powers.'") (emphasis added) (quoting *United States v. Clagett*, 3 F.3d 1355, 1356 (9th Cir. 1993)).

Even if the existence of an adequate remedy is not dispositive, the remaining *Kama* factors disfavor an exercise of jurisdiction here. Plaintiff has failed to establish the third factor—irreparable injury. He states only that he is suffering ongoing harm because he is "deprived of any use, benefit, enjoyment, or access" to his property and he "has no means to recover" it. (SAC ¶ 97.) These allegations do not demonstrate a specific, immediate need for the property at issue. *Cf. Snitko*, 2021 WL 3139706, at *5 (entering preliminary injunction in favor of Rule 41(g) movant in related case where movant established a likelihood of irreparable harm because he "need[ed] the [seized] money to pay for medical care and food"). Absent an immediate, exigent need for the property, Plaintiff's harm is remediable in the forfeiture proceeding. In a similar vein, the second factor—whether the movant has an individual interest in and need for the property—is neutral at best. Plaintiff may indeed have an interest in his property if it was legally obtained, but has no such interest if the currency is contraband. Finally, the Court declines to consider the first factor—whether the Government displayed a callous disregard for the constitutional rights of the movant—given that two of the *Kama* factors favor dismissal, one is neutral, and many courts consider a concurrent judicial forfeiture proceeding dispositive to the analysis. As discussed in Section IV.C, below, Plaintiff's constitutional arguments may be raised in the forfeiture proceeding.

EXHIBIT 3 L. LOE ORDER
PAGE 142

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | **_Louis Loe v. United States of America, et al._** | | |

Accordingly, the Court declines to exercise its equitable jurisdiction and **DISMISSES** Plaintiff's first claim.

**B.    Claim 2: Damages Pursuant to _Bivens_**

With his second claim, Plaintiff requests, pursuant to _Bivens_, money damages against Johnson in her individual capacity and the Special Agent Defendants. Defendants argue that both alleged constitutional violations present new _Bivens_ contexts, and there are reasons for the Court to hesitate before expanding the scope of _Bivens_. The Court agrees.

Federal law did not historically provide a cause of action for damages to those whose constitutional rights are violated by federal officials. _See Ziglar v. Abbasi_, 137 S. Ct. 1843, 1854 (2017). With _Bivens_, however, the Supreme Court implied one, "even absent statutory authorization." _Id._ In _Bivens_, Federal Bureau of Narcotics agents violated the 4th Amendment when they arrested the plaintiff without a warrant, handcuffed him in front of his family, threatened to arrest his family, searched his apartment, and subjected him to a visual strip search. _See Bivens_, 403 U.S. at 389. Aside from _Bivens_, the Supreme Court has only recognized an implied cause of action for money damages against federal officers on two occasions: (1) a due process violation under the Fifth Amendment based on workplace discrimination, _Davis v. Passman_, 442 U.S. 228, 248–49 (1979); and (2) a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause based on failure to provide medical care to an inmate, _Carlson v. Green_, 446 U.S. 14, 17–19 (1980).[2] Since 1980, the Court has recognized no new _Bivens_ claims, chiefly due to separation-of-powers concerns; "[i]n most instances . . . the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." _Abbasi_, 137 S. Ct. at 1857.

In 2018, the Court made clear that judicial creation of new _Bivens_ claims is a "disfavored judicial activity," and introduced a demanding two-step inquiry that courts must undertake before doing so. _Abbasi_, 137 S. Ct. at 1856–57. First, a court must determine "whether the plaintiff is seeking a _Bivens_ remedy in a new context." _Lanuza v. Love_, 899 F.3d 1019, 1023 (9th Cir. 2018). If so, then the court must ask whether "special factors counsel hesitation," such that a new _Bivens_ remedy should not be

---

[2] Plaintiff argues that the Supreme Court recognized a _Bivens_ cause of action in _Groh v. Ramirez_, 540 U.S. 551 (2004). As other courts have recognized, the _Groh_ Court was "not called on to decide . . . that the plaintiffs should be able to proceed with [their] claim," and therefore "seemed only to assume" that the claim was proper. _Annappareddy v. Pascale_, 996 F.3d 120, 136 n.9 (4th Cir. 2021). This explains why the Supreme Court did not include _Groh_ in its list of recognized _Bivens_ claims. _See Abbasi_, 137 S. Ct. 1843 at 1857 ("[T]he Court has refused to [extend _Bivens_] for the past 30 years.").

EXHIBIT 3 L. LOE ORDER
PAGE 143

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|----------|------------------------|------|-------------------|

| Title | *Louis Loe v. United States of America, et al.* |
|-------|--------------------------------------------------|

implied. *Id.* Here, for the reasons explained below, the Court finds that Plaintiff's claims would extend *Bivens* to a new context and that special factors counsel against such an extension.

### 1.     New Context

*Bivens* claims are typically limited to the circumstances of *Bivens*, *Carlson*, and *Davis*, and a case presents a "new context" if it differs "in a meaningful way" from that "*Bivens* trilogy." *Abbasi*, 137 S. Ct. at 1859. Virtually any other claim is a "new context" because "even a modest extension" of the original three *Bivens* cases "is still an extension." *Id.* at 1864; *see also Ahmed v. Weyker*, 984 F.3d 564, 570 (8th Cir. 2020) ("If the test sounds strict, it is."). The Supreme Court has listed several non-exclusive factors that indicate a case might meaningfully differ from *Bivens*. Those factors include the "rank of the officers involved," the "constitutional right at issue," and the "generality or specificity of the official action." *Abbasi*, 137 S. Ct. at 1859–60. After *Abbasi*, courts have also considered the type of injury suffered, along with "the mechanism of injury [] and the kinds of proof those injuries would require." *Farah v. Weyker*, 926 F.3d 492, 500 (8th Cir. 2020).

Plaintiff alleges violations of his Fourth and Fifth Amendment rights. The Court determines whether each presents a "new context" in turn.

### a.     Fourth Amendment

Plaintiff alleges that Defendants violated his Fourth Amendment rights when they searched his USPV box without probable case and pursuant to an invalid warrant, when Agent Zellhart misled the magistrate judge in order to obtain the warrant, and because the purported inventory search was done improperly and not pursuant to any "standardized agency policies and procedures." (SAC ¶¶ 117–124.) Using the "meaningful difference" factors laid out above, the Court determines that Plaintiff's allegations present a new *Bivens* context.[3]

**First**: Plaintiff's claim against ADIC Johnson differs from *Bivens* because Johnson's rank differs from the officers in *Bivens*. The plaintiff in *Bivens* brought an action against line-level federal agents who were present for and directly carried out the alleged constitutional violation. *Bivens*, 403 U.S. at 389. Plaintiff here does not allege that ADIC Johnson was present at the search of his box. Rather, he

---

[3] Because *Davis and Carlson* involved claims brought under different constitutional amendments, the Court compares Plaintiff's Fourth Amendment claim to the only member of the "*Bivens* trilogy" that could possibly be analogous: *Bivens* itself, which involved Fourth Amendment search and seizure violations. *Bivens*, 403 U.S. at 389.

EXHIBIT 3 L. LOE ORDER
PAGE 144

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | ***Louis Loe v. United States of America, et al.*** | | |

alleges that due to her rank and the extensive nature of the operation, she must have either had "knowing participation in, and/or approval or ratification of the operational plan." (SAC ¶ 21.) Johnson's supervisory rank and attenuated involvement in the alleged violations indicate a new context.

**Second**: The alleged malfeasance of the Defendants and the mechanism of Plaintiff's injury differ from *Bivens*. *Bivens* involved federal agents operating without a warrant, who handcuffed and strip-searched the plaintiff while they searched his apartment. *Bivens*, 403 U.S. at 389–90. The agents' actions resulted in plaintiff's "humiliation, embarrassment, and mental suffering." *Id.* Defendants here did no such thing, and Plaintiff does not seem to have suffered injuries similar to *Bivens*. First and foremost, Defendants obtained a warrant prior to seizing the USPV boxes. Plaintiff alleges that Zellhart made misrepresentations to the magistrate to obtain the warrant, while the other Special Agent Defendants searched Plaintiff's box under the pretext of an inventory search. While the Ninth Circuit has yet to address facts such as these head-on, other courts have found that the existence of a warrant along with allegations that one or more defendants knowingly misled the magistrate are meaningfully different situations than *Bivens* and its straightforward warrantless search. *See, e.g.*, *Annappareddy*, 996 F.3d at 135–36 (finding new context and emphasizing that a search pursuant to a warrant presented different legal questions than the warrantless search in *Bivens*); *Ahmed*, 984 F.3d at 568 (finding new context where defendants did not themselves enter plaintiffs' home, but provided allegedly false information resulting in their arrest). Plaintiff also does not allege that he suffered emotional injuries to the extent of the *Bivens* plaintiff, further widening the gap between the two cases.

**Third:** Because the mechanism of Plaintiff's injury differs from *Bivens*, the type of evidence necessary to prove Plaintiff's case does as well. Because Plaintiff alleges that the federal agents obtained their warrant improperly, the Court would need to delve "into evidence before numerous decisionmakers," including the agents themselves and the magistrate judge. *Farah*, 926 F.3d at 499. *Bivens* required only an inquiry into the actions of arresting officers, rather than the "fact-checking and conscience-probing" required to establish that Defendants knowingly or recklessly made false statements on the warrant affidavit. *Ahmed*, 984 F.3d at 569. Such an inquiry poses a great "risk of intruding on the investigatory and prosecutorial functions of the executive branch." *Annappareddy*, 996 F.3d at 136.

Plaintiff argues that, because the Ninth Circuit has found a *Bivens* remedy proper in other Fourth Amendment contexts, this Court should follow suit. Plaintiff's argument impermissibly generalizes the *Bivens* analysis. *See Cantu v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) ("Courts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable searches-and-seizures clause.'"); *see also Quintero-Perez v. United States*, 8 F.4th 1095, 1104 (9th Cir. 2021) (finding new context for Fourth Amendment claim despite "similarities between this case and *Bivens*"). The post-*Abbasi* cases that the Ninth Circuit found analogous to *Bivens* are distinguishable

EXHIBIT 3 L. LOE ORDER
PAGE 145

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|----------|------------------------|------|------------------|
| Title | *Louis Loe v. United States of America, et al.* | | |

from the present case, insofar as they involved a search or seizure of the plaintiff's person in addition to a search of his property. *See Ioane*, 939 F.3d at 952 (finding no new context where, as in *Bivens*, plaintiff claimed "that a federal agent conducted a warrantless search of her person"); *Brunoehler v. Tarwater*, 743 Fed. App'x 740, 743 (9th Cir. 2018) (finding no new context where plaintiff alleged that agents "arrested him in his home without probable cause").

Taking all of the above in its totality, the Court concludes that Plaintiff's Fourth Amendment claims present a meaningful difference from the claims in *Bivens*, and thus present a new context for the doctrine.

          *b.*    *Fifth Amendment*

Plaintiff alleges that Defendants violated his Fifth Amendment right against self-incrimination and right to due process by providing improper notice of the administrative forfeiture proceedings and by requiring claimants to identify themselves before they could claim their property. The only Fifth Amendment *Bivens* remedy implied by the Supreme Court involved a due process claim relating to federal workplace gender discrimination. *Davis*, 442 U.S. at 247–48. While Plaintiff's Fourth Amendment claims were superficially similar enough to *Bivens* to require a detailed analysis, the Court need not embark on such a journey here. Plaintiff's claims, brought against federal agents (not a workplace supervisor) and relating to an allegedly improper forfeiture proceeding (not gender discrimination) would unquestionably extend *Bivens* and *Davis* "to [a] new context [and a] new category of defendants." *Abbasi*, 137 S. Ct. at 1857.

          *c.*    *Conclusion*

For the foregoing reasons, Plaintiff's Fourth and Fifth Amendment claims present an extension of *Bivens* into a new context. Having established as much, the Court must now determine whether "special factors" exist here that "counsel hesitation" in creating a new *Bivens* claim.

        *2.*    <u>*Reasons for Hesitation*</u>

The focus of the "special factors" inquiry is "whether the judiciary is well-suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857–58. The threshold for whether a factor "counsels hesitation" is "remarkably low." *Canada v. United States*, 950 F.3d 299, 309 (5th Cir. 2020). Courts have considered many special factors, including: (1) the existence of an alternative remedial structure; (2) the level of intrusion into the functions of the executive branch required; and (3) whether a plaintiff is seeking to improperly challenge policy via its damages action. *See Abbasi*, 137 S. Ct. at 1861–63. The Court considers each in turn.

EXHIBIT 3 L. LOE ORDER
PAGE 146

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | *Louis Loe v. United States of America, et al.* | | |

 

 

a.    *Alternative Remedial Structure*

If there is an "alternative remedial structure present . . . that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1858. An alternative remedial structure may "take many forms, including administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018).

The heart of Plaintiff's claims is that his property has been improperly taken and withheld from him. Congress has provided a remedy for such an injury, via the Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983. The circuit courts that have addressed the issue have found that CAFRA provides the exclusive remedy for plaintiffs with claims related to forfeiture proceedings. *See Francis v. Milligan*, 530 F. App'x 138, 138 (3d Cir. 2015) ("CAFRA provides a remedy for the very claim [plaintiff] sought to bring under *Bivens*, and it provides the exclusive remedy for such a claim."); *Rankin v. United States*, 556 F. App'x 305, 311 (5th Cir. 2014) (holding similarly). District courts within the Ninth Circuit are in accord. *See, e.g.*, *Williams v. O'Donnell*, 3:19-CV-00418-BR, 2020 WL 6686416, at *6 (D. Or. Nov. 12, 2020). By creating an "exclusive remedy" for forfeiture claims, 18 U.S.C. § 983(e), Congress has indicated its intent to not create a money damages remedy for improper forfeitures. This alone likely "limit[s] the power" of the Court "to infer a new *Bivens* cause of action." *Abbassi*, 137 S. Ct. at 1858.[4]

b.    *Interference with Functions of the Executive Branch*

Another factor that courts consider is whether a damages action "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Abbasi*, 137 S. Ct. at 1861. When a claim alleges that officers obtained a warrant pursuant to a false affidavit, the plaintiff must adduce evidence that would "invite a wide-ranging inquiry into the evidence available to investigators." *Farah*, 926 F.3d at 500. "Burdensome discovery" into "complicated investigations" typically counsels against creating a new *Bivens* action. *Cantu*, 933 F.3d at 424.

---

[4] Plaintiff argues that CAFRA does not serve to "fully compensate" him here, since money damages are not the same as a return of property. (Pl.'s Opp. to Johnson Mot. at 19.) However, a remedial structure may be adequate even if it does not include money damages, since "[t]he absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages." *Schweiker v. Chilicky*, 487 U.S. 412, 421–22 (1988). "Less than complete relief is not a Congressional failure to provide meaningful safeguards and remedies." *Canada*, 950 F.3d at 310.

EXHIBIT 3 L. LOE ORDER
PAGE 147

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | *Louis Loe v. United States of America, et al.* | | |

As laid out in the "new context" discussion above, Plaintiff is seeking to prove that Zellhart knowingly made material misstatements to obtain the search warrant and that Johnson was involved in "the operational plan for the seizure of the USPV safe deposit boxes . . . despite the complete absence of probable cause to do so." (SAC ¶ 21.) To do so, Plaintiff would need to adduce evidence as to "what [these Defendants] knew, what [they] did not know, and [their] state of mind." *Ahmed*, 984 F.3d at 570. As the Eighth Circuit notes, there are "'substantial costs' associated with requiring public officials to litigate these types of issues, including 'the diversion' of public resources and deterring 'able citizens from . . . public office.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)). Because Congress is the entity that should be weighing whether a damages action is worth these costs, this factor also counsels against extending *Bivens*.

> *c.* Bivens *Action as a Vehicle for Challenging Policy*

A *Bivens* action is not "a proper vehicle for altering an entity's policy." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Such a "legal inquiry into the formulation and implementation of policy would impose too high a burden on officials' ability to effectively discharge their duties." *Quintero-Perez*, 8 F.4th at 1106. Plaintiff argues that he does not "challenge any general policies of the FBI," but the SAC indicates otherwise: "Plaintiff has no means to recover possession of [his] property because the government *has no established and standardized policies, procedures, or processes* for promptly returning Plaintiff's property to him." (SAC ¶ 97) (emphasis added.) At the very least, this allegation implicitly challenges the FBI's policy, or lack thereof, regarding return of property after an inventory search. Accordingly, yet another factor weighs against extending *Bivens* to Plaintiff's claims.

> *d.* Conclusion

Because the above factors counsel hesitation against extending *Bivens* to Plaintiff's claims, the Court declines to do so. Therefore, because Plaintiff has no cause of action under *Bivens*, the Court **DISMISSES** his second claim against all individual Defendants.

### C. <u>Claim 3: Declaratory Relief</u>

Plaintiff's remaining claim is for declaratory relief, asking the Court to declare that Defendants violated his Fourth and Fifth Amendment rights. Defendants argue, *inter alia*, that the Court should abstain from adjudicating Plaintiff's declaratory relief claim for prudential reasons. The Court agrees with Defendants.

The Declaratory Judgment Act authorizes courts to declare a party's rights, but does not mandate that they do so. *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942). When faced with a request

| |

EXHIBIT 3 L. LOE ORDER
PAGE 148

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:21-cv-03348-RGK-MAR | Date | December 7, 2021 |
|---|---|---|---|
| Title | **_Louis Loe v. United States of America, et al._** | | |

for a declaratory judgment, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of _practicality and wise judicial administration_." _Wilton v. Seven Falls Co._, 515 U.S. 277, 288 (1995) (emphasis added). When deciding whether to adjudicate a declaratory judgment claim, courts consider: (1) whether the relief would "serve a useful purpose in clarifying and settling the legal relations in issue"; and (2) whether relief would "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." _Eureka Fed. Sav. and Loan Ass'n v. Am. Cas. Co. of Reading, Pa_, 873 F.2d 229, 231 (9th Cir. 1989). When asked to adjudicate constitutional issues via declaratory relief, courts must be particularly cautious, and should not "decide any constitutional question in advance of the necessity for its decision." _Alabama State Fed'n of Labor v. McAdory_, 325 U.S. 450, 461 (1945); _see also Fletes-Mora v. Brownell_, 231 F.2d 579, 581 (9th Cir. 1955) ("The adjudication of alleged constitutional rights in a declaratory judgment action is not to be encouraged.").

The Court need not adjudicate Plaintiff's declaratory relief claim here. The Government has filed a judicial forfeiture action against the property contained within Plaintiff's box. That action is currently pending before this Court. Plaintiff may raise his argument that his constitutional rights were violated in that proceeding. _See United States v. $186,416.00 in U.S. Currency_, 590 F.3d 942, 948–50. If the Court were to find in Plaintiff's favor, it would necessarily issue an order stating that the Government had violated Plaintiff's constitutional rights. Given that this Court will adjudicate the very same issues in the forfeiture action, the Court finds that "considerations of practicality and wise judicial administration" counsel abstention, particularly because no coercive claim remains. _Wilton_, 515 U.S. at 288.

Accordingly, the Court **DISMISSES** Plaintiff's third claim.

## V.     __CONCLUSION__

For the foregoing reasons, the Court **GRANTS** the Defendants' Motions.

**IT IS SO ORDERED.**

EXHIBIT 3 L. LOE ORDER
PAGE 149